UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
JOSEPH WASHINGTON, ST. CLAIR BLACKETT,
LUCILLE MASON, AND MELISSA TROTMAN
on behalf of themselves and all others
similarly situated,

                               Plaintiffs,

                      -against-

UNITED STATES DEPARTMENT OF HOUSING
AND URBAN DEVELOPMENT (HUD),
JULIÁN CASTRO IN HIS OFFICIAL
CAPACITY AS SECRETARY OF HUD,
EDWARD GOLDING IN HIS OFFICIAL
CAPACITY AS COMMISSIONER OF THE
FEDERAL HOUSING ADMINISTRATION,
CALIBER HOME LOANS, INC., AND U.S BANK
TRUST, N.A., AS TRUSTEE FOR LSF9
MASTER PARTICIPATION TRUST,

                           Defendants.
--------------------------------------------------------------------X

No. 16-cv-03948 (CBA) (SMG)

**FIRST AMENDED
CLASS ACTION
COMPLAINT**

**JURY TRIAL
DEMANDED**

      Plaintiffs bring this First Amended Class Action Complaint against the Defendants United States Department of Housing and Urban Development ("HUD"), Julián Castro in his official capacity as Secretary of HUD, Edward Golding in his official capacity as Commissioner of the Federal Housing Administration ("FHA") (collectively the "Federal Defendants"), Caliber Home Loans, Inc. ("Caliber"), and U.S. Bank Trust, N.A., as Trustee for LSF9 Master Participation Trust ("U.S. Bank Trust") (collectively the "Lone Star Defendants") on behalf of themselves and all other similarly situated African Americans in New York City (the "Class").

1

## PRELIMINARY STATEMENT

1.     This class action seeks to vindicate the rights of thousands of African-American homeowners in New York City who are at risk of losing their homes without due process, in violation of fair housing laws and in contravention of Congress's mandate for the Department of Housing and Urban Development ("HUD") to expand housing opportunities to all Americans. As HUD shores up its funding sources on the backs of African-American homeowners by auctioning off mortgages out of the protections of its Federal Housing Administration's ("FHA") mortgage program, middle-class African-American communities throughout New York City are being destroyed.

2.     In its annual report to Congress, HUD touts the fact that its mortgage product—the FHA-insured mortgage—is an important source of home financing for African-American families. HUD, through FHA, does not make mortgages but rather insures them. In other words, to increase homeownership among low- and moderate-income Americans, FHA insures the loans made by private, FHA-approved, mortgage companies to borrowers with lower credit scores and who have less than twenty percent for a down payment. As part of these insurance contracts with the private mortgage lenders, FHA will pay the full amount of the unpaid principal balance of the mortgage if the lender must foreclose.

3.     As HUD has recognized in discussing the importance of its FHA-insured mortgage, homeownership is the pathway to a stable middle-class life. In fact, Congress has specifically mandated that HUD achieve the goal of ". . . a decent home and a suitable living environment for every American family. . ." Congress further requires that HUD achieve this objective in a manner that affirmatively furthers fair housing.

2

4.      To achieve these congressionally mandated goals, HUD, through its FHA mortgage program, offers a panoply of benefits to ensure that these low- and moderate-income homeowners are able to maintain homeownership and reap the benefits of owning property. Homeowners with an FHA mortgage are entitled to benefits that do not exist in loans accessible on the private mortgage market. In addition to providing FHA mortgages to homeowners with lower credit scores and lower down payment requirements, HUD has designed its FHA mortgage program to also provide early and ongoing intervention when struggling homeowners fall behind on payments, a generous mortgage modification program, the ability to easily refinance into a lower interest rate mortgage, and the right to sell the property along with the FHA mortgage to another FHA-eligible homeowner (together "the FHA Mortgage Program").

5.      While generous, these benefits come at a cost. Homeowners pay to be a part of HUD's FHA Mortgage Program, first through an upfront mortgage insurance premium financed at the closing of the FHA mortgage and then every month, as a monthly mortgage insurance payment. Though expensive, access to the FHA Mortgage Program benefits is a lifeline to long-term homeownership and financial stability for many African-American homeowners in New York City.

6.      But in 2010, HUD created its Note Sale Program, whereby HUD pools delinquent FHA mortgages and auctions them to the highest bidder, usually private equity firms or hedge funds, and without notice to the homeowners. The homeowners are thus removed from the FHA Mortgage Program. As a consequence, benefits to which homeowners are entitled and for which they have been paying—often for years—are lost, without notice, consent or an opportunity to be heard. By unilaterally removing the homeowners from the FHA Mortgage Program, HUD puts homeowners' property interests in jeopardy.

3

7.      After the sale of the mortgages to private equity firms, including the Lone Star Defendants, HUD requires these purchasers to offer only one benefit similar to those offered through the FHA Mortgage Program: sustainable mortgage modifications that will preserve homeownership.

8.      However, the Lone Star Defendants have failed to abide by HUD's post-auction requirements. Instead, using fraudulent and deceptive statements, the Lone Star Defendants push homeowners into predatory modifications that will inevitably lead to default.

9.      In New York City, African-American homeowners are disproportionately affected by HUD's Note Sale Program and the Lone Star Defendants' subsequent predatory mortgage servicing. As the foreclosure crisis subsides in other communities, the stability of African-American middle-class neighborhoods is threatened as a result of HUD's wholesale removal of homeowners from the FHA Mortgage Program without due process and in complete contravention of its mandate to preserve homeownership in these neighborhoods.

10.     Federal Defendants' discriminatory actions violate the Due Process Clause, the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("the Fair Housing Act"), and are a breach of implied contract. Lone Star Defendants' fraudulent and discriminatory actions violate the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA"), the New York unfair and deceptive practices statute (General Business Law § 349), the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, and the Real Estate Settlement and Procedures Act, 12 U.S.C. § 2601 *et seq.* ("RESPA")

11.     Plaintiffs seek to stop these unseemly and discriminatory practices that adversely impact African Americans and destabilize African-American neighborhoods in New York City. Plaintiffs are entitled to a declaration that HUD has violated their due process rights and has

4

implemented the Note Sale Program in violation of its congressional mandate to expand housing opportunities in a manner consistent with fair housing laws. Plaintiffs are entitled to a declaration that Lone Star Defendants have fraudulently, deceptively and in violation of their responsibilities under federal law, offered predatory mortgage modification products to African-American homeowners in New York City. Plaintiffs are also entitled to declaratory relief, damages, attorneys' fees and injunctive relief, including disgorgement.

## JURISDICTION AND VENUE

12.     This Court has original subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 3613(a)(1)(A), 15 U.S.C. § 1692k(d), and 12 U.S.C. § 2614.

13.     This Court has jurisdiction over Plaintiffs' breach of implied contract claims against the Federal Defendants under 28 U.S.C. § 1346(a)(2) as no individual Plaintiff's claim exceeds $10,000.

14.     Claims against the Federal Defendants for review under the Administrative Procedure Act are authorized by 5 U.S.C. § 703 *et seq*.

15.     This Court has supplemental jurisdiction over Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367.

16.     Venue is proper under 28 U.S.C. § 1391(b).

## PARTIES

*Plaintiffs*

17.     Plaintiff Joseph Washington is a 53-year-old African-American homeowner who owns the home located at 118-04 203rd Street, Saint Albans, Queens, New York, 11412.

Plaintiff Washington lives there with his fiancé, her two daughters and her grandchild. Plaintiff

Washington is a "consumer" as that term is defined in 15 U.S.C. § 1692a(3).

18.     Plaintiff St. Clair Blackett is a 52-year-old African-American homeowner who

owns the home located at 138-12 232nd Street, Laurelton, Queens, New York, 11413. Plaintiff

Blackett lives in the home with his wife, adult daughter and 14-year old son. Plaintiff Blackett is

a "consumer" as that term is defined in 15 U.S.C. § 1692a(3).

19.     Plaintiff Lucille Mason is a 73-year-old African-American homeowner who owns

the home located at 9413 Avenue A, Brooklyn, New York, 11236. Plaintiff Mason lives in her

home with her two adult sons. Plaintiff Mason is a "consumer" as that term is defined in 15

U.S.C. § 1692a(3).

20.     Plaintiff Melissa Trotman is a 53-year-old African-American homeowner who

owns the home located at 203-14 116th Avenue, St. Albans, Queens, New York, 11412. Plaintiff

Trotman lives in her home with her husband and her two adult sons.

*Defendants*

21.     Defendant United States Department of Housing and Urban Development

("HUD") is the federal agency responsible for administering the Federal Housing Administration

("FHA") Mortgage Program and the Note Sale Program.

22.     Defendant Julián Castro is the Secretary of HUD, and is responsible for the

administration of all HUD programs, including the FHA Mortgage Program and the Note Sale

Program. Mr. Castro is sued in his official capacity only.

23.     Defendant Edward Golding is Principal Deputy Assistant Secretary, Office of

Housing and the Commissioner of the FHA. He has direct responsibility for oversight and

administration of the FHA Mortgage Program and the Note Sale Program. Mr. Golding is sued in his official capacity only.

24.     Defendant HUD, Defendant Castro and Defendant Golding shall be referred to collectively as the "Federal Defendants."

25.     Defendant Caliber Home Loans, Inc. ("Caliber") is a corporation incorporated under the laws of the State of Delaware with its principal place of business at 3701 Regent Blvd., Irving, Texas 75063. Caliber is a subsidiary of the private equity firm Lone Star Funds. In addition to originating mortgages, Caliber is a mortgage servicing company.

26.     Defendant U.S. Bank Trust, as trustee for LSF9 Master Participation Trust ("U.S. Bank Trust"), is a trust with an address of 2711 North Haskell Avenue, Suite 1700, Dallas, Texas, 75204.

27.     Defendant Caliber and U.S. Bank Trust shall be referred to collectively as the "Lone Star Defendants."

## FACTUAL ALLEGATIONS

### The Mechanics of the FHA Mortgage Program

28.     In 1934, Congress enacted the National Housing Act ("NHA"), which created the Federal Housing Administration ("FHA"). The goal of the FHA is to increase homeownership in the United States. In 1965, FHA became a part of HUD's Office of Housing.

29.     In 1949, Congress specifically tasked HUD with administering its programs in such a way that would fulfill the national housing goal of providing "a decent home and a suitable living environment for every American family, thus contributing to the development and redevelopment of communities and to the advancement of the growth, wealth, and security of the Nation." 42 U.S.C. § 1441; 12 U.S.C. § 1701t.

30.     Thus, HUD has described the mission of the FHA as:

provid[ing] financing to homebuyers who, compared to those served by the conventional market, have lower wealth and pose moderately higher risks but are still credit worthy. For this reason, FHA-insured mortgages have been the product of choice, and sometimes necessity, for low income Americans, offering a pathway to the middle class and a chance to build wealth that can be passed down through generations.

U.S. Dep't of Housing and Urban Dev. Fed. Housing Admin., *Annual Report to Congress: The Financial Status of the FHA Mutual Mortgage Insurance Fund*, Fiscal Year 2015, p. 14 (Nov. 16, 2015).

31.     FHA does not make mortgages, but rather insures lenders against losses on the mortgages. In other words, to increase homeownership among low-income Americans, HUD insures loans made to borrowers by FHA-approved mortgage companies. These borrowers often have lower credit scores, are permitted to tender a down payment as low as 3.5%, and are allowed to borrow money from family members to use for the down payment.

32.     As part of the FHA insurance contract between HUD and these mortgage lenders, if a homeowner defaults on his or her mortgage and the loan owner must foreclose on the property, HUD will pay to the loan owner the full amount of the unpaid principal balance of the mortgage loan, plus some amount of delinquent interest.

33.     In order to make these insurance payments in the event of a homeowner's default, Congress created the Mutual Mortgage Insurance Fund ("the Insurance Fund"), administered by FHA, and funded through the collection of insurance premiums and fees.

34.     It is the homebuyers, all of whom choose to take out an FHA mortgage, who ultimately fund the Insurance Fund, in two forms. The first is through the "Up-Front Mortgage Insurance Premium" ("UFMIP") paid at the loan closing. This UFMIP is in addition to other closing costs and is a percentage of the loan amount. HUD changes the UFMIP periodically.

Between July 14, 2008 and April 4, 2010, the UFMIP was approximately 1.75% of the loan balance at closing. On April 5, 2010, the UFMIP was increased to 2.25% of the amount of the loan, but in October 2010 it was lowered to 1.00%. Today, the UFMIP is 1.75% of the loan amount.

35.     The second way homeowners pay money to the Insurance Fund is through the "Annual Mortgage Insurance Premium" ("MIP"). This annual MIP is spread across a 12-month period and is included on the homeowner's monthly mortgage statement. Unlike mortgage insurance in the private market, which generally expires once the unpaid principal balance of the loan is 80% of the value of the property, FHA MIP is not as simple. As of 2013, if the homebuyer contributes less than 10% of the purchase price as a down payment, the annual MIP continues for the entire 30-year life of the loan. When a homebuyer contributes 10% or more to the down payment, the annual MIP is assessed for only 11 years.

36.     The vast majority of FHA homebuyers contribute less than 10% of the purchase price as a down payment. As a result, as of 2013, the vast majority of FHA homeowners pay the annual MIP for the life of the mortgage.[1]

37.     Similar to the UFMIP, HUD periodically changes the annual MIP. Between July 14, 2008 and October 3, 2010, the annual MIP was between 0.50% and 0.55%, depending on the current loan-to-value ("LTV") ratio. If the loan amount was less than or equal to 95% of the value of the property, then the annual MIP was only 0.50%. Today, the current annual MIP is 0.80% where LTV is less than or equal to 95% or 0.85% where LTV is greater than 95%.

38.     The mortgage contract between the homeowner and the FHA-approved lender specifically references the annual MIP. HUD issues a standard FHA form mortgage contract that

---

[1]For FHA mortgages issued prior to 2013, homeowners paid the annual MIP until the loan-to-value ratio reached 78%.

all FHA mortgage lenders use. Paragraph 3 of FHA's form mortgage contract requires the loan owner to apply payment to MIP first from the homeowner's monthly payment on the account.

39.     Since its founding in 1934, FHA has insured mortgages on over 34 million properties and is currently the largest insurer of mortgages in the world.

**The Benefits of the FHA Mortgage Program**

40.     In New York City, because of high housing prices, the cost of an FHA mortgage can be significant. A homeowner who obtained a $350,000 FHA mortgage in early 2010 (the approximate average amount of a mortgage in southeast Queens), would have paid an extra $6,125 for the UFMIP at closing. In the first year of the mortgage, the homeowner would have paid $160.41 per month for the annual MIP.

41.     Although these costs are significant, the homeowner benefits by participating in the FHA Mortgage Program. These benefits can be broken down into five categories: (1) pre-purchase benefits; (2) pre-foreclosure assistance benefits; (3) loss mitigation options; (4) streamline refinance benefit; and (5) assumability of the FHA mortgage loan.

42.     These benefits enable HUD to further the national housing goal of "a decent home and a suitable living environment for every American family," which Congress specifically mandated HUD to fulfill. *See* 42 U.S.C. § 1441; 12 U.S.C. § 1701t.

*Pre-Purchase Benefits*

43.     The FHA Mortgage Program enables borrowers with credit scores as low as 580 to obtain an affordable loan: a 30-year, fully amortizing mortgage with an interest rate at market, fixed for the life of the loan. This type of mortgage is considered a responsible lending product.

44.     An additional pre-purchase benefit of an FHA mortgage is that the down payment can be as low as 3.5% of the purchase price and monetary gifts from family or friends can be used as part or all of that down payment.

*Pre-Foreclosure Assistance Benefits*

45.     Congress recognized that FHA homeowners—who typically have lower incomes, less savings and are subject to more frequent bouts of unemployment—were more likely to experience financial hardships that could cause them to fall behind on their mortgage payments than other homeowners. As a result, the National Housing Act requires HUD to establish a program that requires mortgage servicers to provide alternatives to foreclosure. *See* 12 U.S.C. § 1715u ("[up]on default or imminent default . . . of any mortgage insured under this subchapter, mortgagees shall engage in loss mitigation actions for the purpose of providing an alternative to foreclosure. . . .").

46.     To fulfill the requirement to avoid foreclosure, HUD has designed and implemented a pre-foreclosure assistance system for FHA homeowners. Central to that pre-foreclosure assistance system is early outreach by the mortgage servicer to FHA homeowners soon after they fall behind on payments in order to minimize the number of FHA foreclosures.

47.     HUD has issued regulations, handbooks, and other guidance that encapsulate its pre-foreclosure assistance system. Sections 600 to 604 of the Code of Federal Regulations and Chapter III.A.2.h of the FHA Single Family Housing Policy Handbook 4000.1 ("the FHA Handbook") describe the precise pre-foreclosure steps that every FHA mortgage servicer, the HUD-approved entity that accepts and processes the homeowner's payments on behalf of the lender, must follow before resorting to foreclosure. *See* 24 C.F.R. § 203.606.

48.     Under the FHA program, a homeowner is not considered late until the 15th day after the payment is due. On the 17th day after the payment due date—two days after the mortgage payment is officially declared delinquent—HUD requires the mortgage servicer to attempt telephonic contact to ascertain why the homeowner fell behind and to inform the homeowner about the FHA Mortgage Program's various loss mitigation options.

49.     By the 20th day after the payment due date, the mortgage servicer must attempt contact by mail or email.

50.     By the 32nd day after the first missed payment, but no later than the 45th day after the payment due date, HUD requires the mortgage servicer to send a notice that informs the homeowner of the availability of free, HUD-approved housing counseling agencies and how to find a local housing counseling agency, along with HUD's phone number. If the homeowner has previously designated that he or she speaks another language, the notice must be in that language.

51.     Also by the 32nd day after the first missed payment, but no later than the 60th day, the mortgage servicer must mail the homeowner a letter that states the amount of the past-due payments, the original due dates of the missed payments and an invitation to participate in loss mitigation. With this letter, the mortgage servicer must include the HUD-created pamphlet "Save Your Home – Tips to Avoid Foreclosure."

52.     By the 61st day after the first late payment, the mortgage servicer must have attempted a face-to-face meeting with the homeowner to discuss loss-mitigation options. The only exception to this requirement is if there is no branch office of the mortgage servicer within 200 miles of the home.

53.     Within three months after the first missed payment, the mortgage servicer must evaluate the homeowner's situation to identify FHA loss-mitigation options. In an effort to save the home, it must then continue this loss mitigation review on a monthly basis.

54.     The mortgage servicer is prevented from moving forward with foreclosure until three, full monthly payments are due and unpaid.

55.     Recognizing the importance of these pre-foreclosure assistance benefits to the homeowner, HUD has enshrined these benefits in its form FHA note and mortgage contract that all FHA mortgage lenders must use. Paragraph 6(b) of the FHA form note and Paragraph 9(d) of the FHA form mortgage require mortgage servicers to comply with these pre-foreclosure assistance benefits before accelerating the mortgage debt and beginning foreclosure proceedings.[2] For each of the named Plaintiffs, these provisions are a part of his or her FHA note and mortgage.

56.     HUD can impose monetary penalties against FHA mortgage servicers who fail to follow HUD's pre-foreclosure assistance requirements.

57.     The pre-foreclosure assistance benefits of the FHA Mortgage Program are in stark contrast to the private mortgage market. For mortgages not insured by FHA, contact with the delinquent homeowner is minimal and must occur within 36 days of default. For non-FHA mortgages, there is no requirement to make face-to-face contact with the homeowner, and there is no requirement that pertinent information be communicated in the language designated by each borrower.

---

[2] In or around June 2015, HUD unilaterally removed this language from the form note and mortgage without notice and comment, in violation of the Administrative Procedures Act.

*Loss Mitigation Options*

58.     Loss mitigation is a process where the mortgage servicer evaluates a delinquent homeowner for options that would avoid a foreclosure auction.

59.     The most common loss mitigation option is a mortgage modification. With a mortgage modification, the mortgage servicer rewrites some of the loan terms in a way that produces payments that are affordable to the homeowner. This can include lowering the interest rate, extending the term, forbearing a portion of the unpaid principal balance so that it comes due at the end of the mortgage, or a combination of these options.

60.     Before and during the foreclosure process, HUD requires its mortgage servicers to consider homeowners for various loss mitigation options, including a special forbearance, a repayment plan, a standard modification, and a modification known as "FHA-HAMP," which is HUD's version of the federal Home Affordable Modification Program ("HAMP"). These requirements are found in the HUD Handbook. *See e.g.,* FHA Single Family Housing Policy Handbook ("HUD Handbook"), v. 4000.1 (Issued March 14, 2016), *available at* http://www.allregs.com/tpl/public/fha_freesite.aspx.

61.     Although HUD has long offered loss mitigation to its FHA homeowners, in 2009, with the onset of the foreclosure crisis, it expanded its program, most notably by creating FHA-HAMP. In 2012, after a critical report by the Government Accountability Office regarding HUD's modification options, HUD overhauled its modification program to make it more effective. With these changes, there was a significant increase in the number of homeowners able to save their homes with an FHA-HAMP modification.

62.     Under the loss mitigation options, the FHA Mortgage Program first provides for a special forbearance—where payments are reduced or suspended for a period of up to six

14

months—to homeowners who are facing a short-term hardship. This reduction in monthly payments enables the homeowner to focus on the short-term hardship or to sell the home. For homeowners who are able to get back on their feet, the special forbearance is followed by a repayment plan of the arrears that accumulated during the forbearance. As a modification usually alters the mortgage term and interest rate, a forbearance plan followed by a repayment plan is particularly beneficial to homeowners who have fallen behind on their mortgage later in the life of the mortgage or who have a mortgage with a low interest rate.

63.     For homeowners with a long-term hardship, FHA offers two types of modifications: a standard modification and an FHA-HAMP modification. A standard modification lowers the interest to the current market rate and always extends the term of the mortgage to 30 years from the modification date.

64.     Under an FHA-HAMP modification, the homeowner's monthly mortgage payment can be reduced to as low as 25% of the homeowner's gross monthly income. This target payment is lower than what Fannie Mae, Freddie Mac and non-government-sponsored entities ("non-GSE") offer, which is usually 31% of the homeowner's gross monthly income.

65.     Further, under FHA-HAMP, the mortgage servicer is required to lower the interest rate to the current market rate and to extend the term of the mortgage to 30 years. But unlike the FHA standard modification, FHA-HAMP permits the mortgage servicer to seek a "partial claim" of some of the arrears of the principal balance. By submitting a "partial claim" to HUD, the mortgage servicer requests that HUD pay as much as 30% of the unpaid principal balance to the mortgage servicer so that it can achieve an affordable, modified monthly payment. However, this amount is not forgiven. Instead, this partial claim becomes a second mortgage that

15

the homeowner owes HUD and which is due at the end of the life of the modified mortgage. This partial claim mortgage is non-interest bearing.

66.     During the life of the loan, HUD places no limitation on the number of times the mortgage may be modified as long as the homeowner has not received a modification within the previous 24 months and has not exhausted the full amount of his or her allotted partial claim. This is in contrast to Fannie Mae and Freddie Mac, which limit homeowners to three modifications over the life of the loan, and in contrast to non-GSEs, which limits homeowners to one HAMP Tier 1 modification over the life of the loan.

67.     The non-GSE HAMP program is set to expire on December 31, 2016. Fannie Mae and Freddie Mac, two government-sponsored mortgage agencies, will also terminate their HAMP programs on December 31, 2016. However, HUD has stated that FHA-HAMP is a permanent addition to HUD's loss mitigation program.

68.     Additionally, under the FHA Handbook, mortgage servicers must regularly evaluate homeowners for a possible modification or other home-preserving opportunity during the time they are in default. In the private market, that review is only required if the homeowner submits all the documents necessary to complete a modification application.

69.     Similar to the pre-foreclosure assistance benefits, if mortgage servicers fail to follow HUD's loss mitigation program, HUD may seek monetary penalties.

70.     Further, Paragraph 6(b) of the FHA form note and Paragraph 9(d) of the FHA form mortgage contract also require that the mortgage servicer consider each FHA homeowner for loss mitigation prior to the mortgage servicer initiating foreclosure.

*Streamline Refinance Benefit*

71.     For FHA homeowners who have been current on their mortgage for at least 12 months, the FHA Mortgage Program includes a "Streamline Refinance." A Streamline Refinance is particularly beneficial in an environment of decreasing interest rates or a decrease in the annual MIP.

72.     A Streamline Refinance requires minimal documentation. There is no need for an appraisal or a review of the loan-to-value ratio. As a result, even homeowners who are "underwater"—where the mortgage debt is greater than the value of the home—are able to refinance and take advantage of the lower interest rate or the lower annual MIP. Aside from temporary Fannie Mae and Freddie Mac refinance programs, both of which will expire on December 31, 2016, underwater homeowners cannot refinance.

73.     For certain Streamline Refinances, FHA does not require lenders to certify income or employment or perform a credit check. As a result, closing costs of a Streamline Refinance are usually lower than what would be paid if the homeowner refinanced in the private market.

74.     In order for a homeowner to qualify for a Streamline Refinance, the Streamline Refinance must provide some tangible benefit to the homeowner. A five-percent reduction in the monthly principal, interest and MIP payment is considered a tangible benefit.

75.     Finally, a Streamline Refinance is a "no cash" refinance. In other words, the homeowner is not allowed to take more than a nominal $500 in cash out of the refinance.

76.     In 2013, FHA interest rates hit a record low of approximately 3.5%, and 511,843 FHA homeowners took advantage of the Streamline Refinance benefit. In 2012, when interest rates were approximately 4%, 274,061 FHA homeowners sought a Streamline Refinance.

17

*Assumability of the FHA Mortgage Loan*

77.     Unlike the private market, all FHA mortgages can be sold with the home, pending the mortgage company's determination that the buyer meets FHA's minimum creditworthiness standards. In other words, an FHA mortgage is "assumable" by the next buyer so long as he or she meets FHA's minimum credit score requirement.

78.     This ability to assume the mortgage loan is not just found in the Code of Federal Regulations. HUD has also enshrined the homeowner's right to sell the property, encumbered by the FHA mortgage, into the FHA form mortgage contract itself. Paragraph 9 delineates the precise circumstances in which the mortgage servicer can seek full repayment of the loan, or "accelerate" the loan. Unlike in the vast majority of mortgages, there is no traditional "due on sale" clause in an FHA loan, which allows the mortgage servicer to accelerate the loan when the homeowner sells or transfers his or her interest in the property. Instead, Paragraph 9(b) only permits acceleration when the transfer in ownership is to someone who does not occupy the property or the new owner-occupant did not have his or her credit score approved by HUD.

79.     As a result of this assumability benefit, property encumbered by an FHA mortgage can be easier to sell in a housing environment where mortgage interest rates are rising or are likely to rise. A seller may also command a premium from a purchaser to buy a home with a below-market interest rate loan.

80.     The ability to sell the property more quickly, and potentially earn a premium, can enable delinquent FHA homeowners to avoid foreclosure.

**Current Racial Composition of the FHA Mortgage Program and Continuing Adverse Effects of FHA's Longstanding Historical Racial Discrimination**

81.     Currently in New York City, African-American households comprise only 18% of homeowners of one-to-four family, owner-occupied units even though 22% of New York City

households are African-American. Comparatively, white homeowner households comprise 53% of all owners of one-to-four family, owner-occupied units while constituting 32% of New York City households.

82.     These African-American homeowners disproportionately have FHA loans when compared to white owners of one-to-four family, owner-occupied units in New York City. For example, in 2014, even though FHA mortgages only made up 24% of the market for new home purchases, 43% of all mortgages made to African-American homeowners were FHA mortgages. In contrast, approximately 21% of all mortgages during 2014 made to white homeowners were FHA mortgages.

83.     Between 2007 and 2014, FHA insured 38,047 mortgages for one-to-four family, owner-occupied homes in New York City. Only 27% of these FHA mortgages, or 10,350, were made to white homeowners while 36%, or 13,665 were made to African-American households even though African-American households comprised only 22% of New York City residents.

84.     As a result, in part, of the disproportionate participation in the FHA Mortgage Program by African Americans in New York City, changes to the FHA Mortgage Program that reduce the Program's benefits and protections adversely impact black homeowners more than they do white homeowners.  Even in light of this fact, HUD's Note Sale Program has a disparate and adverse impact on predominately African-American neighborhoods in New York City in excess of African-American homeowners' participation in the FHA Mortgage Program.

85.     These discriminatory effects should come as no surprise to the Federal Defendants given the high level of residential segregation in New York City and FHA's longstanding racially exclusionary and discriminatory past policies and practices, which denied homeownership opportunities to African-American households for decades and created and

19

maintained racially segregated neighborhoods. Perversely, now that these institutional barriers, designed and implemented by FHA, have been removed and African Americans are able to obtain FHA mortgages, the Federal Defendants, through their Note Sale Program, are stripping African-American families of the benefits and protections of the FHA Mortgage Program. And by designing pools that include a disproportionate number of homes located in predominantly African-American neighborhoods, the Federal Defendants are destabilizing the very neighborhoods in which FHA initially refused to provide home mortgages because of the racial composition of its residents.

86.     In the decades after its creation in 1934, FHA fostered residential segregation, simultaneously promoting homeownership among white Americans in predominantly white areas while refusing to provide FHA financing to black buyers of a similar socioeconomic status. *See* Thomas Sugrue, *The Origins of the Urban Crisis: Race and Inequality in Postwar Detroit* 44 (Princeton Univ. Press 2d ed. 2005).

87.     Official FHA policy promoted these discriminatory practices. In its underwriting manuals, FHA encouraged the use of racially restrictive covenants, believing such restrictions protected the "character" of a neighborhood and supported higher home values. Sugrue, *supra*, at 182. Out of this professed concern with actuarial soundness, FHA insisted that loans be restricted to racially homogenous neighborhoods. *Id.* at 62, 182.

88.     These FHA-encouraged covenants proliferated. A 1948 survey found that 85.1 percent of new, large subdivisions in three New York counties—Westchester, Nassau and Queens—contained restrictive covenants. Martha Biondi, *To Stand and Fight: The Struggle for Civil Rights in Postwar New York City* 114 (Harvard Univ. Press 2d ed. 2006).

89.    Once formally confined to live in racially segregated neighborhoods by FHA's policies, a practice known as "redlining" further prevented African-American households from obtaining FHA home loans even in predominantly black neighborhoods. In conjunction with real estate brokers and lenders, the Federal Home Loan Bank Board drew up Residential Security Maps and Surveys, which professed to capture credit risk, but were in fact based on a property's location and the racial composition of the area. Sugrue, *supra*, at 43-44. These maps ranked sections from A (green) to D (red) on a variety of factors, including building conditions and surrounding infrastructure. *Id*. But the paramount consideration was racial uniformity and the absence of "a lower grade population." *Id*. The presence of even a small population of African Americans was sufficient to earn a D rating. *Id*. Buyers trying to purchase homes located in areas rated D—those within the red line—were unlikely to qualify for loans, and developers rarely secured financing to build in these neighborhoods. *Id*. FHA declined loans to buyers in racially mixed or non-white neighborhoods, while at the same time refusing to approve loans for African Americans seeking to purchase homes outside of these neighborhoods. Biondi, *supra*, at 114.

90.    Though the Supreme Court struck down racial restrictions in *Shelly v. Kramer*, 334 U.S. 1 (1948), and FHA ceased insuring new mortgages on homes containing racial covenants in 1950, their presence cast a pall on post-*Shelly* homeownership. Biondi, *supra*, at 121. Racially restrictive covenants in deeds continued to signal a neighborhood's racial composition to real estate brokers and housing developers. Sugrue, *supra*, at 45. Even after *Shelly*, securing loans for nonwhites in subdivisions with deeds restricted to "Caucasians only" was near impossible. *Id*. And real estate brokers followed suit by honoring the restrictions and steering prospective buyers to neighborhoods of their own race. *Id*. As late as the mid-1950s, a study by the National Committee Against Discrimination in Housing found that while 50 percent

of all mortgage loans for new construction were guaranteed by FHA or the Veterans

Administration, only two percent of these mortgages were available to nonwhites, the majority of

which were in the Southern United States. Biondi, *supra*, at 232.

91.     This missed opportunity at homeownership during the time when FHA expressly

prescribed residential segregation (approximately 1934 to 1950) has resulted in staggering

differences in wealth accumulation among the races. By 1984, when many of these racially-

restrictive, federally-insured mortgages had matured, the median white household had a net

worth of $39,135, compared to $3,397 for the median African-American household. Ira

Katznelson, *When Affirmative Action was White: An Untold History of Racial Inequality in*

*Twentieth-America* 164 (Norton 2006).

92.     The absence of homeownership explains much of this racial wealth gap. While

seven in 10 whites owned homes in the 1980s, with an average value of $52,000, only four out of

10 African Americans owned homes, and those homes had an average value of less than

$30,000. *Id*. The majority of African Americans who did not own homes had little or no wealth.

*Id*.

93.     This pattern continues into the present time. Today, 73% of white Americans own

their homes, but only 45% of African Americans are homeowners. Laura Sullivan *et al*., *The*

*Racial Wealth Gap: Why Policy Matters* 9 (Demos IASP 2015), *available at*

http://www.demos.org/sites/default/files/publications/RacialWealthGap_1.pdf. Further, the

impact of redlining, including by FHA, still exists as African-American homeowners live in

neighborhoods with higher rates of poverty, lower home values and declining infrastructure. *Id* at

10.

94.     Pursuant to the duty to affirmatively further fair housing as mandated by Section 3608 of the Fair Housing Act, HUD should have analyzed the anticipated effects or impact of the Note Sale Program prior to implementing the Program and before adopting any changes. In addition, HUD should have adopted policies and implemented procedures in the FHA loan program that do not discriminate based on race and do not create or maintain residential segregation.

95.     However, in designing and implementing the Note Sale Program, HUD has not reviewed the impact of its changes to the Note Sale Program on African-American homeowners in New York City or on predominantly African-American neighborhoods in New York City. In creating the Note Sale Program, HUD identified the specific loans to sell out of the FHA Mortgage Program without knowing whether these decisions would have a racially discriminatory impact on African-American homeowners in New York City or on predominantly African-American neighborhoods in New York City.

96.     If HUD had conducted the appropriate analysis, it would have known of (a) existing residential segregation in New York City; (b) the disproportionate participation in the FHA Mortgage Program by African Americans in New York City; and (c) the expected or anticipated discriminatory effects of its Note Sale Program.

97.     However, HUD neither conducted the required analysis nor adopted or implemented non-discriminatory policies and procedures for the Note Sale Program as required by its duty to affirmatively further fair housing. Thus, it has utterly failed to comply with its obligations under the Fair Housing Act.

**The Emergence of HUD's Delinquent Note Sale Program**

98.    As a result of the 2008 financial crisis, FHA homeowners began to fall behind on their mortgages. Some of these homes were auctioned in foreclosure and, as a result, HUD was required to pay out full insurance claims from the Insurance Fund. Approximately 303,492 homeowners saved their homes through an FHA-HAMP modification. However, many of these FHA-HAMP modifications could only be offered with a "partial claim" of the unpaid principal balance, further depleting the Insurance Fund.

99.    Between 2007 and 2009, the Insurance Fund declined from $21 billion to just $4 billion. By 2012, its capital reserves ratio reached negative 1.44%, far below its congressionally mandated floor of 2%.

100.    Because of the drain the foreclosure crisis had on the Insurance Fund, in 2010, HUD launched the Delinquent Note Sale Program ("Note Sale Program," "Note Sale," or "Note Sales") to sell off delinquent mortgages it perceived as un-savable and to help shore up the Insurance Fund.

101.    Between 2010 and the end of 2011, HUD referred to its Note Sale Program as the Single Family Loan Sale ("SFLS"). SFLS was merely a pilot project to determine if the Note Sale Program could succeed. Between 2010 and the end of 2011, HUD sold off 1,377 delinquent mortgages as part of the SFLS segment of its Note Sale Program.

102.    In 2012, HUD substantially expanded the Note Sale Program and called this expanded version the Distressed Asset Stabilization Program ("DASP").

103.    Unlike the SFLS Note Sales, the DASP-version of the Note Sale Program included two types of sales, a national sale and a Neighborhood Stabilization Outcome ("NSO-

DASP") sale, which required purchasers to achieve certain outcomes for a portion of the mortgages they purchased.

104.    As of May 2016, HUD has sold more than 113,000 mortgages through its Note Sale Program.

105.    Early in 2016, HUD announced a new type of auction under its Note Sale Program: the Aged Delinquent Portfolio Loan Sale ("ADPLS"). For a mortgage to be included in an ADPLS auction, as opposed to being auctioned under SFLS or DASP, the mortgage must be more than 48 months in default.

106.    The Note Sale Program is merely an early insurance payout program to the mortgage servicer. Traditionally, HUD was permitted to pay out a full insurance claim to a mortgage servicer only if the servicer had foreclosed on the property. In exchange for this insurance payment, HUD would take title to the home. As a result, HUD became the owner of what is known as a Real Estate Owned ("REO") property and would be responsible for disposing of it.

107.    In 1999, Congress amended Section 204 of the NHA to permit HUD to pay claims on defaulted mortgages prior to a foreclosure auction. It is through these 1999 amendments that HUD administers the Note Sale Program, be it an SFLS, DASP or ADPLS auction.

108.    Under the Note Sale Program, mortgage servicers are permitted to request a full claim of the unpaid principal balance plus a certain number of months of delinquent interest before any foreclosure auction.

109.    The number of months of delinquent interest that an FHA mortgage servicer can collect on a Note Sale Program loan is limited by HUD.

110.     HUD expects FHA mortgage servicers to properly review homes for loss mitigation options within the timeframes provided by the regulations. This limitation corresponds to what HUD determines to be reasonable diligence in prosecuting a foreclosure to completion.

111.     Any delinquent interest months that exceeds HUD's reasonable diligence timeframe is uncollectable.

112.     HUD determines the reasonable diligence timeframe on a state-by-state basis, and, in certain circumstances, on a metropolitan basis.

113.     Between 1990 and 2012, that reasonable diligence timeframe for New York City was 13 months.

114.     In 2013, HUD increased the reasonable diligence timeframe to 19 months for New York City mortgages.

115.     In 2016, HUD again increased the reasonable diligence timeframe to 21 months for New York City mortgages.

116.     With HUD's increased timeframe for "reasonable diligence," mortgage servicers who submit a claim under HUD's Note Sale Program, including the Program's first ADPLS auction, can now claim 21 months of delinquent interest as opposed to only 19 months of delinquent interest just the year prior.

117.     HUD only permits a mortgage to be included in the Note Sale Program if: (i) the mortgage is six months or more in default;[3] and (ii) the mortgage servicer has exhausted all of the FHA's loss mitigation options and determined that there is no home-saving solution.

118.     It is the FHA mortgage servicer who, in submitting its claim, represents to HUD that it engaged in all HUD-required loss mitigation and that loss mitigation is not possible.

---

[3] For ADPLS Note Sales, this requirement is extended to 48 months in default. *See* Paragraph 105, *supra*.

119.    Upon information and belief, HUD does not independently verify the mortgage servicer's claim that it properly engaged in loss mitigation. It does not inquire or confirm with the homeowner whether loss mitigation was ever attempted.

120.    Once the mortgage servicer submits a claim under the Note Sale Program, it transfers title to the note and mortgage to HUD, without notice to the homeowner. From there, HUD pools the notes and mortgages it has acquired and sells them, in a silent auction, to the highest bidder, again, without notice to the homeowner.

121.    Since 2010, HUD has conducted 16 Note Sale auctions. Each auction has multiple pools. The bidder must purchase the entire pool.

122.    Each pool in a Note Sale includes mortgages from across the country, although New York State mortgages have increasingly become a larger portion of each Note Sale. In the May 16, 2016 Note Sale, New York State mortgages made up between 7 and 39% of each pool.

123.    In designing the Note Sale Program and expanding it through its DASP version, HUD declared that the Note Sale Program would serve two purposes. The first was to shore up the Insurance Fund. The second was to save homes, because DASP ostensibly ". . . provides an alternative to nearly assured foreclosure by offering homeowners a second chance to keep their home." U.S. Dep't of Housing and Urban Dev. Fed. Housing Admin., *Report to the Commissioner on Post-Sale Reporting FHA Single Family Loan Sale Program* 1 (Jan. 22, 2016) ("2016 Note Sale Program Report").

124.    In claiming that the Note Sale Program provides a second opportunity for the homeowner to save his or her home, HUD assumes that because these Note Sale mortgages are

sold for between 40% and 60% of their value,[4] the new post-Note Sale servicer will be inclined to pass along those savings to the homeowner in the form of a generous mortgage modification.

125.    Since initiating the Note Sale Program, the successful bidders have largely been hedge funds and private equity firms. Because these hedge funds and private equity firms are not in the business of dealing directly with homeowners, most hire a mortgage servicer to interface with the homeowners on their behalf. Some even own their own mortgage servicer to service the mortgages they purchased through the Note Sale Program.

126.    On or around July 11, 2016, HUD announced a new Note Sale auction to be held on September 14, 2016.

**<u>Due Process Violations</u>**

127.    Once a mortgage is sold in a Note Sale it is no longer a part of the FHA Mortgage Program. As a result, the homeowner loses all of the benefits of the FHA Mortgage Program that he or she had been paying for, including: pre-foreclosure assistance, FHA loss mitigation options, streamlined refinance, and the ability to sell the property encumbered by the FHA mortgage ("assumability of the mortgage"). At this point, HUD has devolved all responsibilities to the purchaser.

128.    Prior to the Note Sale, the homeowners are not informed that their mortgage is about to be auctioned out of the FHA Mortgage Program. Neither HUD nor the FHA mortgage servicer gives any notice to homeowners prior to the Note Sale to inform them that their mortgage will be sold out of the FHA Mortgage Program. Thus, the homeowners lose the

---

[4] Likely the discount that Note Sale purchasers receive is even greater. It appears that HUD only analyzes the discount based upon the percentage of the unpaid principal balance ("UPB") of the mortgage, not upon the full debt. UPB refers to the amount of the mortgage principal when the homeowner fell behind. It does not include arrears, such as delinquent interest, late fees and other foreclosure-related fees that accrue on a monthly basis once the homeowner is behind. However, when HUD auctions these mortgages, it auctions the full debt—UPB and arrears. The post-Note Sale purchaser seeks to collect on this full debt—UPB and arrears. Thus, HUD's analysis of the discount based on only UPB significantly underestimates the true discount that the purchasers receive through HUD's Note Sale Program.

benefits to which they are entitled—benefits designed to keep them in their homes and ensure that they and their families are on the path to middle class.

129.    On June 30, 2016, HUD announced changes to one of its Note Sale Programs, DASP, including that HUD will now require a warning to be issued in the 120-day delinquency notice of the possibility that the loan may be sold.

130.    This change comes too late for those homeowners who will be unsuspectingly included in the impending September 14, 2016 Note Sale. HUD requires that the loan be in default at least six months before it can be included in its Note Sale Program. As a result, the homeowners whose mortgages will be sold in the September 14, 2016 auction would have received their 120-day delinquency notice prior to the June 30, 2016 changes. Thus, even this limited warning that their mortgages might be sold could not have reached these homeowners.

131.    As a result, these changes will not be applied to the homeowners set to be impacted by the September 14, 2016 sale as by definition, these mortgages included in HUD's Note Sale must be at least six months in default.

132.    Although under the Truth in Lending Act ("TILA"), the new post-Note Sale servicer is required to inform the homeowner in writing that there is a new owner of the mortgage, this notice does not state that the homeowner is no longer entitled to the FHA Mortgage Program and does not explain the consequences of the Note Sale.  And, importantly, this notice is sent *after* the Note Sale.

133.    For four years after the sale, the new post-Note Sale servicer is required to provide quarterly data on the status of each Note Sale Program loan to HUD. Since 2015, HUD has issued two reports analyzing the Note Sale Program, including both the SFLS and DASP

Note Sales. These reports summarize the modifications and other non-foreclosure relief homeowners have obtained after the sales.

134.    However, if a post-Note Sale servicer sells the mortgage loan to another entity, HUD no longer tracks the mortgage. In the July 16, 2015 Note Sale, the purchasers either sold or "charged off"—meaning that the purchaser has written off the mortgage as an uncollectable bad debt—approximately 35% of the mortgages in that sale. In the 2014 Note Sales, approximately 32% of the mortgages were sold or charged off after purchase.

135.    HUD does not track the outcome of the mortgages that the post-Note Sale purchaser re-sells to another entity or that the post-Note Sale purchaser charges off. As a result, HUD provides no information as to what happened to these mortgages and the homeowners.

136.    In the 2016 Note Sale Program Report, which reviews all Note Sales since 2010, less than 7% of all the mortgages sold in the Note Sales held between 2012 and 2015 received a mortgage modification after the sale.[5] Almost 35% of all mortgages sold through HUD's Note Sale Program, and not "charged off" or resold, are foreclosed upon post-sale.

137.    Until April 2015, aside from the loans sold through the Neighborhood Stabilization Outcome pools, HUD placed no loss mitigation requirements on the post-Note Sale purchasers. Up until April 2015, there was not even a requirement that the post-Note Sale purchaser offer a modification program.

138.    On April 24, 2015, HUD, via a press release, announced that those post-Note Sale purchasers who participate in the DASP-version of the Note Sale Program must evaluate homeowners for a HAMP or a HAMP-like modification and the post-Note Sale purchaser is not

---

[5] HUD's own analysis of the Note Sale Program overestimates its success and, as a result, lists a slightly higher rate, 10%, for mortgage modifications post-Note Sale. However, HUD's analysis only counts the mortgages the post-Note Sale purchaser holds at the time of HUD's review. As stated in Paragraphs 134 and 135, *supra*, in some of the recent Note Sales, the purchasers immediately sold or charged off over 30% of the pool. By excluding these "disappeared" loans, HUD is able to inflate its success results.

permitted to finalize any foreclosure action for 12 months after the purchase. Prior to this announcement, the moratorium on foreclosures was only six months.

139.    In its April 24, 2015 press release, HUD provided no further details on what constitutes a HAMP-like modification. HUD also did not codify this change in the Code of Federal Regulations although it is now listed as a requirement in some of Note Sale contracts.

140.    Further, this HAMP or HAMP-like modification requirement is only imposed upon the immediate post-Note Sale purchaser through the contract it enters into with HUD. For those mortgages that the post-Note Sale purchaser re-sells to another entity, HUD does not have the ability to enforce this HAMP modification requirement. Although HUD proclaimed these April 24, 2015 changes as efforts to better help homeowners avoid foreclosure, HUD has limited these protections to the DASP version of its Note Sale Program. The contracts HUD entered into with the May 18, 2016 ADPLS Note Sale purchasers do not contractually obligate the purchasers to offer a HAMP or HAMP-like product and only require a six month foreclosure moratorium.

**Nonprofit Organizations' and Local Governments' Role in the Note Sale Program**

141.    Between September 2012 and November 2015, each of HUD's Note Sales have also included pools that have been designated as Neighborhood Stabilization Outcome ("NSO") pools. HUD's most recent Note Sale on May 18, 2016 does not appear to include NSO pools.

142.    Unlike the non-NSO pools, which HUD refers to as the national pools, each NSO pool covers a very limited geographic area, usually just a single state, city or metropolitan area.

143.    Purchasers of the NSO pools are required to achieve neighborhood stabilizing outcomes within four years on no less than 50% of the loans in each pool.

144. HUD has defined neighborhood stabilizing outcomes as the following: re-performance on the loan, rental to the borrower, sale to an owner-occupant, gift to a land bank, sale to an unaffiliated non-profit, or a loan payoff.

145. Although HUD added NSO pools to the Note Sale Program to "strengthen its strategic focus on community stabilization," the vast majority of these NSO pools are purchased by hedge funds, private equity firms or investment companies.

146. Between September 2012 and November 2015, HUD conducted eight NSO Note Sales. Of the 24,536 loans sold in these NSO Note Sales, only 1,395 of the loans were purchased by non-profits, or just 5.7% of all NSO loans.

147. FHA mortgages encumbering New York City properties have never been offered in the NSO Note Sales.

148. In addition to the NSO Note Sales, HUD negotiates directly with local governments to purchase Note Sale Program mortgages and stabilize these neighborhoods with foreclosure alternatives such as modifications.

149. However, HUD has sold very few mortgages to local governments, undermining the ability of local governments to stabilize the neighborhoods most impacted by the Note Sale Program.

150. In 2015, HUD agreed to a direct sale of a certain number of New York City mortgages that were to be included in the July 16, 2015 Note Sale to New York City's Housing Preservation & Development ("HPD").

151. HPD provided HUD a list of 104 mortgages that it wanted to purchase.

152.    After close to a year of negotiations, on June 30, 2016, HUD sold only 24 of the New York City mortgages to HPD. It is unclear what happened to the remaining 80 mortgages HPD bid on.

**Lone Star Defendants' Denial of Benefits**

153.    As of January 2016, Lone Star Funds ("Lone Star") has purchased 22% of all mortgages sold in the National Note Sale Program since the program was initiated in 2010. It is the second largest owner of mortgages sold through HUD's Note Sale Program, purchasing over 24,128 mortgages.

154.    At the June 11, 2014 Note Sale, Lone Star submitted the highest bid for all 16 national pools, purchasing all the mortgages in that sale.

155.    Lone Star, founded in 1995, is a private equity fund that invests in distressed financial and real estate loans. Because of its focus on purchasing bad loans for significant discount, Lone Star is known in Wall Street parlance as a "vulture investor."

156.    Lone Star's business model is focused on the short term with each of its funds having an investment period of four years or less. As a result, Lone Star focuses on profiting through the purchase of the distressed assets and selling them as quickly as possible.

157.    To manage the servicing of the mortgages purchased through HUD's Note Sale Program, two of Lone Star's funds own Caliber Home Loans, Inc. ("Caliber").

158.    Because Caliber services Lone Star's Note Sale mortgages, it is tasked with the responsibility under TILA of informing homeowners that their note and mortgage is owned by a new entity ("TILA Notice of Ownership Change").

33

159.    For those homeowners whose FHA mortgages were auctioned in HUD's June 11, 2014 sale, the listed owner of their mortgages in the post-sale TILA Notice of Ownership Change is U.S. Bank Trust, as trustee for LSF9 Master Participation Trust.

160.    In the TILA Notice of Ownership Change, Caliber does not inform the homeowner that the mortgage is no longer part of the FHA mortgage program.

161.    On the contrary, in its TILA Notice of Ownership Change, Caliber states this transfer of ownership ". . . does not affect any term or condition of the mortgage instruments or the servicing of your mortgage loan."

162.    However, in negotiating with homeowners after the HUD Note Sale, Caliber refuses to consider any of these homeowners for an FHA-HAMP modification and informs homeowners that they are no longer eligible for FHA-HAMP.

163.    Further, Caliber represents to former-FHA homeowners that it does not participate in HAMP and refuses to offer a HAMP or HAMP-like modification when a homeowner makes a request.

164.    However, in April 2015, HUD required post-Note Sale purchasers to offer a HAMP or a HAMP-like modification for all loans it acquired as a result of HUD's Note Sale Program.

165.    Further, under the Real Estate Settlement Procedures Act ("RESPA"), these post-Note Sale purchasers are required to review homeowners for all loss mitigation options available to them.

166.    Instead, Caliber only offers former-FHA homeowners two types of modifications, both proprietary: a five-year interest-only modification and a five-year standard modification.

167.    Upon information and belief, under both Caliber's five-year interest-only modification and its five-year standard modification, Caliber usually takes some or all of the arrears and creates an interest-bearing balloon payment due at the end of the life of the mortgage. The modified mortgage does not extend the term but rather maintains the maturity date listed in the FHA mortgage contract.

168.    Further, upon information and belief, under both of Caliber's proprietary modifications, the loan modification agreement specifically repudiates the assumability of the mortgage. As a result, to the extent that the ability to sell the property with the mortgage survived the Note Sale, Caliber eliminates this benefit by explicitly repudiating it in the mortgage modification agreement.

169.    Under both of Caliber's proprietary modifications, the interest rate charged during the five-year period is between 4 and 4.88%, which is above the market interest rate.

170.    Under Caliber's five-year interest-only modification, the former-FHA homeowner makes monthly payments of interest, taxes and insurance only, for five years, at an interest rate that is usually between 4 and 4.88%. Principal is not paid down during that five-year period. After the five-year period is over, the homeowner must begin to pay down the principal. In addition, after the five-year period, the interest rate reverts to the interest rate found in the original FHA mortgage. This is generally higher than the 4 to 4.88% rate Caliber provided in the five-year term.

171.    As a result, because Caliber requires homeowners to pay principal down over a shorter period of time and at an increased interest rate, former-FHA homeowners with a five-year interest-only modification will see their monthly payments increase anywhere between $500 and $1,600, based on calculations of Plaintiffs' mortgages.

172.    For former FHA homeowners, who are working class wage-earners, such a contractually obligated jump in monthly mortgage payments is crippling if not a guarantee of default.

173.    Under Caliber's five-year standard modification, the former-FHA homeowner makes monthly payments of principal, interest, taxes and insurance during the five-year period, at an interest rate that is usually between 4 and 4.88%. After the five-year period is over, the interest rate reverts to the interest rate found in the original FHA mortgage. This is generally higher than the 4 to 4.88% rate Caliber provided in the five-year term. As a result, former-FHA homeowners with a five-year standard modification will see their monthly payments increase over $300, based on calculations of Plaintiffs' mortgages.

174.    Further, both Caliber's five-year interest-only and five-year standard modifications include a balloon payment due at the end of the loan term. Upon information and belief, that balloon payment is interest bearing.

175.    Both of these Caliber proprietary modifications result in a higher cost to homeowners, based on the interest charged over the life of the loan, compared to a HAMP-like product. And both substantially increase the risk of re-default in five years when the monthly mortgage payment increases.

**Impact of HUD's Note Sale Program and Lone Star Defendants' Practices on African-American Homeowners in New York City**

176.    Since HUD initiated the Note Sale Program, over 113,000 FHA homeowners have had their mortgages sold out of the FHA Mortgage Program to a hedge fund or private equity firm, including over 8,900 mortgages in New York State.

177.    Between 2012 and June 2014, over 1,100 FHA homeowners residing in New York City have had their mortgages sold through HUD's Note Sale Program.

36

178.    In New York City, as the map below reflects, HUD's Note Sales conducted between 2012 and 2014 have disproportionately included mortgages in African-American communities, making these neighborhoods the hardest hit by HUD's problematic Note Sale Program. Each mortgage sold in a Note Sale is represented by a dot on the map.



179.    Of the 13,462 FHA mortgages issued in New York City between 2012 and 2014, only 4,746 were issued to African-American homeowners. African Americans compromised 36% of New York City homeowners who obtained an FHA mortgage during these two years.

180.    But the percentage of African-American homeowners directly impacted by HUD's Note Sales is significantly higher than their market share of FHA mortgages in New York City. More than 61% of all New York City mortgages sold in the Note Sales from 2012 to 2014 were for homes located in predominately African-American neighborhoods.[6]

181.    As the below chart demonstrates, African-American homeowners in New York City are the only group for which the percentage of mortgages sold through the Note Sale Program is significantly higher than their market share. For example, the percentage of white homeowners impacted by HUD's Note Sale Program is significantly less than that group's market share of FHA mortgages. Only 15.5% of mortgages sold in HUD's Note Sales from 2012 to 2014 were in predominately white neighborhoods, even though white homeowners make up 27% of the market share of FHA mortgages in New York City. For Asian homeowners, who make up 9% of the FHA market share in New York City, only 3.5% of predominately Asian neighborhoods were affected by HUD's Note Sale Program. For Latino homeowners, the percentage of predominately Latino neighborhoods impacted by the Note Sales, 19.9%, approximately equates to their market share of 19%.

|  | Non-Hispanic White | Hispanic | Non-Hispanic Black | Asian | Other | Total |
|---|---|---|---|---|---|---|
| *FHA Mortgage Borrowers in NYC - 2012 to 2014 (by borrower)* | 3,671 | 2,508 | 4,746 | 1,270 | 1,267 | 13,462 |
| *FHA Mortgage Borrowers in NYC by Percentage – 2012 to 2014* | 27% | 19% | 35% | 9% | 9% | 100% |
| *NYC DASP-Sold Mortgages – 2012 to 2014 (by neighborhood)* | 171 | 219 | 675 | 37 | -- | 1,102 |
| *Racial Breakdown of NYC DASP-Sold Mortgages by percentage – 2012 to 2014 (by neighborhood)* | 15.5% | 19.9% | 61.3% | 3.5% | -- | 100% |

---

[6] "Predominately African-American" means a community that is 50.1% or more African-American or black.

182.    Southeast Queens and eastern Brooklyn, historically working- and middle-class black neighborhoods, have been particularly impacted by HUD's Note Sale Program. The six neighborhoods most affected by HUD's Note Sale Program in New York City, measured by number of notes sold, have been: (i) Springfield Gardens with a black population of 86.9%; (ii) Canarsie with a black population of 85.4%; (iii) St. Albans with a black population of 88.9%; (iv) Jamaica with a black population of 64.9%; (v) Rosedale with a black population of 85.5%; and (vi) Laurelton with a black population of 92.2%.

183.    Between 2012 and 2014, 278 FHA mortgages encumbering properties in Southeast Queens were sold through HUD's Note Sale Program. This accounts for 25% of all the 1,102 mortgages sold through HUD's Note Sale Program in New York City between 2012 and 2014. But these 278 Southeast Queens mortgages constitute 41% of all the 675 FHA mortgages encumbering properties located in predominantly African-American neighborhoods in New York City that were sold through HUD's Note Sale Program between 2012 and 2014.

184.    As a result of this disparity, African-American neighborhoods, particularly those in Southeast Queens, are disproportionately and negatively impacted by HUD's Note Sale Program.

185.    Once HUD sells these mortgages through its Note Sale Program, these African-American homeowners can no longer benefit from the FHA Mortgage Program.

186.    Further, by selling their mortgages out of the FHA Mortgage Program to hedge funds and private equity firms like Lone Star Defendants that only offer modifications that result in a mortgage payment increase in five years, these African-American homeowners and the neighborhoods in which they reside, are more susceptible to foreclosure, and the resultant blight, in five years.

187.     These African-American neighborhoods will become less stable as a result of the disproportionate number of their FHA mortgages being sold through HUD's Note Sale Program, because the homeowners in these neighborhoods will no longer be able to benefit from the FHA Mortgage Program's mortgage assumability benefit, modification opportunities, pre-foreclosure assistance benefits, streamline refinance, and other benefits designed to maintain homeownership by low-income homeowners.

188.     African Americans invest a greater portion of their wealth in their homes than whites. Homeownership constitutes approximately 92% of the net worth of African Americans. For whites, homeownership constitutes approximately 58% of their net worth. Peter Dreier *et al.*, Haas Inst. for a Fair and Inclusive Society, *Underwater America: How the So-Called Housing "Recovery" is Bypassing Many American Communities* 5 (2014), *available at* http://haasinstitute.berkeley.edu/underwater-america.

189.     Thus, HUD's Note Sale Program, with its disproportionate adverse impact on African-American communities in New York City, further exacerbates the wealth gap between white and black households in New York City.

190.     As a result, with the loss of the benefits of the FHA Mortgage Program and the resultant increased risk of foreclosure, African-American homeowners in New York City lose more than just their homes. Through HUD's Note Sale Program and Caliber's predatory modifications, African Americans in New York City also stand to lose the vast majority of their wealth.

191.     This leaves African Americans in New York City with the inability to bequeath wealth, in the form of property, to future generations, increasing the historic racial wealth gap in America.

192.     Pursuant to the Fair Housing Act, the Federal Defendants have a duty to affirmatively further fair housing, which includes a duty to take steps to ensure that their housing programs do not discriminate on the basis of race and do not maintain racial segregation in housing. 42 U.S.C. § 3608. In designing and implementing its Note Sale Program, HUD failed to consider the impact of its Note Sale Program on African-American FHA homeowners or on residential segregation, including in New York City.

193.     In particular, in designing its Note Sale Program, HUD failed to analyze the race of the mortgagor or the racial composition of the neighborhoods impacted by the Note Sales even though HUD has access to this information.

## INDIVIDUAL PLAINTIFF FACTS

### Joseph Washington

194.     Originally born in North Carolina in 1963, Joseph Washington was sent to New York City when he was seven years old to live with his sister and her husband.

195.     At the age of 18, Mr. Washington began working in New York City's meat industry, first as a wholesaler and then as a butcher. With a secure union job, Mr. Washington was able to save money with the goal of someday owning a home.

196.     Wishing to get out of his one-bedroom apartment in Brooklyn and move to a neighborhood with tree-lined streets, on October 31, 2011, Mr. Washington purchased the home located at 118-04 203rd Street, in the St. Albans section of Queens.

197.     To purchase the home, Mr. Washington elected to take out an FHA-insured mortgage in the amount of $326,987.00 with First Residential Mortgage Services Corporation. The mortgage had a fixed interest rate of 4.5% over the life of the 30-year loan.

198.    Originally, Mr. Washington purchased the home with his then-fiancé, but eventually their relationship ended and, in March 2014, she deeded her interest in the property to Mr. Washington.

199.    In order to close on the FHA mortgage, Mr. Washington was required to finance HUD's UFMIP in the amount of approximately $3,237.

200.    Mr. Washington's monthly principal and interest payments were $1,656.80.

201.    In addition to the monthly principal and interest payment, Mr. Washington was also charged HUD's MIP in an amount of $307.99 per month, property taxes of $238.26, and homeowner's insurance of $78.39, for a total monthly housing payment of $2,281.47.

202.    Mr. Washington's mortgage was serviced by LoanCare Servicing Center, Inc. ("LoanCare").

203.    For two years, Mr. Washington remained current on his mortgage. During this time he worked as a butcher in Suffolk County, taking two buses to and from work each day, and travelling three hours in total to support himself and his then-fiancé.

204.    On November 1, 2013, because his then-fiancé was moving out and no longer helping with the household expenses, Mr. Washington missed his first mortgage payment.

205.    Soon after defaulting, in or around late 2013, Mr. Washington sought to modify his loan.

206.    Mr. Washington's loan servicer, LoanCare, left him adrift to navigate the loss-mitigation process on his own. After he defaulted, LoanCare did not steer him to a free HUD-approved housing counselor for help with the modification application, leaving him susceptible to the loan modification scammers that prey on low-income homeowners.

207.    At no point after falling behind did Mr. Washington receive the HUD-created pamphlet "Save Your Home – Tips to Avoid Foreclosure."

208.    Further, at no point when he was behind on payments did LoanCare reach out to him to conduct a face-to-face meeting.

209.    Without this guidance, Mr. Washington fell prey to a loan modification scam, paying a company $1,000 to apply for a loan modification on his behalf.

210.    On January 16, 2013, LoanCare mailed Mr. Washington a letter stating that he did not qualify for loss mitigation assistance because he did "not meet Investor requirements." At the time, Mr. Washington's loan had not been pooled into a trust, and so there was no investor whose requirements he would have to satisfy. The letter made no mention of FHA's loss mitigation programs, or why he was denied any specific program, such as an FHA-HAMP modification.

211.    Dismayed by this lack of progress, in or around March 2014, Mr. Washington called LoanCare for more information about his loss mitigation request. The LoanCare representative told Mr. Washington that it had not heard of the company working on Mr. Washington's behalf.

212.    Realizing that he had been scammed, Mr. Washington stopped working with the loan modification company in or around April of 2014.

213.    In or around April of 2014, LoanCare offered Mr. Washington a Trial Period Plan, commencing with a May 1, 2014 payment of $2,269.69. In this offer, LoanCare told Mr. Washington that he did not qualify for a HAMP modification or a "traditional modification." LoanCare claimed that for the latter, there was a "deficit of surplus income," rendering Mr. Washington ineligible.

43

214.    Mr. Washington declined this offer because the resulting monthly payment was no more affordable than his current payment, which he was already struggling to pay.

215.    In or around June of 2014, Mr. Washington submitted another modification application.

216.    On June 26, 2014, LoanCare mailed a letter acknowledging receipt of the loss-mitigation application.

217.    On August 19, 2014, LoanCare mailed a letter offering Mr. Washington a forbearance plan. Under this forbearance plan, Mr. Washington would make three payments of $1,487.89 in lieu of his regular monthly payments, starting with a payment due October 1, 2014. LoanCare promised to provide information about other loss-mitigation options, including a loan modification, before the end of the forbearance plan.

218.    However, Mr. Washington was not unemployed at the time of the offer and thus, under HUD regulations, was ineligible for a forbearance plane. Mr. Washington should have been offered a modification.

219.    In this August 19, 2014 letter, LoanCare did not state that it had reviewed Mr. Washington for any other loss-mitigation programs, including any loan modifications.

220.    Nor did the forbearance plan LoanCare offered Mr. Washington conform to any loss-mitigation program in FHA's loss mitigation hierarchy.

221.    By letter dated August 25, 2014, Caliber, as agent of U.S. Bank Trust, informed Mr. Washington that his loan had been sold to LSF9 Master Participation Trust.

222.    In this August 25, 2014 letter, Caliber claimed that this loan sale took place on July 17, 2014—three weeks after LoanCare promised to review Mr. Washington's loss mitigation application, and more than a month before LoanCare finally completed that review

44

and offered him a forbearance plan. While LoanCare assured Mr. Washington that it was reviewing his loss mitigation application, unbeknownst to him, his loan had already been sold, and Caliber had already assumed the servicing rights.

223.  At no point did Mr. Washington receive any notice from HUD that his loan was going to be sold and at no point did HUD confirm whether LoanCare had provided any of the benefits afforded with an FHA loan, or whether Mr. Washington had exhausted all of his mitigation options.

224.  If Mr. Washington had received notice that his loan was going to be sold in the next month or two, he would have called HUD and requested that it not sell his loan in an impending Note Sale as he was actively working with LoanCare in applying for a modification that would likely be granted.

225.  Further, in this August 25, 2014 letter, Caliber, as agent of U.S. Bank Trust, claimed that the "assignment, sale or transfer of the mortgage loan does not affect any term or condition of the mortgage instruments or the servicing of your mortgage loan."

226.  In or around September of 2014, Mr. Washington submitted a new loss-mitigation application to Caliber.

227.  In or around October 1, 2014, Mr. Washington began making payments in the amount of $1,487.89 to Caliber under the forbearance plan LoanCare had put in place in its August 19, 2014 letter to Mr. Washington.

228.  Between October 2014 and March 2015, to honor the agreement with LoanCare, Mr. Washington made monthly payments in the amount of $1,487.89 to Caliber, and Caliber, as agent of U.S. Bank Trust, accepted each of these payments.

229.     In a letter dated December 9, 2014, Caliber, as agent of U.S. Bank Trust, stated that Mr. Washington had been approved for a "5 Year Interest Only" modification. This modification agreement required Mr. Washington to make interest-only payments of $1,091.88 from February 1, 2015 to January 1, 2020. At the end of this five-year period, on January 1, 2020, the interest rate would revert to the original note rate of 4.5%.

230.     In this December 9, 2014 letter, Caliber, as agent of U.S. Bank Trust, claimed that it had reviewed Mr. Washington for a "5 Year Short Term" modification and a "Loan Modification (With Deferment)." Caliber denied Mr. Washington for both of these modification programs. Caliber did not describe the terms of either modification program, nor did it mention other modification programs in its list of loan modification options.

231.     Anxious and worried about losing his home, on December 18, 2014, Mr. Washington signed the modification agreement, thinking he had no choice. Caliber, as agent of U.S. Bank Trust, never countersigned this agreement.

232.     Instead, by letter dated March 6, 2015, Caliber, as agent of U.S. Bank Trust, offered Mr. Washington another Trial Period Plan for a loan modification. Under this Trial Period Plan, Mr. Washington would make three interest-only payments of $1,706.87, commencing with a payment due on April 1, 2015.

233.     In this March 6, 2015 letter, Caliber did not say if it had reviewed Mr. Washington for any other modification program.

234.     Mr. Washington accepted this offer by signing the Trial Period Plan agreement on March 21, 2015 and by making the first payment due under the plan.

235.     On or around April 1, 2015, Mr. Washington made a mortgage payment in the amount of $1,706.87 to Caliber.

236.    Mr. Washington made all the trial period plan payments for April 2015, May 2015 and June 2015.

237.    On July 6, 2015, Caliber, as agent of U.S. Bank Trust, mailed a second letter stating that Mr. Washington had been approved for a "5 Year Interest Only" modification. This second modification agreement also provided for a five-year interest-only payment period, from September 1, 2015 to August 1, 2020, during which time Mr. Washington would make interest-only payments of $1,280.09. The interest rate charged during this five-year period would be 4.88%, above the current market rate.

238.    As with the first modification agreement, at the end of this five-year period, on August 1, 2020, the interest rate would revert to the original note rate of 4.5%.

239.    Because Caliber, as agent of U.S. Bank Trust, did not extend the term of Mr. Washington's mortgage and the first five years of Caliber's modification consist of interest-only payments, Mr. Washington will only have 21 years to pay down the unpaid principal balance. Thus, in year six, Mr. Washington's monthly mortgage payment—which will include principal and interest payments—will jump to $1,933.09, a $653 difference.

240.    At 53 years old, Mr. Washington does not anticipate that in five years he will be making appreciably more money than what he is making today and thus does not know how he will afford this significantly higher mortgage payment.

241.    Furthermore, only $314,775.95 of Mr. Washington's mortgage will actually be paid down during the life of the loan. Another $30,342 of Mr. Washington's debt, upon information and belief, is an interest-bearing balloon payment due on November 1, 2041. When Mr. Washington is 78 years old, he will owe this balloon payment.

242.    During the time that Mr. Washington was applying for a modification, Caliber, as agent of U.S. Bank Trust, called him almost every day, sometimes two to three times a day, pressuring him to accept the proposed modification, and causing him stress about losing his home. On these calls, Caliber would threaten Mr. Washington with foreclosure. Caliber also repeatedly called Mr. Washington while he was at work, which caused him to become distracted while at work.

243.    Mr. Washington pleaded with Caliber, as agent of U.S. Bank Trust, to stop calling him, including at work, however Caliber refused to honor his requests.

244.    With constant threats of foreclosure, Mr. Washington became anxious and worried that he would lose his home. Thus, believing he had no other choice, Mr. Washington signed the modification agreement with unfair and unconscionable terms on July 19, 2015. Caliber, as agent of U.S. Bank Trust, did the same on July 29, 2015.

245.    The modification that Mr. Washington signed on July 19, 2015 includes a provision that strips him of his ability to sell his property encumbered by the mortgage. In other words, Caliber, as agent of U.S. Bank Trust, specifically repudiated Mr. Washington's ability to sell his mortgage with a freely assumable loan.

246.    At the time he submitted his loss-mitigation application to LoanCare, Mr. Washington was eligible for an FHA-HAMP modification the following terms:

   a.  A capitalized, interest-bearing principal balance of $241,463.18;
   b.  An interest rate of 4.375 percent;
   c.  A loan term of 360 months; and
   d.  A monthly principal and interest payment of $1,205.59.

As part of this HAMP modification, Mr. Washington would have also received a "Partial Claim" of $94,545.45. This Partial Claim is a sum excluded from the interest-bearing principal balance of $241,463.18 and secured by a subordinate mortgage to HUD. No interest would have accrued

on the Partial Claim principal balance and Mr. Washington would have made no monthly payments toward the principal. On the modified maturity date, Mr. Washington would have been responsible for paying the entire Partial Claim amount in one lump sum.

247.    The unfair and unconscionable modification offered by Caliber, as agent of U.S. Bank Trust, with its higher interest rate and higher interest-bearing principal balance, is more expensive than what Mr. Washington would have received under FHA-HAMP. Further, the $653 increase in payment in year six all but guarantees that Mr. Washington will default.

248.    If Caliber, as agent of U.S. Bank Trust, had offered a modification program akin to FHA-HAMP, Mr. Washington would have received a modification with the following terms:

    a.  A capitalized, interest-bearing principal balance of $244,579.41;
    b.  An interest rate of 4.5 percent;
    c.  A loan term of 360 months; and
    d.  A monthly principal and interest payment of $1,239.25.

As part of this FHA-HAMP modification, Mr. Washington would have also received a "Partial Claim" of $94,999.13.

249.    Mr. Washington did not discover Lone Star Defendants' false, deceptive, and misleading representations or that they used unfair and unconscionable means of collecting a debt until he met with a legal services attorney in June 2016, who explained that the mortgage servicers had misled him about his options and should have provided an alternative modification without unfair and unconscionable terms and without additional fees and interest.

250.    Despite his continued eligibility for an affordable modification—both before and after the loan sale—Mr. Washington's servicers have never explained why it did not offer him, or even consider him for, an FHA-HAMP modification or a like program.

251.    Mr. Washington wants to keep his home and remain in St. Albans, Queens, a middle-class neighborhood he was originally attracted to in 2011, because of the prevalence of owner-occupied homes and the resulting neighborhood stability.

252.    On July 15, 2016, Mr. Washington filed a complaint against Lone Star Defendants alleging violations of the FDCPA.

253.    On July 20, 2016, when Mr. Washington attempted to log into his online Caliber mortgage account, a screen appeared that stated that Caliber was unable to provide access to his account and instructed him to call a specific phone number for assistance.

254.    On July 20, 2016, Mr. Washington called the number that was listed when he attempted to log into his online Caliber mortgage account. The individual on the phone identified herself as a Caliber representative. When Mr. Washington inquired why he did not have access to his online account, the Caliber representative informed him that it was because he had sued Caliber. The Caliber representative also informed Mr. Washington that if he instructed his lawyer to drop the suit, he could have access to his online account. Angry that Caliber, as agent to U.S. Bank Trust, could withhold access to his account, Mr. Washington hung up the phone.

255.    Mr. Washington has incurred out-of-pocket expenses as a result of Lone Star Defendants' actions.

256.    Mr. Washington has suffered emotional distress because of Lone Star Defendants' actions. Since Lone Star Defendants purchased and began servicing his mortgage, Mr. Washington has been unable to sleep, worried that the Lone Star Defendants would not offer a modification. He continues to worry and lose sleep over the prospect of the mortgage payment increase on August 1, 2020, which he fears will cause him to default again and will ultimately jeopardize his ownership of his home. He continues to worry and lose sleep that Lone Star

Defendants, by shutting down his online account, will not accept payments, putting his account into default, enabling Lone Star Defendants to unfairly charge late fees and other default-related charges and eventually suing him in foreclosure, taking away his home.

**St. Clair Blackett**

257.    In 1991, St. Clair Blackett immigrated to the United States from his home country of Barbados and, for the next 25 years, worked as a car mechanic at a Toyota dealership in New York City.

258.    In 2007, Mr. Blackett obtained a job with the Metropolitan Transit Authority ("MTA").

259.    With a secure city job, Mr. Blackett began to look to move his wife and their adult daughter and young son out of their Brooklyn basement apartment to their first home in a more suburban part of New York City.

260.    On June 29, 2011, Mr. Blackett purchased his first home, located at 138-12 232rd Street in the Laurelton section of Queens. Mr. Blackett's adult daughter also signed the deed and mortgage, with the understanding that it would be her parents' responsibility to make the mortgage payments.

261.    To purchase his Laurelton home, Mr. Blackett elected to take out an FHA mortgage, originated with Continental Home Loans, Inc. ("Continental").

262.    The mortgage was for $384,975, with a fixed interest rate of 5.25% over the 30-year life of the loan.

263.    In order to close on the FHA mortgage, Mr. Blackett was required to finance HUD's UFMIP in the amount of approximately $3,811.75.

264.    Mr. Blackett's monthly principal and interest payments were $2,125.85.

265.     In addition to the monthly principal and interest payment, Mr. Blackett was also charged HUD's MIP in an amount of $362.94 per month, property taxes of $280.04 per month and homeowner's insurance of $92.67.

266.     As a result, Mr. Blackett's monthly mortgage payment was approximately $2,861.50.

267.     In or around March 2012, after his wife lost her job due to a long-term illness, Mr. Blackett began to fall behind on his mortgage payments.

268.     By letter dated May 4, 2012, Continental informed Mr. Blackett that he was behind on payments and instructed him to pay the arrears with certified funds. The letter did not inform Mr. Blackett of the opportunity to modify his FHA mortgage, list any free housing counseling agencies that could assist him, or invite him to apply for a modification or other FHA loss mitigation options.

269.     At no point after falling behind on his mortgage payments did Continental reach out to Mr. Blackett to arrange an in-person interview, even though its offices are on Long Island, less than 200 miles from Mr. Blackett.

270.     At no point after falling behind did Mr. Blackett receive the HUD-created pamphlet "Save Your Home – Tips to Avoid Foreclosure."

271.     After searching on the internet, Mr. Blackett learned that he could apply for a modification and possibly save his home.

272.     In or around 2013, Mr. Blackett began working with a distressed property consultant to apply for a modification.

273.     More than a year after Mr. Blackett had fallen behind on his mortgage,

Continental sent him a letter dated August 2, 2013 with a list of housing counseling agencies

accompanying 'a 90-day pre-foreclosure notice, required by New York State law.

274.     Over the next year, Mr. Blackett provided every document that Continental

requested as part of his modification application, including paystubs, bank statements, taxes, and

an explanation as to why he fell behind on his mortgage.

275.     During the year that he applied for a modification, Continental repeatedly

requested the same documents every three months, explaining that the prior documents had

"expired." Mr. Blackett provided all of the documents in response to Continental's repeated

requests.

276.     Although Mr. Blackett was actively applying for a modification, on or around

April 30, 2014, Continental sued Mr. Blackett to foreclose on his home. Continental filed an

action in Queens Supreme Court bearing index number 702940/2014.

277.     Two months later, Mr. Blackett's loan was sold as part of HUD's June 11, 2014

Note Sale and was auctioned to Lone Star. As a result, in or around late summer 2014, Caliber

began servicing Mr. Blackett's mortgage.

278.     At no point did Mr. Blackett receive any notice from HUD that his loan was going

to be sold and at no point did HUD confirm whether Continental had provided any of the

benefits afforded with an FHA loan, or whether Mr. Blackett had exhausted all of his mitigation

options.

279.     If Mr. Blackett had received notice that his loan was going to be sold in the next

month or two, he would have called HUD and requested that it not sell his loan in an impending

Note Sale as he was actively working with Continental in applying for a modification that would likely be granted.

280.    At the time he submitted his loss-mitigation application to Continental, Mr. Blackett was eligible for an FHA-HAMP modification, and if Continental had provided an FHA-HAMP modification during the requisite timeframe, it would have had no basis to sue Mr. Blackett in foreclosure.

281.    If Continental had provided an FHA-HAMP modification in April 2014, Mr. Blackett would have received an FHA-HAMP modification the following terms:

   a.   A capitalized, modified principal balance of $335,879.04;
   b.   An interest rate of 4.5 percent;
   c.   A loan term of 360 months; and
   d.   A monthly principal and interest payment of $1,701.85.

As part of this FHA-HAMP modification, Mr. Blackett would have also received a "Partial Claim" of $106,614. This Partial Claim is a sum excluded from the modified principal balance of $335,879.04 and secured by a subordinate mortgage to HUD. No interest would have accrued on the Partial Claim principal balance and Mr. Blackett would have made no monthly payments toward the principal. On the modified maturity date, Mr. Blackett would have been responsible for paying the entire Partial Claim amount in one lump sum.

282.    However, in or around December 2014, Caliber, as agent of U.S. Bank Trust, offered Mr. Blackett its standard modification. Upon information and belief, under the terms of this standard modification, for the first five years of the modification, Mr. Blackett would pay down both interest and principal at a rate of 4.33%, making monthly principal and interest payments of $2,015.07.

283.    Upon information and belief, at the end of this five-year period, the interest rate would revert to the original note rate of 5.25%.

54

284.     In or around January 2015, thinking that he had no choice and anxious and worried that he would lose his home, Mr. Blackett signed this modification agreement. Lone Star Defendants' modification, with its higher interest rate and higher interest-bearing principal balance, is more expensive than what Mr. Blackett would have received under FHA-HAMP. Further, the $174.93 increase in payment in year six would put Mr. Blackett at risk of defaulting.

285.     In or around April 2016, Mr. Blackett began to have trouble making his mortgage payment. On or around June 22, 2016, Caliber, as agent of U.S. Bank Trust, mailed Mr. Blackett a new modification offer, its five-year interest-only modification. This second modification agreement, which states that it is a subprime home loan subject to New York Banking Law § 6-m, provides for a five-year interest-only period, from July 1, 2016 to June 1, 2021. During that interest-only time period, Mr. Blackett would make interest-only payments of $1,281.77. The interest rate charged during this five-year period is 4.125%, above the current market rate.

286.     At the end of this five-year period, on July 1, 2021, the interest rate reverts to the original note rate of 5.25%.

287.     Because Caliber, as agent of U.S. Bank Trust, did not extend the term of Mr. Blackett's mortgage and the first five years of Caliber's modification is interest-only payments, Mr. Blackett will have only 20 years to pay down the unpaid principal balance. Thus, in year six, Mr. Blackett's monthly mortgage payment—which will include principal and interest—will jump to $2,512.61, a $1,230.84 difference from what he is currently paying.

288.     Mr. Blackett did not discover Lone Star Defendants' false, deceptive, and misleading representations or that they used unfair and unconscionable means of collecting a debt until he met with a legal services attorney in July 2016, who explained that the mortgage

servicers had misled him about his options and should have provided an alternative modification without unfair and unconscionable terms and without additional fees and interest.

289.    At 53 years old, Mr. Blackett does not anticipate that in five years he will be earning significantly more than what he is earning today, and thus does not know how he will afford this much higher mortgage payment.

290.    Furthermore, only $372,877.26 of Mr. Blackett's mortgage will actually be paid down during the life of the loan. Another $63,907 of Mr. Blackett's debt, upon information and belief, is an interest-bearing balloon payment due on June 30, 2041, when Mr. Blackett is 77 years old.

291.    Scared that he would lose his home and believing that he had no other choice, on June 24, 2016, Mr. Blackett signed the new modification offered and mailed it back to Caliber, U.S. Bank Trust's agent.

292.    The modification that Mr. Blackett signed on June 24, 2016 includes a provision that strips him of his ability to sell his property with the mortgage. In other words, Caliber specifically repudiated Mr. Blackett's ability to sell his mortgage with a freely assumable loan.

293.    At the time Mr. Blackett accepted Caliber's five-year interest-only modification, he was eligible for an FHA-HAMP modification. If Caliber offered Mr. Blackett a modification akin to FHA-HAMP today, Mr. Blackett would have received a modification with the same principal and interest payment of $1,701.85 as he would have received if Continental had properly reviewed him when he applied for a modification in or around April 2014. However, because the current market interest rate is approximately 3.75%, lower than what was offered in April 2014, a current FHA-HAMP modification would have a smaller Partial Claim.

294.    Despite his continued eligibility for an affordable modification—both before and after the loan sale—Mr. Blackett's servicers have never explained why they did not offer him, or even consider him for, an FHA-HAMP modification or a like program.

295.    Mr. Blackett wants to keep his home and remain in Laurelton, Queens, a middle-class neighborhood he was originally attracted to in 2011 because of its stability as a result of its prevalence of its owner-occupied homes.

296.    On or around July 6, 2016, Mr. Blackett called Caliber, U.S. Bank Trust's agent, to make his first payment under the June 22, 2016 interest-only modification over the phone. However, the Caliber representative informed Mr. Blackett that it would not accept his payment, without any explanation.

297.    Instead, on or around July 8, 2016, Caliber, as agent of U.S. Bank Trust, mailed Mr. Blackett a solicitation to apply for a modification.

298.    Knowing how long the modification process is, Mr. Blackett is further anxious and stressed that he will be unable to save his home.

299.    Mr. Blackett has incurred out-of-pocket expenses as a result of Defendants' actions.

300.    Mr. Blackett has suffered emotional distress because of Lone Star Defendants' actions. Since Lone Star Defendants purchased and began servicing his mortgage, Mr. Blackett has been unable to sleep, worried that the Lone Star Defendants would not offer a modification. He continues to worry and lose sleep since Lone Star Defendants are not even honoring the interest-only modification he signed on June 22, 2016. He continues to worry and lose sleep that Lone Star Defendants refusal to honor the modification and require him to re-apply will result in the loss of his home.

***Lucille Mason***

301.    On June 13, 1997, Lucille Mason, a home health aide, purchased her first home, a three-family house located at 9413 Avenue A, in the Canarsie section of Brooklyn for herself, her two sons, and her daughter.

302.    On January 20, 2010, Ms. Mason refinanced the home, choosing to take out an FHA-insured 30-year mortgage in the amount of $529,627.00 with The Money Source, Inc.

303.    In order to close on the FHA mortgage, upon information and belief, Ms. Mason was required to finance HUD's UFMIP in the amount of approximately $9,268.47.

304.    The FHA mortgage terms provided for an annual interest rate of 5.0% and principal and interest payments of $2,843.15.

305.    Ms. Mason was also required to pay HUD's Mortgage Insurance Premium (MIP) in the amount of approximately $242.75 per month, in additional to her monthly property taxes of approximately $292.49 and homeowners insurance of approximately $100 for a monthly housing payment of $3,478.39.

306.    For two and a half years, Ms. Mason made her monthly mortgage payments to the mortgage servicer, J.P. Morgan Chase ("Chase"), until summer 2012, when Ms. Mason's tenants stopped paying their rent regularly.

307.    At the same time, Ms. Mason was forced to take several weeks of unpaid leave from her job due to a medical condition.

308.    On August 1, 2012, Ms. Mason missed her first mortgage payment because of this unforeseen leave from work and because of her unreliable tenants.

309.    After Ms. Mason returned to work, she tried submitting her missed mortgages payments to Chase. Chase accepted some of her payments, but on January 8, 2013, Chase

rejected the payments and sent Ms. Mason a check in the amount of $4,273.67, the money that she had submitted to Chase in order to catch up on some of her missed payments.

310. At no point after falling behind did Ms. Mason receive the HUD-created pamphlet "Save Your Home – Tips to Avoid Foreclosure."

311. Further, at no point after falling behind did Chase make any attempts to conduct a face-to-face interview with Ms. Mason even though there is a Chase branch within 200 miles of her home.

312. During the time she was in default, Chase never informed Ms. Mason in writing of the opportunity to modify her FHA mortgage, nor did it provide a list of free housing counseling agencies that could assist her in applying for loss mitigation.

313. Not knowing what else to do and desperate to save her home, in or around March 2013, Ms. Mason reached out to her councilman's office and began working with a constituent advocate in the office ("the Advocate" or "her Advocate").

314. The Advocate first informed her about the various modification programs and helped her apply for a modification. In or around March 2013, Ms. Mason, through her Advocate, submitted a modification application to Chase.

315. Although Ms. Mason's modification application was pending, on April 17, 2013, Chase sued Ms. Mason in Kings County Supreme Court to foreclose on her home. That foreclosure action bears index number 7166/2013 and is still pending.

316. From the period of approximately March 2013 through November 2013, on almost a monthly basis, Ms. Mason or her Advocate received repeated document requests from Chase for updated paystubs and bank statements. Each time, Ms. Mason submitted the requested documents.

317.    Ms. Mason never received a decision from Chase approving or denying her for a modification even though her foreclosure case is ongoing and she has appeared in court 19 times in her efforts to obtain a modification.

318.    Despite the dedication and goodwill from the councilman's office, her Advocate was not an attorney or housing counselor familiar with the modification and foreclosure processes.

319.    Had she been provided with a list free housing counselors, as part of the FHA mandated loss mitigation procedures, Ms. Mason may have been able to obtain a proper FHA-HAMP modification before her loan was sold to Lone Star Defendants on or around June 11, 2014.

320.    In or around June 2014, as a result of her loan being sold out of the FHA program, Ms. Mason's mortgage was assigned to Lone Stare Defendants with Caliber as her new mortgage servicer. Lone Star Defendants continued prosecuting the foreclosure action that Chase had initiated in 2013 and has appeared in court 12 times in the case against Ms. Mason (without substituting in as a party).

321.    At no point did Ms. Mason receive any notice from HUD that her loan was going to be sold and at no point did HUD confirm whether Chase had provided any of the benefits afforded with an FHA loan, or whether Ms. Mason had exhausted all of her mitigation options.

322.    If Ms. Mason had received notice that her loan was going to be sold in the next month or two, she would have called HUD and requested that it not sell her loan in an impending Note Sale as she was actively working with Chase in applying for a modification that would likely be granted.

323.    Although frustrated and upset, Ms. Mason and her Advocate continued to apply for a modification with Caliber. In or around February 2016, Ms. Mason submitted another application to Caliber.

324.    In or around April 2016, Ms. Mason received an interest-only three-month Trial Period Plan ("TPP") from Caliber, as agent of U.S. Bank Trust, to make monthly interest-only payments in the amount of $2,010.40.

325.    Based on the TPP offer and similar products provided by Caliber, upon information and belief, the final modification will likely provide for five years of interest-only payments, set at an interest rate of 4.75%. Upon information and belief, after the five-year interest-only period expires, the modification will revert to Ms. Mason's original interest rate of 5.0% for the remainder of the loan.

326.    Upon information and belief, Caliber, as agent of U.S. Bank Trust, is likely keeping the original maturity date of the mortgage, resulting in the final payment due on February 1, 2040.

327.    As a result, upon information and belief, an unpaid principal balance of $507,891.49 would need to be paid down within 19 years. Thus, upon information and belief, in year six of the modification, Ms. Mason's mortgage payment of principal and interest will jump to $3,602.93, a $1,592.53 difference.

328.    In September 2021, when her monthly mortgage payment increases, Ms. Mason will be 78 years old. Although Ms. Mason currently works, at 73 years old, she desperately wishes to retire. If Ms. Mason accepts Lone Star Defendants' five-year interest-only modification, her default in five years is all but certain.

329.    Upon information and belief, the Caliber interest-only modification would include an interest-bearing balloon payment of $107,926.01.

330.    In or around May 2016, recognizing the unsustainability of Lone Star Defendants' offer, Ms. Mason rejected the five-year interest-only modification. She is currently putting together another modification application and requesting that Caliber review her for a HAMP or HAMP-like modification.

331.    If Caliber, as agent of U.S. Bank Trust, were to offer a modification akin to FHA-HAMP, Ms. Mason would receive a modification with the following terms:

    a.  A capitalized, modified principal balance of $463,453;
    b.  An interest-rate of 3.875%;
    c.  A loan term of 360 months; and
    d.  A monthly principal and interest payment of $2,179.

As part of this FHA-HAMP modification, Ms. Mason would also receive a "Partial Claim" from HUD of $152,367. This Partial Claim is a sum excluded from the modified principal balance of $463,453 and secured by a subordinate mortgage. No interest would accrue on the Partial Claim principal balance and Ms. Mason would have made no monthly payments toward the principal. On the modified maturity date, Ms. Mason would be responsible for paying the entire Partial Claim amount due in one lump sum.

332.    Although eligible for a HAMP or HAMP-like product, on or around June 6, 2016, Lone Star Defendants' counsel in the Kings County foreclosure action informed Ms. Mason that she would not be reviewed for HAMP.

333.    Ms. Mason did not discover Lone Star Defendants' false, deceptive, and misleading representations or that they used unfair and unconscionable means of collecting a debt until she met with a legal services attorney in June 2016, who explained that the mortgage

servicers had misled her about her options and should have provided an alternative modification without unfair and unconscionable terms and without additional fees and interest.

334.    Ms. Mason has lost income as a result of Defendants' actions. Since Lone Star Defendants purchased Ms. Mason's mortgage on or around June 11, 2014, Ms. Mason has attended court 12 times. Unless she has the day off, Ms. Mason must take unpaid time from work to attend these court conferences.

335.    Ms. Mason has also suffered damages because as the Lone Star Defendants drag her case out in court, refusing to offer her a HAMP or HAMP-like product, they charge delinquent interest, late fees and other foreclosure related fees to her account that, even if provided an affordable modification, would be unfairly capitalized into her new, modified debt.

336.    Ms. Mason has also has incurred out-of-pocket expenses as a result of Defendants' actions.

337.    Mr. Mason has suffered emotional distress because of Lone Star Defendants' actions. Since Lone Star Defendants purchased and began servicing his mortgage, Mr. Mason has been unable to sleep, worried that the Lone Star Defendants will never offer a modification that she can afford.

338.    Ms. Mason wants to keep her home and remain in Canarsie, Brooklyn, a neighborhood she was originally attracted to in 1997 because of the prevalence of owner-occupied homes and the resulting neighborhood stability.

*Melissa Trotman*

339.    In 1974, with two daughters in a cramped Corona apartment, Melissa Trotman's parents purchased their first home, the house located at 203-14 116th Avenue in the St. Albans section of Queens.

340.    Ms. Trotman was 11 years old when she moved to her new home in St. Albans. She grew up in St. Albans and attended the local high school.

341.    Although Ms. Trotman left the family home as an adult, she eventually returned to the house she always considered her home. In 1981, she joined her husband in Texas, where he was stationed in the Army. In the early 1980s, she moved back to Queens, living with her parents for a while before settling in Massachusetts.

342.    By 1997, Ms. Trotman's parents had paid off their $20,000 mortgage and owned their home free and clear.

343.    Also in 1997, Ms. Trotman decided to return to St. Albans. With her parents retiring to Florida, Ms. Trotman desired to move back to the home where she grew up, to raise her family where her parents had raised her.

344.    In February 2008, Ms. Trotman's father passed away. Her mother followed him in July of that year. With her parents' passing, Ms. Trotman and her sister inherited the home.

345.    On March 26, 2010, Ms. Trotman took out an FHA-insured mortgage in the amount of $167,850 with First Franklin Financial, Ltd. ("First Franklin") to purchase her sister's interest in the property. Ms. Trotman's mortgage had a fixed interest rate of 5.5% over the life of the 30-year loan.

346.    In order to close on the mortgage, Ms. Trotman was required to finance HUD's UFMIP in the amount of approximately $2,887.50.

347.    Ms. Trotman's monthly principal and interest payments were $953.03.

348.    In addition to the monthly principal and interest payment, Ms. Trotman was also charged HUD's MIP in the amount of $68.31 per month, property taxes of approximately $240.27 per month, and homeowner's insurance of $100 per month, for a total monthly housing payment of $1,361.61.

349.    Although Ms. Trotman took out her mortgage with First Franklin, her mortgage was almost immediately serviced by Hartford Funding Ltd. ("Hartford").

350.    For two years, Ms. Trotman made her mortgage payments. However, when she changed jobs in late 2011, her new job paid significantly less, straining the family's budget.

351.    Further, in or around April 2012, Ms. Trotman's husband began a long spell of unemployment. Ms. Trotman's husband is a sheet metal mechanic and, because of the nature of the work, is out of work one to two months every year. But in 2012, Ms. Trotman's husband was not re-employed until October 2012. Because of this long spell of unemployment, Ms. Trotman fell behind on her mortgage.

352.    Because she was still working, Ms. Trotman applied for an FHA mortgage modification with Hartford.

353.    After approximately six months of updating documents and re-submitting the same documents, on or around October 30, 2014, Ms. Trotman was finally able to enter into a permanent modification ("the October 2014 Modification"). However, it was not Hartford that signed the modification but rather LoanCare. Up until that point, Ms. Trotman had never heard of LoanCare. Her monthly mortgage statements had always come from Hartford.

354.    Under the modification, Ms. Trotman's arrears were capitalized into her unpaid principal balance for a new balance of $201,607.92. The FHA modification lowered her interest

rate to 4.375%, with a higher monthly principal and interest payments of $1,066.60. The modification also extended the term of her loan to 30 years.

355. Even with the modification, Ms. Trotman is still charged the HUD monthly MIP in an amount of approximately $84. Because her unpaid principal balance increased, so did her monthly MIP.

356. After Ms. Trotman modified her loan, her husband again became unemployed. As a result, on or around April 2015, Ms. Trotman fell behind on her October 2014 Modification.

357. Soon thereafter, Ms. Trotman reached out to Hartford to apply for a modification and began submitting documents.

358. On September 10, 2015, Hartford brought a foreclosure action against Ms. Trotman in Queens County Supreme Court bearing the index number 709532/2015. This case is ongoing.

359. Since being sued in foreclosure, Ms. Trotman has attended six court-mandated settlement conferences in an effort to save her home of 42 years.

360. At the most recent settlement conference, held on June 13, 2016, Hartford's attorney informed Ms. Trotman that to apply for a modification, she would have to submit documents to Cenlar. Ms. Trotman had never heard of Cenlar and Ms. Trotman's mortgage statements continue to come from Hartford.

361. Under HUD regulations, Ms. Trotman cannot be offered another modification until two years after her prior modification.

362. As a result, Ms. Trotman cannot begin to apply for an FHA-HAMP Modification until around August 2016.

363.    However, because she is almost two years behind on her mortgage, is African-American and lives in Southeast Queens, Ms. Trotman stands the very real risk that her mortgage will be sold out of the FHA Mortgage Program at the September 14, 2016 Note Sale, or at another auction soon thereafter. If her loan were to be sold in a Note Sale, she would no longer be able to apply for an FHA-HAMP Modification.

364.    Based on Ms. Trotman's current income, she is eligible for an FHA-HAMP modification that would include the following terms:

   a. A capitalized, modified principal balance of $160,650.82;
   b. An interest rate of 3.875%;
   c. A loan term of 360 months; and
   d. A monthly principal and interest payment of $755.44.

As part of this FHA-HAMP modification, Ms. Trotman would also receive a "Partial Claim" of $60,154.71. This Partial Claim is a sum excluded from the interest-bearing principal balance of $160,650.82 and secured by a subordinate mortgage to HUD. No interest would accrue on the Partial Claim principal balance and Ms. Trotman would make no monthly payments toward the principal. On the modified maturity date, Ms. Trotman would be responsible for paying the entire Partial Claim to HUD.

365.    To the extent that Ms. Trotman is unable to obtain an FHA-HAMP modification, she would likely want to be able to sell her property and reap the economic benefits of selling her mortgage with an assumable FHA-insured mortgage. Currently, she has close to $200,000 of equity in her property. Sale of her FHA-insured mortgage at the next HUD Note Sale would relinquish her of her ability to sell her home with the FHA-insured mortgage.

366.    Ms. Trotman has received no notice from HUD or her current mortgage servicer that her mortgage could potentially be sold out of the FHA Mortgage Program.

367.    If Ms. Trotman were provided this notice, she would immediately call HUD and inform HUD that she is now able to re-apply for a modification as HUD's two-year moratorium on offering her another modification is about to expire. She would request that her mortgage stay in the FHA Mortgage Program and that she be reviewed for an FHA-HAMP modification, a modification that will lower her monthly mortgage payments.

368.    Ms. Trotman has been a resident of St. Albans, Queens for the better part of 42 years. It is where she was raised and where she chose to raise her daughter. She wants to keep her family home and the stable life that the neighborhood offers her and her family because of the prevalence of owner-occupied homes and the resulting neighborhood stability.

## CLASS ACTION ALLEGATIONS

369.    Plaintiffs bring this case as a class action on behalf of Plaintiffs and all African-American New York City homeowners whose mortgages were auctioned through one of HUD's Note Sales or who are at risk of having their mortgage sold through one of HUD's Note Sales, seeking equitable, injunctive and other relief pursuant to Fed. R. Civ. P. 23(b)(1)(A) and 23(b)(2).

370.    The exact number or identification of the Rule 23(b)(1)(A) and/or 23(b)(2) Class members is presently known only by Federal Defendants. On information and belief that Class includes more than 1,000 individuals. The identity of Class members is ascertainable and can be determined based on available records.

371.    The questions of law and fact common to the Class predominate over questions affecting only individual Class members, and include, but are not limited to, the following:

    a.    whether the Note Sale Program violates the due process clause of the United States Constitution because homeowners impacted by the program were not informed

prior to the auction that their mortgages were to be sold out of the FHA Mortgage Program

and/or were provided no opportunity to be heard about the decision;

   b.  whether the Note Sale Program is an abuse of discretion and/or contrary to

law because it fails to affirmatively further fair housing;

   c.  whether the Note Sale Program has a negative, disparate impact on

African-American homeowners in New York City in violation of the Fair Housing Act; and

   d.  whether Federal Defendants breached an implied contract because it

collected UFMIP and monthly MIP without providing Class members all the benefits of the FHA

Mortgage Program.

   372.  Plaintiffs' claims are typical because they were subject to or affected by Federal

Defendants' Note Sale Program, or are likely to be subjected to the program. The claims of the

named Plaintiffs do not conflict with the interest of any other member of the Class in that both

Plaintiffs and the other members of the Class were subject to the effects of the same unlawful

conduct and experienced the same damages as a result of the manner in which the Federal

Defendants conduct their Note Sale Program. The Class will benefit from the remedial and

monetary relief sought against Federal Defendants.

   373.  Plaintiffs also seek to certify an overlapping class consisting of all African-

American New York City homeowners whose mortgages were auctioned to Lone Star

Defendants or who are at risk of having their mortgages sold to Lone Star Defendants through

one of HUD's Note Sales, seeking equitable and injunctive relief pursuant to Fed. R. Civ. P.

23(b)(1)(A) and 23(b)(2) and damages pursuant to Fed. R. Civ. P. 23(b)(3) (the "Lone Star

Class").

374. The exact number or identification of the Lone Star Class is presently only known by Federal Defendants and Lone Star Defendants. On information and belief, that Class includes more than 500 individuals. The identity of Class members is ascertainable and can be determined based on available records.

375. The Lone Star Class claims are based upon Caliber's post-Note Sale conduct and misrepresentations to Class members. The questions of law and fact common to the Lone Star Class predominate over questions affecting only individual Class members, and include, but are not limited to, the following:

a. whether Lone Star Defendants falsely stated or misrepresented to Class members important terms that impact their mortgages, including, but not limited to, informing Class members that the sale of their mortgage out of the FHA Mortgage Program did not affect any term or condition of the mortgage, stating that they do not offer a HAMP or HAMP-like modifications, and refusing to provide a HAMP-like modification;

b. whether Lone Star Defendants' false statements and/or misrepresentations constitute a violation of the Fair Debt Collection Practices Act ("FDCPA");

c. whether Lone Star Defendants' false statements and/or misrepresentations constitute a "deceptive practice" in violation of New York's General Business Law § 349 ("GBL § 349");

d. whether Lone Star Defendants' interest-only modification and standard modification products have a negative, disparate impact on African-American homeowners in New York City in violation of the Fair Housing Act; and

e.      whether Caliber's refusal to review post-Note Sale homeowners for a HAMP or HAMP-like modification violates the Real Estate Settlement Procedure Act ("RESPA").

376.    Plaintiffs' claims are typical of the claims of the Lone Star Class because Plaintiffs and Class members were subject to or affected by Lone Star Defendants' post-Note Sale behavior. The claims of the named Plaintiffs do not conflict with the interest of any other member of the Class in that both Plaintiffs and the other members of the Class were subject to the effects of the same unlawful conduct and experienced the same damages as a result of Lone Star Defendants' unlawful conduct, namely, Lone Star Defendants' various misrepresentations to homeowners and a modification program that has a disparate impact on African Americans in New York City in violation of the Fair Housing Act. The Class will benefit from the remedial and monetary relief sought against Lone Star Defendants.

377.    The individual Plaintiffs have no conflict of interest with any putative absent class members, and they are committed to the vigorous prosecution of all class claims. They have retained counsel that is competent and experienced in federal class actions, civil rights actions, unfair debt collection practice litigation, fair lending actions, and RESPA litigation.

378.    This action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members of the class is impracticable, and the damages suffered, although substantial, are small in relation to the extraordinary expense and burden of individual litigation and therefore it is highly unlikely that individual actions will be pursued.

379.    Managing this case as a class should not present any particular difficulty.

380.    Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

## FIRST CAUSE OF ACTION
### (Due Process Against Federal Defendants)

381.    Plaintiffs restate, reallege and incorporate by reference all foregoing paragraphs.

382.    The FHA Mortgage Program is designed to provide and preserve homeownership among low-income Americans.

383.    To achieve this objective, HUD has provided various benefits to homeowners through the FHA Mortgage Program, including pre-foreclosure assistance benefits, loss mitigation options, a streamline refinance benefit, assumablity of the FHA mortgage, and other benefits.

384.    Various federal law, federal statutes, federal regulation and HUD documents, including its Handbook, mortgagee letters and other guidelines, establish the procedure by which the FHA Mortgage Program's benefits are distributed to homeowners.

385.    Further, HUD has required some of the FHA Mortgage Program's benefits to be enshrined in the HUD-form note and mortgage into which homeowners and the lender enter.

386.    Plaintiffs all chose to purchase their homes with an FHA-insured mortgage.

387.    As part of the purchase, Plaintiffs paid HUD's UFMIP at the closing of the FHA mortgage loan.

388.    Further, Plaintiffs paid HUD the monthly MIP.

389.    As a result, Plaintiffs had a reasonable expectation of continued receipt of the benefits provided in the FHA Mortgage Program.

390.    Plaintiffs have a legitimate claim of entitlement to the FHA Mortgage Program, creating a property interest.

391.    However, through HUD's Note Sale Program, Federal Defendants sold Plaintiffs' mortgages out of the FHA Mortgage Program to entities that do not provide the same benefits as the FHA Mortgage Program.

392.    Plaintiffs were not informed or notified prior to the Note Sales that their mortgages were going to be sold out of the FHA Mortgage Program, thereby depriving them of all the benefits of an FHA-insured mortgage.

393.    Plaintiffs were not provided any opportunity to be heard before Federal Defendants auctioned their mortgages out of the FHA Mortgage Program through a Note Sale.

394.    Federal Defendants have violated Plaintiffs' right to due process under the Fifth Amendment of the United States Constitution for failing to provide sufficient notice and an opportunity to be heard regarding Federal Defendants' decision to sell Plaintiffs' loans out of the FHA Mortgage Program.

395.    As a result of Federal Defendants' violation, Plaintiffs are entitled to declaratory and injunctive relief and reasonable attorney's fees and costs as authorized by 28 U.S.C. § 2412(b).

## SECOND CAUSE OF ACTION
### (Fair Housing Act § 3608(e)(5) Against Federal Defendants)

396.    Plaintiffs restate, reallege and incorporate by reference all foregoing paragraphs.

397.    The Fair Housing Act ("Act") imposes an affirmative duty on HUD to "administer the programs . . . in a manner affirmatively to further the policies of [the Act]." 42 U.S.C. § 3608(e)(5).

398.    As a result, Federal Defendants are required to consider the impact of HUD's housing policies and actions to ensure they do not discriminate based on race and do not create or maintain residential segregation. Based on their analysis, Federal Defendants are required to

adopt policies and implement procedures in HUD's housing programs that do not discriminate based on race and do not create or maintain residential segregation.

399.     In designing and implementing the Note Sale Program, Federal Defendants have not reviewed the impact of the Note Sale Program on African-American homeowners in New York City or on predominantly African-American neighborhoods in New York City. Because Federal Defendants did not perform this analysis, they created the criteria and rules for the Note Sale Program and identified the specific loans to sell out of the FHA Mortgage Program without knowing whether their decisions would have a racially discriminatory impact on African-American homeowners in New York City or on predominantly African-American neighborhoods in New York City.

400.     Because of their failure to conduct such an analysis and then adopt and implement non-discriminatory policies and procedures for the Note Sale Program, Federal Defendants have failed to affirmatively further fair housing as required by Section 3608(e)(5) of the Act.

401.     Plaintiffs have a claim for relief for Federal Defendants' failure to affirmatively further fair housing pursuant to the Administrative Procedures Act because of the Federal Defendants' abuse of discretion and otherwise acting contrary to law in creating, authorizing, permitting and supporting the Note Sale Program, including identifying the specific loans to sell out of the FHA Mortgage Program. 42 U.S.C. §§ 702, 706.

402.     Sovereign immunity is waived by 5 U.S.C. § 702 for the injunctive and declaratory relief requested.

403.     As a result of Federal Defendants' violation, Plaintiffs are entitled to declaratory and injunctive relief and reasonable attorney's fees and costs as authorized by 28 U.S.C. § 2412(b).

## THIRD CAUSE OF ACTION
### (Fair Housing Act § 3604(a) and (b) Against Federal Defendants)

404.    Plaintiffs restate, reallege and incorporate by reference all foregoing paragraphs.

405.    Under the Fair Housing Act ("the Act"), it is unlawful to otherwise make unavailable or deny a dwelling to any person because of race. 42 U.S.C. § 3604(a).

406.    The Act also prohibits discriminating against any person in the terms, conditions or privileges of sale of a dwelling or in the provision of services in connection therewith because of race. 42 U.S.C. § 3504(b).

407.    Liability can be established under the Act if actions cause a discriminatory effect, even if not motivated by discriminatory intent, unless there is a legally sufficient justification to avoid liability. 24 CFR § 100.500.

408.    Federal Defendants' Note Sale Program has a disparate impact on African-American homeowners and predominantly African-American neighborhoods in New York City in violation of the Act, because a disproportionately high number of loans sold through the Note Sale Program are secured by homes located in predominately African-American neighborhoods.

409.    Federal Defendants' Note Sale Program makes housing unavailable to African-American homeowners in New York City in violation of section 3604(a) of the Act. Over a third of all the mortgages sold through the Note Sale Program result in foreclosure post-sale and only 7% of mortgages sold through the Note Sale Program have resulted in a home-saving solution, such as a modification.

410.    Further, by auctioning FHA mortgages to private investors that refuse to offer HAMP or HAMP-like mortgage modifications, and that only offer more expensive and unsustainable modification products, Federal Defendants violate sections 3604(a) and 3604(b) of the Act by making housing unavailable to African-American homeowners, imposing less

favorable terms, conditions and privileges of sale, and providing discriminatory services in connection with the sale of a dwelling.

411.    Federal Defendants have failed to employ practices that serve HUD's interests with a less discriminatory effect, including ensuring that the FHA homeowners receive the benefits to which they are entitled and working with the homeowner before selling the loans through the Note Sale Program and further, ensuring that every homeowner with an FHA mortgage who qualifies for a HAMP modification be provided with an affordable HAMP modification to preserve affordable homeownership for African-American homeowners.

412.    HUD's Note Sale Program has caused and continues to cause direct injury to African-American homeowners and predominantly African-American neighborhoods in New York City by increasing the likelihood of African-American homeowners losing their homes to foreclosure and threatening neighborhood stability.

413.    As a result of Federal Defendants' breach, Plaintiffs are entitled to declaratory and injunctive relief and reasonable attorney's fees and costs as authorized by 42 U.S.C. § 3613.

**FOURTH CAUSE OF ACTION**
**(Breach of Contract Against Federal Defendants)**

414.    Plaintiffs restate, reallege and incorporate by reference all foregoing paragraphs.

415.    Through Plaintiffs' payment of the UFMIP and the monthly MIP, Federal Defendants have entered into an implied in fact contract with Plaintiffs to provide the benefits of the FHA Mortgage Program.

416.    Plaintiffs' intention to contract with Federal Defendants is evidenced by their choice to obtain an FHA mortgage, their payment of the UFMIP at closing and their payment and/or HUD's charge of the monthly MIP.

417.     Federal Defendants' intention to contract with Plaintiffs is evidenced through the regulations, Handbook, mortgagee letters and other guidance that HUD publishes regarding the UFMIP and monthly MIP, the fact that the UFMIP and MIP payments are a part of the closing and the monthly mortgage statement, and the determination of benefits included in the FHA Mortgage Program.

418.     Offer and acceptance is unambiguous through Plaintiffs' tendering of the UFMIP and the monthly MIP and Federal Defendants' acceptance of these payments.

419.     The Secretary of HUD and the FHA Commissioner have the authority to bind the government. In fact, that authority is manifested in the various regulations, Handbook provisions, mortgagee letters and guidelines that Federal Defendants pronounce regarding the Insurance Fund and the FHA Mortgage Program.

420.     By selling Plaintiffs' mortgages through the Note Sale Program and out of the FHA Mortgage Program, Federal Defendants have breached this implied in fact contract.

421.     As a result of Federal Defendants' breach, Plaintiffs are entitled to actual damages and reasonable attorney's fees and costs as authorized by 28 U.S.C. § 2412(b). .

422.     None of Plaintiffs' individualized damages exceed $10,000, or alternatively, Plaintiffs waive any damages over $10,000.

### FIFTH CAUSE OF ACTION
**(FDCPA Against Lone Star Defendants)**

423.     Plaintiffs restate, reallege and incorporate by reference all foregoing paragraphs.

424.     Congress enacted the Fair Debt Collection Practices Act ("FDCPA") to stop "the use of abusive, deceptive and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a).

425. Under the FDCPA, a debt collector is prohibited from making any false, deceptive or misleading representation in connection with the collection of a debt. 15 U.S.C. § 1692e.

426. Such prohibition includes the use of any false representation or deceptive means to collect or attempt to collect a debt. 15 U.S.C. § 1692e(10)

427. A debt collector may not "use unfair or unconscionable means to collect any debt." 15 U.S.C. § 1692f.

428. Under the FDCPA, a debt collector is prohibited from engaging in any conduct, the natural consequence is to harass or abuse any person in connection with the collection of a debt. 15 U.S.C. § 1692d.

429. Each Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because each Plaintiff is alleged to owe a debt.

430. Each Plaintiff's mortgage loan is a "debt" as defined by 15 U.S.C. § 1692a(5).

431. Caliber and U.S. Bank Trust are each a "debt collector" as defined by 15 U.S.C. § 1692a(5) because Plaintiffs' mortgages were, by definition, in default at the time the Lone Star Defendants acquired them.

432. Caliber's actions, as an agent of U.S. Bank Trust, constitute attempts to collect a debt or were taken in connection with attempts to collect a debt within the meaning of the FDCPA.

433. The Lone Star Defendants violated the FDCPA, 15 U.S.C. §§ 1692e, 1692f and 1692d, by making false and misleading representations, engaging in unfair and deceptive practices, and engaging in harassing and abusive conduct. Those violations include, but are not limited to:

a. Falsely stating in the TILA Notice of Ownership Change to former-FHA homeowners that transfer of ownership of Plaintiffs' mortgages ". . . does not affect any term or condition of the mortgage instruments or the servicing of your mortgage loan;"

b. Misrepresenting that Caliber does not offer a HAMP modification when Caliber not only has a HAMP modification option, but is required by HUD to offer a HAMP or HAMP-like modification;

c. Failing to review homeowners for all modification programs offered, including the HAMP or HAMP-like modification program, in violation of federal law; and

d. Forcing homeowners to accept unfair and unconscionable modifications.

434.    As a direct and proximate result of these violations of the FDCPA, Plaintiffs and Class members have sustained actual damages in the form of out-of-pocket expenses, lost income, and emotional harm in an amount to be proved at trial.

435.    Plaintiffs and the Class are therefore entitled to actual damages, statutory damages, and reasonable attorney's fees, including litigation expenses and costs. 15 U.S.C. § 1692k.

### SIXTH CAUSE OF ACTION
**(GBL § 349 Against Lone Star Defendants)**

436.    Plaintiffs restate, reallege and incorporate by reference all foregoing paragraphs.

437.    New York General Business Law ("GBL") § 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state . . . " where that conduct is consumer-oriented.

438.    Under GBL § 349(h), an individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful acts or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions."

439.    At all relevant times, the Lone Star Defendants conducted a business or furnished a service as those terms are used in GBL § 349.

440.    As U.S. Bank Trust's agent, Caliber violated, and continues to violate, GBL § 349 by:

      a.  Falsely stating in the TILA Notice of Ownership Change to former-FHA homeowners that transfer of ownership of Plaintiffs' mortgages to LSF9 Master Participation Trust ". . . does not affect any term or condition of the mortgage instruments or the servicing of your mortgage loan;"

      b.  Misrepresenting that Caliber does not offer a HAMP modification when Caliber not only has a HAMP modification option, but is required by HUD to offer a HAMP or HAMP-like modification; and

      c.  Violating HUD regulations and RESPA by refusing to review Plaintiffs' loans for a HAMP or HAMP-like modification.

441.    The Lone Star Defendants committed the above-described acts willfully and/or knowingly.

442.    These acts and practices are consumer oriented and have had, and will continue to have, a broad impact on consumers at large, because U.S. Bank Trust purchased over 22,000 loans from the June 11, 2014 Note Sale and Caliber, upon information and belief, services over 22,000 loans purchased through HUD's Note Sale Program, including those loans purchased by U.S. Bank Trust on June 11, 2014.

443.    These deceptive acts have caused injury and damage to the Plaintiffs and Class members, and unless enjoined, will cause further irreparable injury.

444.    As a direct and proximate result of these violations of GBL § 349, Plaintiffs and members of the Class have suffered compensable harm and are entitled to permanent injunctive relief, and to recover actual and treble damages, costs and attorney's fees.

## SEVENTH CAUSE OF ACTION
### (Fair Housing Act §§ 3604 and 3605 against Lone Star Defendants)

445.    Plaintiffs restate, reallege and incorporate by reference all foregoing paragraphs.

446.    Under the Fair Housing Act ("Act"), it is unlawful to otherwise make unavailable or deny a dwelling to any person because of race. 42 U.S.C. § 3604(a).

447.    The Act also prohibits discrimination in making available residential real-estate related transactions and in the terms and conditions of such transactions because of race. 42 U.S.C. § 3605(a).

448.    Liability can be established under the Act if actions cause a discriminatory effect, even if not motivated by discriminatory intent, unless there is a legally sufficient justification to avoid liability. 24 CFR § 100.500.

449.    At all relevant times Lone Star Defendants were, and continue to be, entities "engaging in residential real estate-related transactions" as defined by 42 U.S.C. § 3605(b).

450.    The Lone Start Defendants' policy of refusing to offer HAMP or a HAMP-like modification such as an FHA-HAMP and instead offering a five-year interest-only or a five-year standard modification at a higher-than-HAMP interest rate to post-Note Sale homeowners has and continues to have a disproportionate adverse impact on African-American homeowners and predominantly African-American communities in New York City. The Lone Star Defendants' policy makes housing unavailable by causing housing to become unaffordable based on the

81

unsustainable modifications Caliber, as the agent of U.S. Bank Trust, has offered instead of a

HAMP or HAMP-like product such as an FHA-HAMP modification. This same policy also

makes residential real-estate related transactions unavailable and discriminates in the terms and

conditions of such transactions because of race.

451.    U.S. Bank Trust and Caliber's polices have caused and continue to cause direct

injury to African-American homeowners and other individuals living in predominantly African-

American neighborhoods by increasing the likelihood of African-American homeowners losing

their homes to foreclosure and threatening neighborhood stability.

452.    As a result of U.S. Bank Trust and Caliber's conduct, Plaintiffs are entitled to

actual and punitive damages, reasonable attorney's fees, including litigation expenses and costs,

and an order directing that Plaintiffs be reviewed for a HAMP modification and be provided with

such a modification if they are eligible. 42 U.S.C. § 3613(c).

## EIGHTH CAUSE OF ACTION
### (RESPA Against Caliber)

453.    Plaintiffs restate, reallege and incorporate by reference all foregoing paragraphs.

454.    Under 12 USC § 2605(k)(1)(E), servicers shall not "fail to comply with any other

obligation found by the Bureau of Consumer Financial Protection, by regulation, to be

appropriate to carry out the consumer protection purposes of this chapter."

455.    Under 12 C.F.R. § 1024.41, the implementing regulations of the Real Estate

Settlement Procedures Act ("RESPA"), if a mortgage servicer receives a complete loss

mitigation application more than 37 days before a foreclosure sale, it must "[e]valuate the

borrower for all loss mitigation options available to the borrower." 12 C.F.R. § 1024.41(c)(1)(i).

456.    If the servicer denies this application for any trial or permanent loan modification

option available to the borrower, it shall state in the notice sent to the borrower "the specific

reason or reasons for the servicer's determination for each such trial or permanent loan modification option." 12 C.F.R. § 1024.41(d).

457.    At all relevant times, Caliber was, and continues to be, a "servicer" under 12 C.F.R. § 1024.2(b).

458.    At all relevant times, each of Plaintiffs' loans was, and continues to be, a "mortgage loan" under 12 C.F.R. § 1024.31.

459.    Each of Plaintiffs' applications was a "loss mitigation application" because each was a "written request for a loss mitigation option" and each included "information required by the servicer for evaluation." 12 C.F.R. § 1024.31.

460.    Each of Plaintiffs' applications was submitted more than 37 days before a foreclosure auction date.

461.    A HAMP modification, or a similar loss mitigation program, is a "loss mitigation option" because it is an "alternative to foreclosure," which Caliber may offer borrowers on behalf of the owners of the mortgage loans. 12 C.F.R. § 1024.31.

462.    Caliber violated 12 C.F.R. § 1024.41(c)(1)(i) by not evaluating Plaintiffs for a HAMP or HAMP-like modification, even though this program was required to be a part of Caliber's loss mitigation in accordance with HUD guidance.

463.    In the alternative, if Caliber did evaluate Plaintiffs for a HAMP modification, or a similar loss mitigation program as required by HUD, Caliber violated 12 C.F.R. § 1024.41(d) by not providing Plaintiffs with the specific reasons for its determination not to offer them a HAMP modification or a HAMP-like modification, such as an FHA-HAMP modification.

464.    Caliber has engaged in a pattern or practice of violating these provisions of 12 C.F.R. § 1024.41 as three of the five named Plaintiffs entered into or were offered Interest Only Modifications even though Caliber was required to have a HAMP or HAMP-like product.

465.    Additionally, Defendant U.S. Bank Trust purchased all of the mortgages sold during the June 11, 2014 Note Sale, which was over 22,000 mortgages. Caliber services all of these mortgages on behalf of U.S. Bank Trust. Thus, upon information and belief, Caliber has engaged in a pattern or practice of violating these provisions of 12 C.F.R. § 1024.41 by maintaining a policy of refusing to offer HAMP or HAMP-like modifications to homeowners whose notes were sold as part of the June 11, 2014 Note Sale, even though Caliber was required to have a HAMP or HAMP-like product.

466.    These regulations are enforceable against Defendant Caliber through RESPA. 12 U.S.C. § 2605(f).

467.    As a direct and proximate result of these violations of 12 C.F.R. § 1024.41, Plaintiffs and the members of the Class have suffered actual damages.

468.    As a result of the above violations of RESPA, Defendant Caliber is liable to Plaintiff and the Class for actual damages and the maximum amount of statutory damages provided under 12 U.S.C. § 2605(f), attorney's fees, litigation expenses and costs, and such other and further relief as this Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request the following relief:

i.    An order certifying this case as a class action under Fed. R. Civ. P. 23 and designating the Plaintiffs as the Class Representatives and their counsel as Class Counsel;

ii.  A judgment declaring that Defendants have committed the violations of law alleged in this action;

iii.  An order enjoining Federal Defendants from continuing to harm Plaintiffs and members of the Class by conducting future Note Sales;

iv.  An order enjoining and directing Federal Defendants, without limitation, to:

a.  Review the racial impact of prior Note Sales on African-American homeowners and communities in New York City;

b.  To the extent that future note sales are permitted, ensure that such note sales are in accordance with the Fair Housing Act; and

c.  To the extent that future note sales are permitted, ensure that homeowners whose mortgages are contemplated to be sold in the note sales are provided sufficient notice and an opportunity to be heard;

v.  An order enjoining and directing Lone Star Defendants to comply with federal and state law in its modification program, including without limitation:

a.  Directing Lone Star Defendants to cease engaging in practices that violate the FDCPA, GBL § 349, and the Fair Housing Act;

b.  Directing Caliber to cease engaging in practices that violate RESPA;

c.  Directing Lone Star Defendants to review homeowners for a HAMP or HAMP-like modification;

d.  Directing Lone Star Defendants to locate class members and notify them that they can be re-reviewed for a HAMP or HAMP-like product;

e.   Directing Lone Star Defendants to cease from including a repudiation of the assumability of the mortgage in future modification agreements of mortgages purchased through HUD's Note Sale Program;

vi.   Actual and/or compensatory damages against all Defendants, except the individual defendants sued in their official capacity only, in an amount to be proven at trial;

vii.   Statutory damages against the Lone Star Defendants pursuant to the FDCPA, 15 U.S.C. § 1692k;

viii.   Treble damages against the Lone Star Defendants pursuant to GBL § 349(h);

ix.   Additional damages against the Lone Star Defendants pursuant to RESPA, 12 U.S.C. § 2605(f);

x.   Punitive damages pursuant to the Fair Housing Act, 42 U.S.C. § 3613(c);

xi.   Reasonable costs and litigation expenses of this action as set forth above;

xii.   Reasonable attorney's fees;

xiii.   Pre-judgement and post-judgement interest, to the extent allowable by law; and

xiv.   Such other and further relief as this Court finds may be just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs request a jury on all claims so triable.

Dated: August 12, 2016
New York, New York


MFY LEGAL SERVICES, INC.

By:  /s/ Elizabeth M. Lynch_____
Elizabeth M. Lynch,
Christopher Fasano,
Linda Jun, of counsel to
Jeanette Zelhof, Esq.
299 Broadway, 4th Floor
New York, NY 10007
Tel: (212) 417-3700


EMERY CELLI BRINCKERHOFF
& ABADY LLP

By:  /s/ Matthew D. Brinckerhoff_____
Matthew D. Brinckerhoff
Diane L. Houk
600 Fifth Avenue, 10th Floor
New York, NY 10020
Tel: (212) 763-5000