**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| JOSEPH WASHINGTON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:16-cv-03948-ENV-SMG |
| UNITED STATES DEPARTMENT OF | ) | |
| HOUSING & URBAN DEVELOPMENT, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF THE FEDERAL DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

BACKGROUND ...............................................................................................................3

   I.    Statutory and Regulatory Framework ....................................................................3

   II.   FHA's Single Family Loan Sale Program ...............................................................7

   III.  This Litigation ........................................................................................................10

STANDARD OF REVIEW ...............................................................................................11

ARGUMENT .....................................................................................................................12

   I.    PLAINTIFFS LACK STANDING TO ASSERT THEIR CLAIMS AGAINST
       THE FEDERAL GOVERNMENT..........................................................................12

       A.   Plaintiffs Lack Standing Because They Have Not Suffered An Injury-in-
           Fact..................................................................................................................12

       B.   Plaintiffs Lack Standing Because Their Purported Injury Is Not Fairly
           Traceable to the Federal Defendants.............................................................15

       C.   Plaintiffs Lack Standing Because Their Claims Are Not Redressable By
           This Court .......................................................................................................18

   II.   EVEN IF THE COURT HAD SUBJECT MATTER JURISDICTION OVER
       PLAINTIFFS' CLAIMS AGAINST THE FEDERAL DEFENDANTS, THESE
       CLAIMS FAIL AS A MATTER OF LAW..............................................................22

       A.   Plaintiffs Have Failed to State a Claim that Their Fifth Amendment
           Due Process Rights Were Violated.................................................................22

       B.   Plaintiffs' Claim for Breach Of An Implied Contract Is Without Merit..........25

       C.   Plaintiffs' Fair Housing Act Claim Under 3608(e)(5) Fails As a
           Matter Of Law.................................................................................................27

       D.   Plaintiffs' § 3604 Disparate Impact Claim Under the Fair Housing Act
           Fails As a Matter Of Law................................................................................31

CONCLUSION..................................................................................................................35

i

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*ACLU v. NSA*,
   493 F.3d 644 (6th Cir. 2007) ............................................................ 20

*Allco Finance Ltd. v. Klee*,
   805 F.3d 89 (2d Cir. 2015).............................................................. 18

*American Disabled for Attendant Programs Today v. HUD*,
   170 F.3d 381 (3d Cir. 1999)............................................................ 29

*Amityville Mobile Home Civic Ass'n v. Town of Babylon*,
   Civ. No. 14-2369, 2015 WL 1412655 (E.D.N.Y. Mar. 26, 2015)............... 11

*Baur v. Veneman*,
   352 F.3d 625 (2d Cir. 2003)............................................................ 14

*Bd. of Regents of State Colls. v. Roth*,
   408 U.S. 564 (1972)...................................................................... 23

*Benzman v. Whitman*,
   523 F.3d 119 (2d Cir. 2008)............................................................ 28

*Bowen v. Georgetown Univ. Hosp.*,
   488 U.S. 204 (1988)...................................................................... 20

*Bresier v. Golden Nat'l Mortg. Banking Corp.*,
   225 F.3d 645 (2d Cir. 2000)........................................................ 24, 26

*City of Cincinnati v. United States*,
   153 F.3d 1375 (Fed. Cir. 1998)........................................................ 26

*Clapper v. Amnesty Int'l USA*,
   133 S. Ct. 1138 (2013).................................................................. 13

*Cobb Cty. v. Bank of Am. Corp.*,
   183 F. Supp. 3d 1332 (N.D. Ga. 2016)............................................... 33

*CREW v. Dep't of Homeland Sec.*,
   527 F. Supp. 2d 101 (D.D.C. 2007).................................................. 19

*Cutler v. U.S. Dep't of Health & Human Servs.*,
   797 F.3d 1173 (D.C. Cir. 2015)................................................... 17, 18

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ................................................................................................ 12

*Dean v. HUD*,
  No. 00-56(H), 2000 WL 575576 (W.D.N.Y. Mar. 14, 2000) .................................... 21

*Ellis v. City of Minneapolis*,
  No. 14cv3045, 2015 WL 5009341 (D. Minn. Aug. 24, 2015) ................................... 33

*Friends for Ferrell Pkwy., LLC v. Stasko*,
  282 F.3d 315 (4th Cir. 2002) .................................................................................. 15

*Fulton v. Goord*,
  591 F.3d 37 (2d Cir. 2009) ...................................................................................... 12

*Garcia v. Vilsack*,
  563 F.3d 519 (D.C. Cir. 2009) ................................................................................. 31

*Godwin v. Sec'y of Hous. & Urban Dev.*,
  356 F.3d 310 (D.C. Cir. 2004) ................................................................................. 31

*Habecker v. Town of Estes Park, Colo.*,
  518 F.3d 1217 (10th Cir. 2008) ............................................................................... 13

*HDC LLC v. City of Ann Arbor*,
  675 F.3d 608 (6th Cir. 2012) ................................................................................... 35

*Hollywood Mobile Estates v. Seminole Tribe of Fla.*,
  641 F.3d 1259 (11th Cir. 2011) ............................................................................... 20

*Houck v. U.S. Bank NA*,
  No. 15-10042 (AJN), 2016 WL 5720783 (S.D.N.Y. Sept. 30, 2016) ....................... 14

*Inclusive Communities Project, Inc. v. U.S. Dep't of Treasury*,
  No. 3:14cv3013-D, 2016 WL 6397643 (N.D. Tex. Oct. 28, 2016) ................... 32, 33, 34

*Inclusive Communities Project, Inc. v. Tex. Dep't of Housing & Cmty. Affairs*,
  No. 3:08cv0546, 2016 WL 4494322 (N.D. Tex. Aug. 8, 2016) ................................. 33

*Keita v. U.S. Small Business Admin.*,
  Civ. No. 07-4958, 2010 WL 395980 (E.D.N.Y. Feb. 3, 2010) ............................. 11, 12

*Lewis v. Casey*,
  518 U.S. 343 (1996) ................................................................................................ 13

*Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ........................................................................... 19

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ........................................................... 12, 15, 18

*Makarova v. United States*,
  201 F.3d 110 (2d Cir. 2000) ........................................................ 11

*Mhany Mgmt. Inc. v. Cty. of Nassau*,
  819 F.3d 581 (2d Cir. 2016) ........................................................ 32

*NRDC v. U.S. Food & Drug Admin.*,
  710 F.3d 71 (2d Cir. 2013) .......................................................... 15

*Nicosia v. Amazon.com, Inc.*,
  834 F.3d 220 (2d Cir. 2016) .................................................... 19, 22

*Norton v. Southern Utah Wilderness Alliance*,
  542 U.S. 55 (2004) ................................................................ 27, 27, 30

*Otero v. New York City Housing Authority*,
  484 F.2d 1122 (2d Cir. 1973) ...................................................... 30

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
  797 F.3d 1087 (D.C. Cir. 2015) ................................................ 28, 29

*Petro-Chem Processing, Inc. v. EPA*,
  866 F.2d 433 (D.C. Cir. 1989) .................................................... 17

*Plunkett v. Castro*,
  67 F. Supp. 3d 1 (D.D.C. 2014) ................................................. 163

*Resolute Forest Prods., Inc. v. U.S. Dep't of Agric.*,
  130 F. Supp. 3d 81 (D.D.C. 2015) ................................................ 0

*Robbins v. HUD*,
  72 F. Supp. 3d 1 (D.D.C. 2014) ................................................. 15

*Sec'y of HUD v. Sky Meadow Ass'n*,
  117 F. Supp. 2d 970 (C.D. Cal. 2000) ......................................... 4

*Sinclair v. Donovan*,
  No. 11-00010, 2011 WL 5326093 (S.D. Ohio Nov. 4, 2011) ......................... *passim*

iv

*Spiro v. Healthport Tech., LLC*,
  73 F. Supp. 3d 259 (S.D.N.Y. 2014)................................................................19

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*,
  135 S. Ct. 2507 (2015)..........................................................................*passim*

*Thompson v. Donovan*,
  No. 13cv2988-CS, 2014 WL 5149037 (S.D.N.Y. Oct. 14, 2014)........................29

*Trauma Serv. Grp. v. United States*,
  104 F.3d 1321 (Fed. Cir. 1997)..................................................................27

*Trustees of Upstate New York Engineers Pension Fund v. Ivy*,
  843 F.3d 561 (2d Cir. 2016)......................................................................11

*United States v. Chelsea Towers, Inc.*,
  295 F. Supp. 1242 (D.N.J. 1967)..............................................................24

*United States v. Lawrence Towers, Inc.*,
  236 F. Supp. 208 (E.D.N.Y. 1964)............................................................24

*United States v. Neustadt*,
  366 U.S. 696 (1961)...............................................................................*passim*

*W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*,
  549 F.3d 100 (2d Cir. 2008).................................................................12, 13

*Wards Cove Packing Co. v. Antonio*,
  490 U.S. 642 (1989)...............................................................................32

*Ziemba v. Rell*,
  409 F.3d 553 (2d Cir. 2005).....................................................................15

## STATUTES & REGULATIONS

5 U.S.C. § 701........................................................................................21
5 U.S.C. § 702........................................................................................27
5 U.S.C. § 704........................................................................................31
5 U.S.C. § 706.............................................................................27, 29, 30
12 U.S.C. § 1701......................................................................................3
12 U.S.C. § 1708...............................................................................3, 5, 6
12 U.S.C. § 1709......................................................................4, 6, 24, 25
12 U.S.C. § 1710..............................................................................*passim*
12 U.S.C. § 1715b....................................................................................4
12 U.S.C. § 1715u..............................................................................*passim*

12 C.F.R. § 1024.33 ................................................................................................... 18

42 U.S.C. § 3601 ...................................................................................................... 10

42 U.S.C. § 3613 ...................................................................................................... 20

24 C.F.R. § 25.5 ......................................................................................................... 6

24 C.F.R. § 100.500 ............................................................................................ 32, 35

24 C.F.R. § 200.145 .................................................................................................... 4

24 C.F.R. pt. 203 ......................................................................................................... 4

24 C.F.R. § 203.251 ............................................................................................... 4, 26

24 C.F.R. § 203.257 .................................................................................................... 4

24 C.F.R. § 203.260-.285 ............................................................................................ 5

24 C.F.R. § 203.331 .................................................................................................... 5

24 C.F.R. § 203.500 .................................................................................................... 6

24 C.F.R. § 203.501 .......................................................................................... *passim*

24 C.F.R. § 203.606 .................................................................................................... 6

## INTRODUCTION

Congress has tasked Defendants the United States Department of Housing and Urban Development ("HUD"), Ben Carson in his official capacity as Secretary of HUD, and the Commissioner of the Federal Housing Administration ("FHA"), a component agency of HUD (collectively, "the Federal Defendants"), with administering the Single Family Insured Mortgage Program, an insurance program established to encourage approved mortgage lenders to meet the housing needs of certain creditworthy low- and moderate-income borrowers.  To encourage mortgage lenders to participate in this program, Congress authorized HUD to insure approved mortgage lenders against losses incurred when borrowers, like Plaintiffs, default on their mortgage loans.  When a borrower defaults and the lender meets the prerequisites to claim payment set forth in HUD's regulations, HUD is obliged to pay the mortgage lender's insurance claim using funds from the Mortgage Mutual Insurance Fund ("MMIF").  Congress has also imposed on HUD a fiduciary responsibility to ensure the fiscal soundness of the fund.

This case concerns HUD's operation of the Distressed Asset Stabilization Program ("DASP")[1], created in the wake of the country's foreclosure crisis.  DASP provides a mechanism for FHA-approved mortgage lenders holding eligible defaulted mortgage loans to assign the mortgage loans to HUD in exchange for an insurance payment.  HUD, in turn, may then sell the loans (which are now no longer FHA-insured) to a qualified purchaser, which may be a nonprofit organization, state or local government, or private lender.  Plaintiffs, four African-American residents of New York who defaulted on their FHA-backed loans, allege that the Federal

---

[1]  The Plaintiffs refer to this as the "Note Sale Program," but this memorandum will use the official nomenclature.  *See* Written Testimony of Julián Castro, Secretary of the U.S. Department of Housing & Urban Development ("HUD"), Hearing Before the House of Representatives Committee on Financial Services (July 13, 2016) ("Castro Testimony"), *available at* http://financialservices.house.gov/uploadedfiles/hhrg-114-ba00-wstate-jcastro-20160713.pdf.

1

Defendants' actions under DASP violated Plaintiffs' due process rights, breached an implied contract between Plaintiffs and the Federal Defendants, and violated the Fair Housing Act by creating a racially discriminatory impact and failing to fulfill HUD's statutory duty to affirmatively further fair housing.  Plaintiffs' claims against the Federal Defendants fail for at least four reasons, and this Court should therefore dismiss the Complaint with prejudice.

First, Plaintiffs lack standing to mount this programmatic attack on DASP.  Plaintiffs' purported injuries, including the sale of their defaulted mortgage loans and their purported loss of FHA mortgage program "benefits," do not constitute deprivation of a legally cognizable interest.  Nor is Plaintiffs' conjecture that DASP prevented them from reaching an accommodation with their mortgagee or otherwise increased their likelihood of foreclosure sufficiently concrete or particularized to establish standing.   And even if Plaintiffs had adequately alleged an injury-in-fact, their alleged injuries are not traceable to the Federal Defendants, but are a direct result of their own failure to pay their respective mortgage loans and the independent actions of the third-party mortgage lenders who identified and submitted Plaintiffs' defaulted loans for sale in DASP.  Plaintiffs' claims are also not redressable.

Second, even if Article III standing existed, Plaintiffs' claims under the Due Process Clause and their implied contract theory fail as a matter of law.  Plaintiffs' due process claim (Count I) fails because Plaintiffs lack a property interest in the alleged "benefits" of HUD mortgage insurance.  The Supreme Court has held that federal mortgage insurance does not create a legal relationship between the Federal Housing Administration and the individual borrower.  Plaintiffs thus lack any legally cognizable interest in a contract that the government entered into with a third-party mortgagee.  Plaintiffs' implied breach of contract claim (Count IV) likewise fails because,

2

as a matter of law, there was no "meeting of the minds" sufficient to create an implied contract between Plaintiffs and the Federal Defendants.

Third, equally meritless is Plaintiffs' claim that the Federal Defendants must "perform an analysis" of the "impact of DASP on African-American homeowners in New York City or on predominantly African-American neighborhoods in New York City" (Count II). The broad statutory mandate to affirmatively further fair housing does not prescribe any such analysis. Rather, the Fair Housing Act establishes a broad framework in which HUD exercises discretion to decide how to effectuate the directive to affirmatively further fair housing.

Finally, Plaintiffs' claim that DASP has a disparate impact on African-American homeowners in New York and predominately African-American neighborhoods in violation of the Fair Housing Act (Count III) fails as a matter of law. Because Plaintiffs have not and cannot identify any plausible let alone "robust" chain of causation linking a HUD policy to any purported racial disparity, Plaintiffs' disparate impact theory runs directly afoul of the Supreme Court's decision in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2523 (2015).

Accordingly, for these reasons and those discussed in detail below, the Court should dismiss Plaintiffs' claims against the Federal Defendants.

## BACKGROUND

### I.     Statutory and Regulatory Framework

The National Housing Act ("NHA"), 12 U.S.C. § 1701 *et seq*., establishes, *inter alia*, the Federal Housing Administration's single family insured loan program "to meet the housing needs" of creditworthy low- and moderate-income borrowers whose mortgages meet eligibility criteria. 12 U.S.C. § 1708(a)(7). To encourage mortgagees (lenders) to make loans to such borrowers,

Congress authorized HUD to enter into contracts with approved mortgagees to provide mortgage insurance to cover losses incurred by mortgagees in the event of a borrower default. *See* 12 U.S.C. §§ 1709(a), (b)(1), (e). "By insuring the mortgage, HUD encourages private lenders to make loans to individuals who would not otherwise qualify for a loan." *Sec'y of HUD v. Sky Meadow Ass'n*, 117 F. Supp. 2d 970, 973 (C.D. Cal. 2000). In doing so, "[t]h[e] [FHA mortgage insurance] program substantially increases the number of low to moderate income families who can purchase a home." *Id.* The program's implementing regulations[2] serve as the terms of the mortgage insurance contract, which is between the mortgagee and HUD. *See generally* 24 C.F.R. pt. 203 subpt. B ("Contract Rights and Obligations"); *see also id.* § 203.257 ("The [FHA] Commissioner and the mortgagee are thereafter bound by the regulations in [24 C.F.R. part 203 subpart B] with the same force and to the same extent as if a separate contract had been executed relating to the insured mortgage, including the provisions of the regulations in [24 C.F.R. part 203 subpart B] and of the [NHA]."); *id.* § 203.251(j) (defining "Contract of Insurance" as the agreement evidenced by the issuance of a Mortgage Insurance Certificate or by the endorsement of the Commissioner upon the credit instrument given in connection with an insured mortgage, incorporating by reference the regulations in [24 C.F.R. part 203 subpart B] and the applicable provisions of the [NHA]."). The mortgagor (homeowner) is *not* a party to the contract of mortgage insurance between HUD and eligible mortgagees, *see United States v. Neustadt*, 366 U.S. 696, 709 (1961); *see also* 24 C.F.R. § 200.145(b), nor does the FHA mortgage insurance program provide benefits or subsidies from HUD to homeowners. Rather, the FHA mortgage insurance program operates solely through HUD's contracts with approved mortgagees.

---

[2] *See* 12 U.S.C. § 1715b (authorizing HUD to issue regulations "to carry out the provisions" of the FHA mortgage insurance program).

Under the terms of the mortgage insurance contract, HUD agrees to pay insurance benefits to mortgagees in the event of a borrower default on an FHA-insured mortgage, provided that the mortgagee complies with all prerequisites for claim payment.  Insurance benefits may include payments for costs incurred by mortgagees in mitigating the potential loss to HUD under the defaulted loan, including through loan modification.  *See* 12 U.S.C. §§ 1710(a) & 1715u.  HUD pays the mortgagee's insurance claim with funds from the MMIF.  To fund the insurance, mortgagees pay HUD a mortgage insurance premium.  *See* 24 C.F.R. §§ 203.260-.285.  To ensure that there are sufficient funds to pay insurance claims made under the FHA mortgage insurance program, Congress has imposed upon HUD a "fiduciary responsibility" to "ensure that . . . [the Fund] remains financially sound."  12 U.S.C. § 1708(a)(3); *see also id.* § 1711(f) (requiring the Secretary to ensure that the Fund maintains a capital ratio of not less than 2% at all times).  Although mortgagees may pass on the cost of the mortgage insurance premium to borrowers, *see* 24 C.F.R. § 203.22(a), borrowers do not purchase insurance (or anything else) from HUD.  *Id.* §§ 203.260-.285.

In the event of a mortgagor default,[3] the NHA and its implementing regulations require a mortgagee to evaluate loss mitigation options.  12 U.S.C. § 1715u(a) ("Upon default . . . of any mortgage insured under this title, mortgagees shall engage in loss mitigation actions for the purpose of providing an alternative to foreclosure . . . as provided in regulations by the Secretary.").  HUD designed a loss mitigation program that sets out various options available to mortgagees to protect the fiscal health of the Fund.  *See* 24 C.F.R. § 203.501 (instructing mortgagees to "consider the comparative effects of their elective servicing actions, and [] [to] take those appropriate actions

---

[3] Under HUD's regulations, default is defined as the mortgagor's failure "to make any payment or perform any other obligation under the mortgage" for a continuous period of 30 days.  24 C.F.R. § 203.331(a).

which can reasonably be expected to generate the smallest financial loss to the Department"). Section 203.501 of the NHA's implementing regulations sets forth the loss mitigation options, which include: (1) deeds-in-lieu of foreclosure under § 203.357, (2) pre-foreclosure sales under § 203.370, (3) partial claims under § 203.414, (4) assumptions under § 203.512, (5) special forbearance under § 203.417 and § 203.614, and (6) recasting of mortgages under § 203.616. *Id.* It is within the mortgagee's discretion, in performing its loss mitigation evaluation, to select the loss mitigation option that will minimize the financial loss to the Department. *See id.* § 203.501. Congress has made clear that HUD cannot be compelled to implement, under the "[National Housing] Act or any other law," an alternative to foreclosure for insured mortgage lenders (*i.e.*, require the mortgagees to use a specific loss mitigation option). *See* 12 U.S.C. § 1715u(f) ("No provision of this Act, or any other law, shall be construed to require the Secretary to provide an alternative to foreclosure for mortgagees with mortgages on 1-to-4 family residences insured by the Secretary under this Act, or to accept assignments of such mortgages.").[4]

HUD's regulations also delineate the time period in which a mortgagee may initiate foreclosure proceedings. A mortgagee may not initiate foreclosure proceedings against a borrower until the borrower has failed to pay at least three months' worth of monthly mortgage loan payment installments. *See* 24 C.F.R. § 203.606. HUD's regulations also make clear that a mortgagee *must* initiate foreclosure proceedings against a borrower no later than six months from the date of

---

[4] Even when a participating mortgagee has failed to comply with the loss mitigation requirements, under the statutory and regulatory framework, the Secretary may not deny insurance benefits to the mortgagee. *See* 12 U.S.C. § 1709(e); *see also* 24 C.F.R. § 203.500. The Secretary may impose a civil penalty, *see* 24 C.F.R. pt. 30; *see also* 12 U.S.C. § 1753f-14(b)(1)(I), or take administrative action, including withdrawal or suspension of the mortgagee's FHA approval, *i.e.*, barring the mortgagee's future participation in the FHA mortgage insurance program, *see* 12 U.S.C. § 1708(c)(3); *see also* 24 C.F.R. § 25.5. The Secretary may also issue a cease-and-desist order, *see* 12 U.S.C. § 1708(c)(6).

default.[5]  *See id.* § 203.355(a); *see also id.* § 203.356(b) (mortgagee must "exercise reasonable diligence in prosecuting foreclosure proceedings to completion and in acquiring title to and possession of the property").  If a borrower is able to bring the loan current by paying a lump sum, including any foreclosure costs and reasonable attorneys' fees and expenses related to the foreclosure proceedings, the mortgagee must permit the borrower to reinstate the mortgage.  *See id.* § 203.608.  The mortgagee, however, is not required to allow reinstatement of the loan twice in two years.  *See id.*

## II.    FHA's Single Family Loan Sale Program

Congress has granted the Secretary authority to accept assignment of eligible, defaulted mortgage loans in exchange for payment of FHA insurance claims and to dispose of the real estate subject to those mortgages or the mortgages himself.  Under the NHA, HUD can pay insurance benefits to a mortgagee (thereby terminating the mortgage insurance contract) "*whenever* a mortgage has been in a monetary default for not less than 3 full monthly installments."  12 U.S.C. § 1710(a)(1)(A) (emphasis added).  "Insurance benefits shall be paid . . . upon the assignment, transfer and delivery to the Secretary of" rights and interests under the mortgage, and related claims of the mortgagee against the mortgagor.  *Id.*  The statute expressly provides that "[n]either the Secretary nor any servicer of the mortgage [retained by HUD] shall be required to forbear from collection of amounts due under the mortgage or otherwise pursue loss mitigation measures," *id.* § 1710(a)(4), and that HUD may sell such mortgages "*on such terms and conditions as the Secretary may prescribe*."  *Id.* at § 1710(g) (emphasis added).  Congress has also provided that no mortgagee or mortgagor has "any right or interest in any property conveyed to the Secretary …

---

[5] If the mortgagee fails to meet this time frame, the interest on its insurance claim may be reduced.  *See* 24 C.F.R. § 203.402(k)(1)(i).

nor [does] the Secretary owe any duty to any mortgagee or mortgagor with respect to the handling or disposal of any such property or the collection of any such claim." 12 U.S.C. § 1710(i).

Pursuant to this authority, HUD designed DASP "to maximize recoveries to the [MMIF], and when possible, help keep borrowers—otherwise headed to foreclosure—in the home." Report to the Commissioner on Post-Sale Reporting FHA Single Family Loan Sale Program ("2016 Commissioner Report") (Data as of January 22, 2016) at 2, available at https://portal.hud.gov/hudportal/documents/huddoc?id=rprt.12616.pdf. The Program achieves this goal by allowing mortgage servicers to assign defaulted mortgage loans to FHA "prior to a foreclosure sale, thereby avoiding the costly and potentially lengthy foreclosure process." *Id.* In addition, under DASP, borrowers who have defaulted on their mortgage loans may end up with "a second chance to keep their home" and "avoid costly foreclosures," if they are able to resolve their defaulted loans with the successful purchasers, who, having acquired the mortgages at "competitive prices," therefore have "the flexibility to service the [defaulted loans] conventionally." *Id.* at 1, 2. By minimizing losses on defaulted loans, DASP helps the Secretary satisfy his fiduciary duty to preserve the MMIF while generating new opportunities for positive borrower outcomes. *Id.* Such opportunities would not be available to a borrower whose mortgage servicer elects not to perfect its FHA insurance claim through participation in DASP. *Id.*

DASP includes two types of sales: (1) National sales pools, which represent the bulk of the sales and are not geographically restricted; and (2) Neighborhood Stabilization Outcome pools, which sell pooled defaulted loans in a defined geographic area. *See* Castro Testimony at 1. The loans for plaintiffs Washington, Blackett, and Mason were sold in National sale pools. Am. Compl. (ECF No. 11) ¶ 154. Overall, HUD has sold approximately 105,000 defaulted loans through the DASP Note Sale Program. *See* Castro Testimony at 2; Financial Status of the FHA

8

Mutual Mortgage Insurance Fund FY 2015 ("Annual Report FY 2015"), at 29.  The average loan is 2.5 years delinquent at the time of settlement.  2016 Commissioner Report at 2.

Despite the magnitude of the default of the underlying mortgages, DASP has resulted in positive outcomes for thousands of borrowers.  For the 57,400 defaulted loans sold through the program, foreclosure has been avoided for 43.3% of the borrowers, including nearly 10,000 borrowers whose loans became re-performing after sale, primarily as a result of loan modifications, and 15,000 borrowers were able to avoid foreclosures through short sales or deed-in-lieu of foreclosure transactions.  2016 Commissioner Report at 2.  In addition to providing expanded options for borrowers, DASP has protected the solvency of the MMIF.  *Id.*  Overall loss rates to the Fund have declined from 63.5% in the first quarter of 2010 to 51.3% in the fourth quarter of 2015.  *Id.*  "FHA estimates that DASP recoveries . . . [have] netted $2.2 billion."  Annual Report FY 2015 at 29.

As noted above, mortgagees choosing to submit insurance claims on defaulted loans through DASP must first determine whether those loans satisfy certain criteria, including that the loan "is at least six (6) full payments past due under the terms of the Mortgage Note, or at least three (3) full payments past due under the terms of the Mortgage Note and the Participating Servicer has determined that the Mortgaged Property is vacant or abandoned."  *See* Declaration of John W. Lucey ("Lucey Decl."), Exhs. A-C, Participating Servicer Agreement ("PSA"), Art. I, Eligible Mortgage Loan Definition, subsection (e), at p.9.  In addition, in order to submit a defaulted loan for sale in DASP, a mortgagee must fulfill its loss mitigation obligations under 24 C.F.R. § 203.501.  Importantly, "each Participating Servicer is responsible for evaluating its portfolio for mortgage loans eligible for" sale in DASP, and each participating servicer must certify that the defaulted mortgage loan satisfies DASP's criteria, including that the mortgagee has

complied with HUD's loss mitigation regulations.  PSA, Lucey Decl. Exhs. A-C, Art. II., § 2.01, at 15; Art. III, § 3.02(a), at p. 22; *see also* Am. Compl.  ¶ 117.

Once a mortgagee has determined that certain loans in its portfolio satisfy DASP criteria, the mortgagee submits to HUD an electronic report of the loans it intends to submit for sale through DASP and an eligibility certification.   PSA, Lucey Decl. Exhs. A-C, Art. II., § 2.01, at 15; Art. III, § 3.02(a), at p. 22.  HUD then assigns the defaulted loans a date identifier for purposes of the note sale.  *Id.* Art. II, § 2.02, at p. 16.  HUD relies upon the representation from the participating mortgage servicer that the loans submitted for sale through DASP meet the eligibility criteria.  *Id.*, Art. III, § 3.03(b), at p. 28.   Prior to the note sale, mortgagees are required to submit updates to HUD regarding any changes in data since the submission of the loan, including unpaid principal and escrow balances and whether the mortgagee "no longer intends to submit" the loan for sale in DASP.  *Id.*, Art. II, § 2.01, at p.15-16.  At settlement, the purchasing mortgagee becomes the owner of the loan as of the date of insurance claim payment to the original mortgagee.  *See* 12 U.S.C. § 1710(g).  HUD takes title only momentarily for purposes of the sale.  *Id.*

## III.    This Litigation

Plaintiffs Joseph Washington, St. Clair Blackett, Lucille Mason, and Melissa Trotman are African-American residents of New York City who filed this putative class action challenging, among other things, the Federal Defendants' implementation and operation of DASP.  *See generally* Am. Compl..  Plaintiffs allege that the Federal Defendants' operation of DASP violates their Fifth Amendment due process rights and the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, and breaches implied contracts between themselves and the Federal Defendants.  *Id.* ¶¶ 381-95, 414-22.  Plaintiffs seek a declaration that the Federal Defendants' operation of DASP violates the Due Process Clause and the Fair Housing Act.  *Id.* Prayer for Relief, ¶¶ (ii)-(iv).  Plaintiffs also seek to

enjoin future note sales, and they request that the Court order the Federal Defendants to review the racial impact of prior note sales on African-American homeowners and communities in New York City. *Id.* ¶¶ (iii)-(iv). Plaintiffs also seek unspecified damages. *Id.* ¶¶ (vi), (x).

## STANDARD OF REVIEW

Federal Defendants move to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). To survive a Rule 12(b)(1) motion to dismiss, Plaintiffs bear the burden of demonstrating that they have standing to sue and must do so by "alleg[ing] facts that affirmatively and plausibly suggest that" standing exists. *Amityville Mobile Home Civic Ass'n v. Town of Babylon*, No. 14-cv-2369 (SJF), 2015 WL 1412655, at *3 (E.D.N.Y. Mar. 26, 2015) (internal citation omitted). "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside of the pleadings." *Makarova*, 201 F.3d at 113. If Plaintiffs cannot satisfy their burden of demonstrating standing, the Court must dismiss the suit. *See, e.g.*, *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy*, 843 F.3d 561, 569 (2d Cir. 2016).

"A court considering a motion to dismiss pursuant to 12(b)(6) must 'accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party.'" *Keita v. U.S. Small Business Admim*. Civ. No. 07-4958 (ENV)(LB), 2010 WL 395980, at *2 (E.D.N.Y. Feb. 3, 2010) (citation omitted). To determine whether Plaintiffs have stated a claim upon which relief may be granted, "a court may only consider, in addition to the pleading itself, documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when

bringing suit, and matters of which judicial notice may be taken." *Id.*  If, after reviewing these materials and accepting as true the facts alleged in the complaint, the Court determines that the complaint fails to state a claim upon which relief may be granted, it must be dismissed.  *See id.*

## ARGUMENT

## I.        PLAINTIFFS LACK STANDING TO ASSERT THEIR CLAIMS AGAINST THE FEDERAL DEFENDANTS.

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies," the "core component of [which] is standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Plaintiffs bear the burden of establishing standing, and this Court must be satisfied that they have met this burden to reach the merits of the claims against the Federal Defendants.  *See id.* at 561.  To make this showing, Plaintiffs must establish "three irreducible elements: (1) 'injury-in-fact'; (2) causation in the form of a 'fairly traceable' connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief."  *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106-08 (2d Cir. 2008) (quoting *Lujan*, 504 U.S. at 560).  Failure to establish any one of the three standing elements deprives the Court of jurisdiction and requires dismissal of the claims. *Fulton v. Goord*, 591 F.3d 37, 41 (2d Cir. 2009).  Moreover, "a plaintiff must demonstrate standing for each claim he seeks to press" and "for each form of relief" that is sought.  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  Indeed, "[s]tanding is not dispensed in gross."  *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).

### A.  Plaintiffs Lack Standing Because They Have Not Suffered an Injury-in-Fact.

Plaintiffs' asserted injury is their "remov[al] from the FHA Mortgage Program" and resulting loss of purported FHA Mortgage Program benefits.  Am. Compl. ¶ 6; *see also id.* ¶¶ 40-

80 (describing "[t]he benefits of the FHA Mortgage Program"). [6]   However, as a matter of law, Plaintiffs are not entitled to FHA mortgage program benefits.  As explained in detail below, *infra* at 22-25, the text of the National Housing Act and its implementing regulations as well as Supreme Court precedent make clear that the FHA Mortgage Program does not confer rights or benefits on participating borrowers.  *See United States v. Neustadt*, 366 U.S. 696, 709 (1961) (analyzing the text and legislative history of the National Housing Act and concluding that "'there is no legal relationship between the [Federal Housing Administration] and the individual [borrower]'").  Because Plaintiffs do not have a legal or proprietary interest in FHA mortgage program benefits, they have not alleged the deprivation of a property or contractual interest sufficient to establish an injury-in-fact that would confer standing for their due process and breach of implied contract claims, *see W.R. Huff*, 549 F.3d at 108 (explaining that "the minimum requirement for an injury-in-fact is that the plaintiff have a legal title to, or proprietary interest in, the claim").

Furthermore, Plaintiffs' speculation that the sale of their defaulted mortgage loans through DASP increases their risk of foreclosure, *see, e.g.*, Am. Compl. ¶¶ 186, 190, is too conjectural to establish an Article III injury.  "To qualify as a constitutionally sufficient injury-in-fact, the asserted injury must be 'concrete and particularized' as well as 'actual and imminent,' not

---

[6] It bears mentioning that Plaintiff Trotman has not yet suffered this purported injury because, as she concedes, her defaulted mortgage loan has not been submitted for sale in DASP.  *See* Am. Compl. ¶ 363.  And Ms. Trotman's unsubstantiated speculation that her mortgage loan *may* be sold in DASP at some point in the future, *see id.*, is simply that—speculation.  Indeed, Plaintiffs' prediction that Ms. Trotman's defaulted mortgage loan would be sold in the September 2016 DASP, *see id.*, did not come to fruition.  Moreover, as discussed in detail below, *see infra* at 20-21, whether Plaintiff Trotman's defaulted mortgage loan is sold hrough DASP at some date in the future depends entirely on the discretion of her current mortgage servicer.  Under these circumstances, Plaintiff Trotman lacks standing and her claims against the Federal Defendants must be dismissed. *See Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1155 (2013) (holding that plaintiffs lack standing "because they cannot demonstrate that the future injury they purportedly fear is certainly impending"); *see also Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1225 (10th Cir. 2008).

'conjectural' or 'hypothetical.'" *Houck v. US Bank NA*, Civ. No. 15-10042 (AJN), 2016 WL 5720783, at *7 (S.D.N.Y. Sept. 30, 2016) (internal citation omitted). In their Amended Complaint, Plaintiffs assert that, but for the sale of their defaulted loans through DASP, they would have been able to negotiate a loan modification that would have kept their mortgage loans in the FHA mortgage program. *See* Am Compl. ¶ 224 (alleging that Plaintiff Washington "was actively working with [the original mortgagee] in applying for a modification that would likely be granted"); *id.* ¶ 279 (same allegation for Plaintiff Blackett); *id.* ¶ 322 (same allegation for Plaintiff Mason). But these allegations are nothing more than unsubstantiated conjecture that Plaintiffs' mortgage lenders' decisions to sell their defaulted loans through DASP deprived Plaintiffs of loan modifications they otherwise would have obtained. *Cf. Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir 2003). Plaintiffs' conjecture is further belied by their own acknowledgement that a mortgage is only eligible for sale through DASP if "(i) the mortgage is six months or more in default; and (ii) the mortgage *servicer has exhausted all of the FHA's loss mitigation options and determined that there is no home-saving solution*." Am. Compl. ¶ 117 (emphasis added). Because the mortgagees of Plaintiffs Washington, Blackett, and Mason had already determined that no loss mitigation options (*i.e.*, alternatives to foreclosure) were viable, *see id.* ¶¶ 117, 118, Plaintiffs cannot show that any subsequent sale of their defaulted mortgage loans through DASP adversely affected the likelihood of saving their respective homes. To the contrary, Plaintiffs Washington, Blackett, and Mason remain in their homes to date due in large part to the fact that their mortgagees identified and submitted their defaulted mortgage loans for sale in DASP, rather than completing foreclosure proceedings against them. *See, e.g.*, Am. Compl. ¶¶ 244 & 251 (Plaintiff Washington signed a modification and remains in home after DASP sale); *id.* ¶¶ 291 & 295 (same with respect to Plaintiff Blackett); *id.* ¶¶ 324 & 338 (same with respect to Plaintiff Mason).

14

### B. Plaintiffs Lack Standing Because Their Purported Injury Is Not Fairly Traceable to the Federal Defendants.

Plaintiffs also lack standing because they cannot show "a causal connection between [their] injury and the conduct complained of." *Lujan*, 504 U.S. at 560-61. This inquiry is in large part designed to ensure that the injury complained of is "'not the result of the independent action of some other third party not before the court.'" *Ziemba v. Rell*, 409 F.3d 553, 555 (2d Cir. 2005) (quoting *Lujan*, 504 U.S. at 560). "The presence of third party links in a causal chain can independently corroborate that a party's claim of causation is 'entirely speculative' and insufficient for standing." *Robbins v. U.S. Dep't of Hous. & Urban Dev.*, 72 F. Supp. 3d 1, 7 (D.D.C. 2014) (internal citation omitted). Put another way, where "the existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," courts will find that plaintiffs lack standing because their purported injury is not fairly traceable to defendants. *Friends for Ferrell Pkwy., LLC v. Stasko*, 282 F.3d 315, 324 (4th Cir. 2002) (quoting *Lujan*, 504 U.S. at 562). The same is true with respect to self-inflicted injuries. "An injury is self-inflicted so as to defeat the causation necessary to establish standing . . . if the injury is so completely due to the plaintiff's own fault as to break the causal chain." *Natural Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 85 (2d Cir. 2013) (citation omitted).

Here, Plaintiffs' own failure to make their mortgage payments and the independent determinations of Plaintiffs' original mortgage servicers that no further loss mitigation options were available and that the loans should be submitted for sale through DASP sever any purported link between the Federal Defendants' operation of DASP and Plaintiffs' alleged injury. Plaintiffs established an independent, contractual relationship with their original mortgagees upon execution

of their mortgages.  *See Plunkett v. Castro*, 67 F. Supp. 3d 1, 18 (D.D.C. 2014).  Pursuant to these

mortgages, Plaintiffs were contractually obligated to make payments on their loans in a timely

manner in consideration of the loan that they each respectively received.  However, as Plaintiffs

admit, they failed to do this.  *See, e.g.*, Am. Compl. ¶ 204 (Washington alleges that his oldest

unpaid installment was on November 1, 2013); *id.* ¶ 267 (Blackett's oldest unpaid installment was

on March 1, 2012); *id.* ¶ 308 (Mason's oldest unpaid installment was on August 1, 2012); *id.* ¶ 356

(Trotman's oldest unpaid installment was on or around April 2015).  Failure to make timely

payments triggered the mortgagee's right under the plain terms of the mortgage to pursue

foreclosure, and later to submit their mortgage for sale in DASP.  As explained above, when a

borrower defaults on an FHA-approved mortgage loan, the mortgagee must take whatever action

will, in its judgment, minimize losses to the MMIF.  *See* 12 U.S.C. § 1715u(a); *see also* 24 C.F.R.

§ 203.501.  And where, as here, a homeowner has been in default for at least six months, the

mortgagee must generally utilize one or a combination of options set forth in 24 C.F.R. §

203.355(a), which include the loss mitigation options and foreclosure proceedings.  *See id.* §

203.355(a)(2).  This is precisely what happened here.  As a result of Plaintiffs' failure to pay their

mortgage loans, and after loss mitigation evaluation, Plaintiffs' original mortgage servicers

initiated foreclosure proceedings, and they did so *prior to* identifying and submitting Plaintiffs'

defaulted loans for sale in DASP.  *See, e.g.*, Am. Compl. ¶¶ 276, 315, 358.  In other words, any

risk of foreclosure is entirely attributable to the circumstances surrounding Plaintiffs' default and

not the result of the sale of their loans through DASP.  *See Petro-Chem Processing, Inc. v. EPA*,

866 F.2d 433, 438 (D.C. Cir. 1989).

Moreover, it was Plaintiffs' original mortgagees, not the Federal Defendants, who

determined that no further loss mitigation options were available and who identified and submitted

16

Plaintiffs' defaulted loans for sale in DASP, *see* Am. Compl. ¶¶ 117-18.  As explained above, a participating mortgagee that has fulfilled its loss mitigation obligations under 24 C.F.R. § 203.501 may choose to submit qualifying defaulted mortgage loans in its portfolio for sale through DASP. *See* Am. Compl. ¶ 117; *see also* PSA, Lucey Decl. Exhs. A-C, Art. I, Definitions, "Eligible Mortgage Loan" at p. 9; *see also id.* Art. III, § 3.02, at p. 22.  Mortgagees are responsible for evaluating each loan to determine whether the loan is eligible for sale in DASP, and must certify that the submitted defaulted loans meet the eligibility criteria.  *See id.* Art. II, § 2.01, at p. 15.  And prior to the note sale, if a mortgagee determines that it no longer wants to submit certain defaulted loans for sale, participating mortgagees maintain the discretion to remove the defaulted loans from DASP and keep the loans in their portfolios.  *See id.*

Although the mortgagees are required to evaluate loss mitigation options, the mortgagees have discretion to determine the appropriate loss mitigation action to take.[7]  *Sinclair v. Donovan*, Civ. No. 11-00010 (SAS), 2011 WL 5326093, at *3 (S.D. Ohio Nov. 4, 2011) (HUD "has no authority to compel a mortgagee to follow a particular course.").  The independent discretion and decision-making of Plaintiffs' original mortgagees breaks any link between Federal Defendants' operation of DASP and Plaintiffs' alleged injury.  *See, e.g.*, *Cutler v. U.S. Dep't of Health & Human Servs.*, 797 F.3d 1173, 1183-84 (D.C. Cir. 2015) (no standing to pursue Equal Protection claim against HHS because the cancellation of plaintiff's health insurance policy was not "fairly traceable to the [challenged] transitional policy," which "applie[d] evenhandedly across the United States," but rather the "action of his private insurer").

---

[7] The fact that Plaintiff Trotman's defaulted mortgage loan has not been sold through DASP illustrates the discretion that mortgagees have.

Indeed, Plaintiffs do not dispute these facts. They allege that they each have been in default on their mortgage loans for a year or more. *See* Am. Compl. ¶¶ 204-20, 267-77, 306-20, 350-53. And Plaintiffs also allege that their original mortgage servicers submitted their defaulted loans for sale in DASP. *See id.* ¶¶ 108, 118, 120. Thus, the independent decisions of Plaintiffs' original mortgage servicers that no further loss mitigation options were available, which resulted from Plaintiffs' failure to pay their respective mortgage loans, defeats Plaintiffs' ability to establish that any alleged injuries they suffered are traceable to the Federal Defendants.[8]

### C.   Plaintiffs Lack Standing Because Their Claims Are Not Redressable By This Court.

Plaintiffs must also establish that it is likely, "as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal citation omitted). Redressability must be determined separately as to each claim for relief and each aspect of the relief sought. *Allco Finance Ltd. v. Klee*, 805 F.3d 89, 93 (2d Cir. 2015). Because Plaintiffs cannot meet this burden, the claims against the Federal Defendants must be dismissed.

Plaintiffs seek an order "enjoining Federal Defendants from continuing to harm Plaintiffs . . . by conducting future Note Sales;" "ensur[ing] that [future note sales] . . . are in accordance with the Fair Housing Act;" and "ensur[ing] that homeowners whose mortgages are contemplated to be sold in the note sales are provided sufficient notice and opportunity to be heard." Am. Compl., Prayer for Relief at ¶¶ iii, iv(b), (c). Where, as here, Plaintiffs seek "prospective relief,

---

[8] To the extent that Plaintiffs claim that they were injured by a lack of notice of the transfer of servicing of their mortgages, that injury also is not traceable to the Federal Defendants. The PSA makes clear that the obligation to provide notice of the transfer of servicing of Plaintiffs' defaulted loans falls squarely on Plaintiffs' original mortgage servicers. *See* PSA Art. IV, § 4.01(g), at p.36 (requiring Participating Servicers to send the mortgagor a "Goodbye Letter" that complies with all "applicable law, including [the Real Estate Settlement Procedures Act] and [the Truth In Lending Act]"); *see also* 12 C.F.R. § 1024.33(b) (setting forth requirements for notice of servicing transfer).

such as a declaratory order invalidating an agency policy [or program], [they] must show that [they] [are] likely to suffer a future injury." *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 527 F. Supp. 2d 101, 105 (D.D.C. 2007) (citing *Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)). But Plaintiffs Washington, Blackett, and Mason cannot make this showing because their defaulted mortgage loans were sold through DASP almost three years ago, *see* Am. Compl. ¶¶ 221, 277, 319-20. Nor can these Plaintiffs show that they are likely to face the same purported injury in the future. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) (explaining that "[a]though past injuries may provide a basis for standing to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way"); *see also Spiro v. Healthport Tech., LLC*, 73 F. Supp. 3d 259, 271 (S.D.N.Y. 2014) (no redressability because "[plaintiffs] have failed to plead facts that would permit the plausible inference that they are in danger of being 'wronged again'").

Nor would an order directing the Federal Defendants to "[r]eview the racial impact of *prior* Note Sales," *see* Am. Compl., Prayer for Relief at ¶ iv(a) (emphasis added), redress these Plaintiffs' alleged injuries because their defaulted loans have already been sold through DASP. To the extent Plaintiffs Washington, Blackett, and Mason seek to have the sale of their defaulted notes reversed, *see id.*, this is not redressable by requiring the Federal Defendants to review prior note sales. The Federal Defendants do not hold Plaintiffs' defaulted loans. Rather, the loans of Plaintiffs Washington, Blackett, and Mason are now held by bona fide purchasers. *See* 42 U.S.C. § 3613(d) (stating that "[r]elief granted under th[e] [Fair Housing Act] shall not affect any contract [or] sale consummated before the granting of such relief and involving a bona fide purchaser . . . without actual notice of the filing of a . . . civil action under this subchapter"); *see also Bowen v.*

*Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *ACLU v. NSA*, 493 F.3d 644, 670-73 (6th Cir. 2007) (holding that plaintiff lacked standing to pursue claim where alleged injury was not redressable by remedy sought).

Plaintiff Trotman's purported injuries are also not redressable by this Court. Ms. Trotman's defaulted mortgage loan has not been sold through DASP. *See* Am. Compl. ¶ 363. Rather, Ms. Trotman alleges that she "stands the very real risk that her mortgage will be sold out of the FHA Mortgage Program at the September 14, 2016 Note Sale, or another auction soon thereafter" and that if her "loan were to be sold in a Note Sale, she would no longer be able to apply for an FHA-HAMP modification." *Id.* Setting aside the fact that Ms. Trotman's purported injury is entirely speculative (indeed, her prediction that her defaulted loan would be sold in September 2016 did not come to fruition), Ms. Trotman's alleged injury is not redressable because any relief issued against the Federal Defendants would not affect the legal right of the mortgagee holding her defaulted loan to complete the foreclosure-and-eviction process and to file an insurance claim in accordance with FHA requirements. *See Hollywood Mobile Estates v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1266 (11th Cir. 2011) (claim to enjoin a Tribe from repossessing leased property was not redressable because it "failed to allege what the Secretary could have done to prevent the Tribe from repossessing the leased property or cite any authority that empowers the Secretary to act for the benefit of" plaintiff). And contrary to Ms. Trotman's claims otherwise, *see* Am. Compl. ¶ 367, HUD cannot be compelled to provide her mortgagee with an alternative to foreclosure, and her mortgagee has discretion to determine the appropriate loss mitigation option. *See* 12 U.S.C. § 1715u(f); *see also Sinclair*, 2011 WL 5326093, at *3. In any event, Ms. Trotman's defaulted mortgage loan could be sold through DASP only if her mortgagee were to determine that

20

no further loss mitigation options are available.  *See supra* at pp. 7-10, 15-18.  For these reasons,

Plaintiff Trotman's claims are not redressable and they should be dismissed.

 In fact, the National Housing Act expressly precludes judicial review of action or inaction

by the Federal Defendants with respect to the provision of alternatives to foreclosure for mortgages

in default, including the sale of such mortgages pursuant to 12 U.S.C. § 1710(g).  *See*

5 U.S.C. § 701(a)(1) (Agency actions are not reviewable under the APA "to the extent that . .

.statutes preclude judicial review.").  Under the NHA, the Secretary may pay "any costs of the

mortgagee for taking loss mitigation actions that provide an alternative to foreclosure," but "[n]o

actions taken under this paragraph, nor any failure to act under this paragraph, by the Secretary or

by a mortgagee shall be subject to judicial review."  12 U.S.C. § 1710(a)(2).  Likewise, while the

National Housing Act provides that "mortgagees shall engage in loss mitigation actions  . . .

providing an alternative to foreclosure . . . as provided in regulations by the Secretary," 12 U.S.C.

§ 1715u(a), "[n]o decision by the Secretary to exercise or forego exercising any authority under

this section shall be subject to judicial review."  12 U.S.C. § 1715u(d).  *See, e.g., Dean v. HUD*,

No. 00-CV-56H, 2000 WL 575576, at *4 (W.D.N.Y. Mar. 14, 2000) ("[T]he intent to preclude

judicial review of HUD's decision on a mortgagee's provision of alternatives to foreclosure is

explicit in § 1715u(d).").  Congress plainly intended to remove from judicial review HUD's actions

to mitigate losses to the MMIF resulting from defaults on FHA-insured mortgages, and therefore,

Plaintiffs cannot obtain the order they seek "enjoining Federal Defendants from . . . conducting

future Note Sales."  Am. Compl., Prayer for Relief.[9]

---

[9] The same is true with respect to Plaintiffs' assertion that HUD should be required to "ensur[e] that every homeowner with an FHA mortgage who qualifies for a HAMP modification be provided with an affordable HAMP modification to preserve affordable homeownership."  Am. Compl. ¶ 411.  The National Housing Act bars judicial review of such a claim.  *See* 12 U.S.C. § 1715u(f) ("No provision of this Act, or any other law, shall be construed to require the Secretary

\* \* \*

For the reasons stated above, Plaintiffs lack standing to bring their claims (Counts I through IV) against the Federal Defendants.  Plaintiffs cannot show that they have suffered an injury-in-fact.  Nor have Plaintiffs shown that their purported injuries are fairly traceable to the Federal Defendants.  To the contrary, as a direct result of Plaintiffs' failure to pay their mortgage loans (for years in some cases), Plaintiffs faced imminent foreclosure even before their original mortgagees submitted their defaulted loans for sale in DASP.  And even if Plaintiffs could overcome these jurisdictional obstacles, they cannot show that their claims are redressable by this Court.[10]

## II.   EVEN IF THE COURT HAD SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS AGAINST THE FEDERAL DEFENDANTS, THESE CLAIMS FAIL AS A MATTER OF LAW.

### A.   Plaintiffs Have Failed to State a Claim that Their Fifth Amendment Due Process Rights Were Violated.

The threshold inquiry in any procedural due process claim is whether the plaintiff was deprived of a liberty or property interest protected by the U.S. Constitution.  *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972).  Plaintiffs allege that they have a "property interest" in the continued receipt of benefits under the Federal Defendants' FHA Mortgage Insurance

---

to provide an alternative to foreclosure for mortgagees with mortgages on 1- to 4-family residences insured by the Secretary under this Act, or to accept assignments of such mortgages.").  To this point, even if the Court were to enjoin DASP and prevent its future operation, *see* Am. Compl. Prayer for Relief ¶ iii, mortgagees have discretion to determine the appropriate loss mitigation option to utilize. *See Sinclair*, 2011 WL 5326093, at \*3.  Failure to make timely payments triggered the mortgagees' rights to pursue foreclosure under the plain terms of their mortgage contracts with Plaintiffs.  Without DASP, Plaintiffs would face foreclosure and eviction proceedings unless the Federal Defendants provided an alternative to foreclosure, but the Federal Defendants cannot be compelled to do so.  *See* 12 U.S.C. § 1715u(f).

[10] Because "[a] plaintiff seeking to represent a class must personally have standing," *see Nicosia*, 834 F.3d at 239, and none of the named Plaintiffs here has standing, the Court should also dismiss the class action allegations against the Federal Defendants.

Program and further claim that the Federal Defendants' "sale of Plaintiffs mortgages out of the FHA Mortgage Program" without notice or an opportunity to be heard violated Plaintiffs' due process rights.  *See* Am. Compl. at ¶¶ 389-94.  As explained above, Plaintiffs' claim is belied by Supreme Court precedent and the National Housing Act's statutory and regulatory framework.

In *United States v. Neustadt*, plaintiffs, borrowers under an FHA-insured mortgage, sued FHA, alleging that the agency had violated the Federal Tort Claims Act by negligently conducting an inspection and appraisal of the property, the reports on which plaintiffs relied to their detriment. After a trial, the district court entered judgment for plaintiffs.  366 U.S. 696, 701 (1961).  The Fourth Circuit affirmed, reasoning, among other things, that, under the provisions of the National Housing Act, the FHA owed plaintiffs a "'specific duty' to make and communicate an accurate appraisal of the property." *Id.* at 701, 708.  The Supreme Court reversed.  Relying on its "careful[] examin[ation] [of] the rather extensive legislative history of [the National Housing Act]," the *Neustadt* Court observed that "the primary and predominant objective of the [FHA mortgage insurance program including the] appraisal system was the 'protection of the Government and its insurance funds.'" *Id.* at 709.  "[T]he [FHA] mortgage insurance program was not designed to insure anything other than the repayment of loans made by lender-mortgagee." *Id.* (citing 78 Cong. Rec. 11981; 1st Annual Report of FHA (1935)).  Finally (and as relevant here), in rejecting the argument that the FHA owed a "specific duty" to plaintiffs, the *Neustadt* Court admonished that "'there is *no* legal relationship between the FHA and the individual [borrower].'"  *Id.* (citing 22, H.R. Conf. Rep. No. 2271, 83d Cong., 2d Sess., pp. 66-67)).

Since *Neustadt*, courts have uniformly concluded that "the legislative history of the [National Housing] Act does not disclose or intimate *any* intent on the part of Congress to benefit or protect anyone but the Government."  *United States v. Chelsea Towers, Inc.*, 295 F. Supp. 1242,

1247 (D.N.J. 1967) (quoting *United States v. Lawrence Towers, Inc.*, 236 F. Supp. 208, 210

(E.D.N.Y. 1964)).  As one district court aptly explained:

> Congress designed the National Housing Act, with its mortgage insurance program of guaranteeing lender-mortgagees' loans, to encourage development of housing throughout the United States.  Neither the Act, nor the FHA Regulations implementing it, . . .created any legal relationship between the Government, or the FHA, and the individual mortgagors. The only assurance which was contemplated under the national mortgage insurance program was a guaranty by the Government that, if the mortgage falls into an unremedied default, the FHA will repay the mortgage-lender and succeed to its rights under the mortgage.  *Since Congress imposed no duty extending to mortgagors, then none can be breached.*

*Id.* at 1247 (emphasis added); *see also Bresier v. Golden Nat'l Mortg. Banking Corp.*, 225 F.3d

645, 1 (2d Cir. 2000) ("The mortgage insurance relationship [under the National Housing Act and

its implementing regulations] [] exists exclusively between the lender and [FHA].").

The Supreme Court's rationale in *Neustadt* likewise forecloses Plaintiffs' claim that they

have a legitimate claim of entitlement to loss mitigation benefits.  The FHA Mortgage Insurance

Program provides insurance to cover losses incurred by mortgage lenders in the event of a

borrower default.  *See* 12 U.S.C. § 1709(b)(1); *see also id.* §§ 1709(a), (e).  Under the terms of the

mortgage insurance contract between HUD and the FHA-eligible mortgagees, HUD will pay

insurance benefits to mortgagees in the event of default of any FHA-insured mortgage that satisfies

the prerequisites for claim payment, *see id.* § 1709(a), and in turn, the mortgagees agree to take

actions to minimize losses to the MMIF.  *See id.* § 1715u(a); *see also* 24 C.F.R. § 203.501.  "If

default [of an FHA-mortgage loan] is imminent or has occurred," the NHA expressly directs

mortgagees to engage "in loss mitigation actions for the purpose of providing an alternative to

foreclosure."  12 U.S.C. § 1715u(a).  It is for this reason that the NHA's implementing regulations

mandate that mortgagees "*must* consider the comparative effects of their elective servicing actions,

24

and *must* take those appropriate actions which can reasonably be expected *to generate the smallest financial loss to the Department*." 24 C.F.R. § 203.501 (emphasis added).

These statutory and regulatory provisions "make[] clear that the loss mitigation provisions are intended to benefit the Government as provider of the [mortgage] insurance." *Sinclair*, 2011 WL 5326093, at *3; *see also Baker v. Countrywide Home Loans, Inc.*, No. 3:08cv0916-JJB, 2009 WL 1810336, at *3 (N.D. Tex. June 24, 2009). Because the "primary and predominant objective" of the NHA's loss mitigation provisions is "the protection of the Government and its insurance funds," and these provisions make clear that "there is no legal relationship between the FHA and the individual mortgagor," *Neustadt*, 366 U.S. at 709, Plaintiffs' claim that they have a legitimate entitlement to purported loss mitigation "benefits" under the NHA fails as a matter of law. *See Sinclair*, 2011 WL 5326093, at *6 ("Any ancillary benefit the Plaintiff Homeowners might enjoy does not confer a legally protected procedural due process interest on them."). Accordingly, Count I of the Amended Complaint must be dismissed for failure to state a claim.

### B.  Plaintiffs' Claim For Breach Of An Implied Contract Is Without Merit.

The same reasoning precludes Plaintiffs' implied-in-fact breach of contract claim. Plaintiffs allege that "[t]hrough [their] payment of the [Up-Front Mortgage Insurance Premium] UFMIP and the monthly [Mortgage Insurance Premium] MIP, [the] Federal Defendants [] entered into an implied in fact contract with Plaintiffs to provide the benefits of the FHA Mortgage Program," Am. Compl. ¶ 415, which the Federal Defendants purportedly breached "[b]y selling Plaintiffs' mortgages through DASP and out of the FHA Mortgage Program." *Id.* ¶¶ 415, 420. But as explained above, there is *no* legal relationship – contractual or otherwise – between the Federal Defendants and Plaintiffs. *See Neustadt*, 366 U.S. at 709; *Bresier*, 225 F.3d at 1. And the FHA mortgage insurance program "benefits" Plaintiffs cite, such as the loss mitigation provisions

at issue here, are intended to benefit the *government* as the provider of the mortgage insurance. *See Sinclair*, 2011 WL 5326093, at *5; *see also Baker*, 2009 WL 1810336, at *3.  The fact that Plaintiffs paid a mortgage insurance premium to their mortgagees does not alter this conclusion. Plaintiffs do not pay the UFMIP or the MIP to HUD.  Rather, the mortgagee pays the MIP directly to HUD in consideration of the contract of mortgage insurance.  *See* 24 C.F.R. § 203.251(k); *see also id.* § 203.259.

"An implied-in-fact contract is one 'founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'"  *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998) (internal citation omitted).  The NHA's text, its implementing regulations, and Supreme Court precedent belie Plaintiffs' claim that there was "a meeting of the minds" between the Federal Defendants and Plaintiffs such that an implied-in-fact contract existed, or that a contract may be inferred from the Federal Defendants' "conduct."[11] Accordingly, Count IV of the First Amended Complaint must be dismissed.[12]

---

[11] Moreover, it is well-settled that "an implied in fact contract cannot exist if an express contract already covers the same subject matter."  *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997).  Thus, the fact that an express contract of mortgage insurance already exists (or existed) between the Federal Defendants and Plaintiffs' mortgagees, and a mortgage agreement exists (or existed) between Plaintiffs and their original mortgagees, further undercuts Plaintiffs' claim that an implied-in-fact contract exists between Plaintiffs and the Federal Defendants.  *See id.*

[12] Because Plaintiffs cannot show that the Federal Defendants breached an implied-in-fact contract, they are not entitled to the money damages that they seek under 28 U.S.C. § 1346 and that claim for relief should be dismissed.  Money damages are likewise unavailable against the Federal Defendants under the APA.  *See* 5 U.S.C. § 702.

### C. Plaintiffs' Fair Housing Act Claim Under § 3608(e)(5) Fails As a Matter Of Law.

Equally meritless is Plaintiffs' claim that Section 3608(e)(5) of the Fair Housing Act mandates that the Federal Defendants "perform an analysis" of the "impact of [DASP] on African-American homeowners in New York City or on predominantly African-American neighborhoods in New York City" and that the Federal Defendants' failure to conduct such an "analysis" violates § 706 of the Administrative Procedure Act. Am. Compl. ¶¶ 396-403. As a result of this alleged violation, Plaintiffs seek an order "directing Federal Defendants . . . to [r]eview the racial impact of prior Note Sales on African-American homeowners and communities in New York City." *Id.* Prayer for Relief subpar. iv(a). The Court should decline to issue any such order.

Section 706(1) of the APA empowers a district court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). "[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) ("*SUWA*"). As *SUWA* explains, "the 'discrete agency action' limitation 'precludes broad programmatic attacks' and the 'required agency action' limitation 'rules out judicial direction of even discrete agency action that is not demanded by law.'" *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1098 (D.C. Cir. 2015) (quoting *SUWA*, 542 U.S. at 66). Thus, much "like the power to grant writs of mandamus, '§ 706(1) empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing *how* it shall act.'" *Benzman v. Whitman*, 523 F.3d 119, 130 (2d Cir. 2008) (quoting *SUWA*, 542 U.S. at 64). If a plaintiff is unable to identify any statutory or regulatory provision that requires the federal agency to take a *discrete* action, the § 706(1) claim fails as a matter of law.

In *Benzman*, the Second Circuit rejected plaintiffs' claim that certain regulations compelled the Environmental Protection Agency ("EPA") to, among other things, "perform representative testing of all office buildings, schools, and residences in Lower Manhattan . . . for any and all hazardous substances" and "implement a program for medical monitoring services" and that the EPA's failure to perform these actions violated § 706(1) of the APA.  523 F.3d at 130.  Although plaintiffs cited several EPA regulations that they claimed compelled action, the Second Circuit rejected plaintiffs' § 706(1) claim, holding that the regulations simply "state[d] what an agency should do, rather than outlining discrete actions that a court may require it to do" and did not obligate the EPA to take specific actions.  *Id.* at 131-32.

Count II of the Amended Complaint is similarly flawed.  Although HUD takes its statutory duty to affirmatively further fair housing seriously with respect to all of its programs, including DASP, § 3608(e)(5) does not compel the Federal Defendants to take any specific action, let alone the action that Plaintiffs seek to compel here: specific analysis of the impact of DASP on African-American homeowners in New York City.  Plaintiffs have not cited to, nor is there, any language in the statute that suggests otherwise.  Rather, Plaintiffs rely solely on § 3608(e)(5)'s broad mandate to mount a programmatic attack on DASP that impermissibly injects the Court into the Federal Defendants' "day-to-day agency management" of DASP by requiring the Court to craft the nature and scope of the "analysis" that Plaintiffs seek as relief in this case.  The Court should not countenance such a result.  *See, e g.*, *Am. Disabled for Attendant Programs Today v. U.S. Dep't of Hous. & Urban Dev.*, 170 F.3d 381, 388-89 (3d Cir. 1999) (concluding that HUD did not violate § 3608(e)(5) and refusing to order HUD to, among other things, "gather statistical information on housing discrimination" because to do so "we would be creating an independent guideline to limit HUD's discretion that would conflict with the plain text of the statute").

Plaintiffs' failure to identify any language in § 3608(e)(5) (or any other statutory or regulatory provision) that requires the Federal Defendants to conduct the type of analysis of DASP that Plaintiffs seek to compel here is fatal to their claim. *See People for the Ethical Treatment*, 797 F.3d at 1097-98 (affirming district court's dismissal of plaintiff's APA claim because "we cannot say that the [United States Department of Agriculture] has failed to take action it was 'required to take'" under the Animal Welfare Act); *Thompson v. Donovan*, No. 13cv2988-CS, 2014 WL 5149037, at *7-8 (S.D.N.Y. Oct. 14, 2014) (dismissing plaintiffs' APA claim because neither HUD's enabling statute nor the Office of Management and Budget's regulation at 2 C.F.R. § 180.600 imposed on HUD a specific obligation "to provide interested parties with legal interpretations upon request").

And to the extent that Plaintiffs' § 3608(e)(5) claim arises under § 706(2) of the APA, *see* Am. Compl. ¶ 401, it fails for the same reason. Section 706(2) requires the Court "to hold unlawful and set aside agency action . . . found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A). Whether Plaintiffs couch their programmatic attack in terms of a § 706(1) or § 706(2) violation, the APA's limitation on review of particular "agency action" rules out "the kind of broad programmatic attack" seeking "wholesale improvement of [a] program by court decree" that the Supreme Court rejected in *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), and in *SUWA*, 542 U.S. at 64-65. As explained above, the Fair Housing Act grants the Secretary broad, general authority to take "[a]ction . . . to fulfill, as much as possible, the goal of open, integrated residential patterns." *Otero v. N.Y.C. Hous. Auth.*, 484 F.2d 1122, 1134 (2d Cir. 1973). Given the broad discretion Congress afforded the Secretary under § 3608(e)(5), *see id.*, Plaintiffs' claim that the Federal Defendants were required to conduct an analysis of the impact of DASP on African-American homeowners in New York and that the Federal Defendants' failure to do so is contrary

to § 3608(e)(5) and an abuse of discretion, falls short.[13]   *See Resolute Forest Prods., Inc. v. U.S. Dep't of Agric.*, 130 F. Supp. 3d 81, 96-98 (D.D.C. 2015) (no § 706(2) violation where the statutory provision afforded the Secretary of Agriculture "broad discretion" to conduct the referendum).[14]

---

[13] Even if § 3608(e)(5) could somehow be read to impose a specific duty on the Federal Defendants with respect to their operation of DASP, Federal Defendants have satisfied any such duty.  By administering DASP in a manner that is financially sound, the Federal Defendants continue to ensure the solvency of the MMIF, which is essential to the operation of the Single-Family Mortgage Insurance Program, a point that even Plaintiffs concede.  *See* Am. Compl. ¶ 31 (observing that the availability of FHA insurance for private mortgage lenders increases the opportunity for homeownership by making financing available to families with low incomes, lower credit scores, etc.); *see also id.* ¶¶ 82-83 (alleging that between 2007 and 2014, "36% of FHA-insured mortgages were made to African-American homeowners" compared to 27% of FHA-insured mortgages made to white homeowners).  By ensuring the financial soundness of the MMIF and thus the continued availability of FHA mortgage insurance, the Federal Defendants further the goal of increasing housing opportunities "of racial groups whose lack of opportunities the Act was designed to combat."  *Otero*, 484 F.2d at 1134.   Because nothing more is required of the Secretary under this deferential standard, the Court should dismiss Count II of the Amended Complaint for failure to state a claim upon which relief may be granted.

[14] To the extent that Plaintiffs' claims are brought pursuant to the APA, *see, e.g.,* Am. Compl. ¶¶ 401-02, their claims should also be dismissed because Plaintiffs have an adequate remedy against their original mortgage servicers.  Section 704 of the APA limits this Court's ability to review Plaintiffs' APA claims to "final agency action for which there are *no other adequate remedy in a court*."  5 U.S.C. § 704 (emphasis added).  Here, the crux of Plaintiffs' complaint is that their defaulted loans were sold through DASP without adequate notice and an opportunity to be heard and that they now face imminent foreclosure. *See, e.g.*, Am. Compl. ¶¶ 1, 6, 9, 381-77.  But as explained above, *see supra* at pp. 7-10, 15-18, it was Plaintiffs' original mortgage servicers who determined that no loss mitigation options were available and who identified and submitted Plaintiffs' defaulted loans for sale through DASP.  It was also Plaintiffs' original mortgage servicers who were required to provide Plaintiffs with notice of the transfer of servicing as a result of the sale of Plaintiffs' defaulted loans through DASP.  And as relevant here, at least two of the Plaintiffs faced imminent foreclosure *prior to* their defaulted loans being sold through DASP because their original mortgage servicers had already initiated foreclosure proceedings, proceedings that remain pending to date. *See, e.g.*, Am. Compl. ¶¶ 221, 277, 319-20, 358.  Under these circumstances, Plaintiffs cannot avail themselves of relief under the APA because Plaintiffs have an adequate alternative remedy against their original mortgage servicers, which precludes judicial review of their APA claims.  *See Garcia v. Vilsack*, 563 F.3d 519, 523 (D.C. Cir. 2009) (observing that relief "will be deemed adequate 'where there is a private cause of action against a third party otherwise subject to agency regulation'" (citation omitted)).  Accordingly, Plaintiffs' APA claims against the Federal Defendants must be dismissed. *See, e.g.*, *Godwin v. Sec'y of Hous. & Urban Dev.*, 356 F.3d 310, 312-13 (D.C. Cir. 2004) (holding that plaintiff had no claim under

### D.      Plaintiffs' § 3604 Disparate Impact Claim Under the Fair Housing Act Fails As a Matter Of Law.

The Supreme Court recently explained that "disparate-impact liability has always been properly limited in key respects that avoid the serious constitutional questions that might arise under the [Fair Housing Act], for instance, if such liability were imposed based solely on a showing of statistical disparity." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.* ("*ICP*"), 135 S. Ct. 2507, 2522 (2015). Thus, to prevail on a disparate impact claim under the Fair Housing Act, Plaintiffs bear the "burden of proving that a challenged practice caused or predictably will cause a discriminatory effect." 24 C.F.R. § 100.500(c).[15] "[A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policy causing that disparity." *ICP*, 135 S. Ct. at 2523. "A robust causality requirement ensures that racial imbalance does not, without more, establish a prima facie case of disparate impact and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (quoting *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642, 653 (1989)) (alterations

---

the APA because it had an adequate alternative remedy through a private suit against the alleged wrongdoer).

[15] In considering disparate impact claims, courts generally employ the three-step burden-shifting test set forth in HUD's Discriminatory Effects Rule. *ICP*, 135 S. Ct. at 2514 (citing 24 C.F.R. § 100.500(c)); *see also Mhany Mgmt. Inc. v. Cty. of Nassau*, 819 F.3d 581, 618-19 (2d Cir. 2016). First, a plaintiff must make a prima facie showing of disparate impact by "proving that a challenged practice caused or predictably will cause a discriminatory effect." *ICP*, 135 S. Ct. at 2514 (quoting 24 C.F.R. § 100.500(c)(1)). "If a statistical discrepancy is caused by factors other than the defendant's policy, a plaintiff cannot establish a prima facie case, and there is no liability." *Id.* "After a plaintiff does establish a prima facie showing of disparate impact, the burden shifts to the defendant to 'prove that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests.'" *Id.* at 2514-15 (quoting 24 C.F.R. § 100.500(c)(2)) (alteration omitted). "Once a defendant has satisfied its burden at step two, a plaintiff may 'prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect.'" *Id.* at 2515 (quoting 24 C.F.R. § 100.500(c)(3)).

omitted).  To that end, the Court cautioned that "[c]ourts must examine with care whether a plaintiff has made a prima facie case of disparate impact and prompt resolution of these cases is important."  *Id.*  "A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." *Id.*

Following *ICP*, courts have employed these "safeguards at the prima facie stage," *see id.* at 2523, to dismiss disparate impact claims on the pleadings.  *See, e.g. Inclusive Communities Project, Inc. v. U.S. Dep't of Treasury*, No. 3:14cv3013-D, 2016 WL 6397643, at *11-12 (N.D. Tex. Oct. 28, 2016) ("*ICP v. Treasury*") (dismissing plaintiff's §3604(a) claim because plaintiff "has failed in its amended complaint to identify a policy or practice that has created an artificial, arbitrary, or unnecessary barrier"); *Cobb Cty. v. Bank of Am. Corp.*, 183 F. Supp. 3d 1332, 1345-47 (N.D. Ga. 2016) (dismissing disparate impact claim against mortgage lenders at pleading stage for the same reason); *Ellis v. City of Minneapolis*, No. 14cv3045 (SRN/JJK), 2015 WL 5009341, at *10 (D. Minn. Aug. 24, 2015) (dismissing disparate impact claim where complaint "contains no plausible allegations that the City's alleged heightened enforcement of the housing code has caused any adverse impact on a protected class").

Count III of the Amended Complaint does not state a claim because Plaintiffs fail to identify any policy of the Federal Defendants that is the cause of a racial disparity (or even an adverse result).  As an initial matter, it was Plaintiffs' original mortgage servicers (and not the Federal Defendants) who determined that loss mitigation options for home retention were not available to Plaintiffs and who, as a result, identified and submitted Plaintiffs' defaulted loans for sale in DASP as an alternative to foreclosure.  Where, as here, there are factors that "substantially limit[]" a defendant's control over the decision alleged to cause a disparate impact, the Supreme

32

Court has reasoned "that should result in dismissal of th[e] case." *ICP*, 135 S. Ct. at 2524 (cautioning that a third party's exercise of discretionary decision-making "may [make it] . . . difficult" for plaintiffs to establish causation to satisfy their *prima facie* burden at the motion to dismiss stage); *see also Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, No. 3:08cv0546, 2016 WL 4494322, at *9 (N.D. Tex. Aug. 8, 2016) (holding that plaintiffs' § 3604 disparate impact claim failed "to account for other potential causes of the statistical disparity" including "local zoning rules, community preferences, [and] developers' choices"). Plaintiffs' claim here suffers the same flaw. Plaintiffs' alleged injuries were not caused by the Federal Defendants; they flowed from the circumstances of Plaintiffs' default, which resulted in the independent decision-making of the original mortgage servicers who identified Plaintiffs' defaulted loans, determined that they satisfied the requirements for DASP, and ultimately submitted them for sale in the Program. *See, e.g.*, *ICP v. Treasury*, 2016 WL 6397643, at *12 (dismissing plaintiffs' § 3604(a) disparate impact claim against federal defendants, the Office of the Comptroller of the Currency ("OCC") and Treasury, because, among other reasons, it was "undisputed" that "local agencies—not OCC—decide which affordable housing developments will be awarded the [challenged low income housing tax credit]").

Moreover, although Plaintiffs allege that "61% of all New York City mortgages sold in DASP from 2012 to 2014 were for homes located in predominately African-American neighborhoods," Am. Compl. ¶ 180, they fail to allege that this disparity was *caused by* DASP, rather than the underlying conditions triggering these defaulted loans' eligibility for DASP. In other words, Plaintiffs do not show that, of the population that could be impacted by a DASP sale (*i.e.*, borrowers in default), African-American borrowers were disproportionately impacted. *See ICP*, 135 S. Ct. at 2523 (explaining that "a disparate-impact claim that relies on a statistical

disparity must fail if the plaintiff cannot point to a defendant's policy . . . causing that disparity"—a requirement that is necessary to "protect[] defendants from being held liable for racial disparities they did not create").  And even if Plaintiffs could somehow overcome this burden, they cannot show that the purported disparity is a result of the Federal Defendants' actions and not the independent decision-making of Plaintiffs' original mortgage servicers regarding loss mitigation, a process that would not have occurred absent Plaintiffs' default.

Finally, it bears mentioning that Plaintiffs purported disparity is based on a flawed statistical analysis.  In their Amended Complaint, Plaintiffs compare the percentage of homes sold through DASP that were located in African-American neighborhoods with the percentage of FHA-borrowers who are African-American and allege that the resulting statistic demonstrates a disparity based on race.  *See* Am. Compl. ¶¶ 179-81.  But this is not the correct comparison.  Rather, to allege a disparity based on race as a result of DASP, Plaintiffs need to show that, among borrowers holding DASP-eligible loans, the loans sold through DASP were disproportionately held by African-American borrowers (compared with non-African-American borrowers).  But even if Plaintiffs' statistical comparison was correct (which it is not), Plaintiffs' disparate impact claim nevertheless fails because they cannot show that any purported disparity is based on the Federal Defendants' actions and not the direct result of other causes, *see supra* at pp. 7-10, 15-18, 33-34. *See, e.g.*, *HDC LLC v. City of Ann Arbor*, 675 F.3d 608, 613 (6th Cir. 2012) (affirming dismissal of disparate impact claim where plaintiff developers "have not alleged facts showing that any disproportionate effect [on persons with disabilities] result[ing]" from defendants' conduct).

Because Plaintiffs have "fail[ed] to allege facts . . . demonstrating a causal connection" between DASP and any alleged racial disparity, they "cannot make out a prima facie case of

34

disparate impact." *ICP*, 135 S. Ct. at 2523; *see also* 24 C.F.R. § 100.500(c)(1).  Accordingly,

Count III of the Amended Complaint fails as a matter of law and must be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Counts I, II, III, and IV against the

Federal Defendants.


Dated: May 3, 2017                                   Respectfully submitted,

                                                     CHAD A. READLER
                                                     Acting Assistant Attorney General

BRIDGET M. ROHDE                                     LESLEY R. FARBY
Acting United States Attorney                        Assistant Branch Director
Eastern District of New York


ELLIOT M. SCHACHNER                                  By: *Tamra T. Moore*
Assistant United States Attorney                     TAMRA T. MOORE
Eastern District of New York                         Trial Attorney
                                                     United States Department of Justice
                                                     Civil Division – Federal Programs Branch
                                                     20 Massachusetts Avenue, N.W.
                                                     Washington, DC  20530
                                                     (202) 305-8628

                                                     *Attorneys for the Federal Defendants*