**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

JOSEPH WASHINGTON, et al.,    )
    )
          Plaintiffs,    )
    )
          v.    )
    )  Case No. 1:16-cv-03948-CBA-SMG
    )
UNITED STATES DEPARTMENT OF    )
HOUSING & URBAN DEVELOPMENT,    )
et al.,    )
    )
          Defendants.    )
    )
    )
    )
    )

## THE FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................1

ARGUMENT .......................................................................................................................4

    I.   The Court Should Deny Plaintiffs' Motion to Amend Their Complaint As Futile. ...........4

      A.  Plaintiffs lack standing to bring their proposed procedural APA claim........................ 4

      B.  Plaintiff's Ninth Cause of Action is Time Barred............................................................ 7

          1.  Plaintiffs' APA claim is untimely because HUD published notice of the
             challenged note sale program in the Federal Register in 2002 ...............................9

          2.  HUD's 2006 publication of the Advance Notice of Proposed Rulemaking
             is not evidence of the agency's intent to create a new note sale program .............10

          3.  HUD was not required under 42 U.S.C. § 3542 to provide notice of
             changes it made to the demonstration ...................................................................11

          4.  The July 2017 Inspector General Report supports HUD's position that the
             2010 note sale is simply a continuation of the demonstration that the
             agency has conducted since 2002 .........................................................................13

      C.  Plaintiff's Ninth Cause of Action Fails As A Matter of Law. .....................................15

          1.  Congress has specified the procedures with which HUD must comply
             when establishing a demonstration program such as DASP..................................16

          2.  DASP is not "agency action" within the meaning of the APA.............................21

CONCLUSION....................................................................................................................25

## TABLE OF AUTHORITIES

**CASES**

*Air India v. Brien*,
   261 F. Supp. 2d 134 (E.D.N.Y. 2003) .................................................................................. 8, 9

*Am. Civil Liberties Union v. Nat'l Sec. Agency*,
   493 F.3d 644 (6th Cir. 2007) .......................................................................... 22, 23, 24, 25

*Asiana Airlines v. FAA*,
   134 F.3d 393 (D.C. Cir. 2010) ............................................................................................. 6

*Ass'n of Am. Physicians & Surgeons, Inc. v. Food & Drug Admin.*,
   539 F. Supp. 2d 4 (D.D.C. 2008) ...................................................................................... 6, 7

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................................... 10

*Bennett v. Spear*,
   520 U.S. 154 (1997) ........................................................................................................... 25

*Bresier v. Golden Nat'l Mortg. Banking Corp.*,
   225 F.3d 645 (2d Cir. 2000) ................................................................................................ 6

*C.K. v. New Jersey Dep't of Health & Human Servs.*,
   92 F.3d 171 (3d Cir. 1993) ................................................................................................ 13

*Cedars-Sinai Med. Ctr. v. Shalala*,
   177 F.3d 1126 (9th Cir. 1999) ............................................................................................. 9

*Consumer Fed'n of Am. v. Consumer Prod. Safety Comm'n*,
   990 F.2d 1298 (D.C. Cir. 1993) ......................................................................... 12, 17, 18, 19

*Fla. Audobon Soc'y v. Bentsen*,
   94 F.3d 658 (D.C. Cir. 1996) ...................................................................................... 5, 6, 8

*Guertin v. United States*
   743 F.3d 382 (2d Cir. 2014)…………………………………………………………………7

*Gully v. NCUA Bd.*,
   341 F.3d 155 (2d Cir. 2003) .............................................................................................. 19

*Milk Train v. Veneman,*
   310 F.3d 747 (2002) ............................................................................................. 8

*Norton v. S. Utah Wilderness Alliance,*
   542 U.S. 55 (2004) ......................................................................................... 22, 24

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.,*
   712 F.3d 705 (2d Cir. 2013) ............................................................................... 10

*Rodriguez v. United States,*
   480 U.S. 522 (1987) ....................................................................................... 18, 19

*Sai Kwan Wong v. Doar,*
   571 F.3d 247 (2d Cir. 2009) ........................................................................ 8, 9, 14

*Slayton v. Am. Express Co.,*
   460 F.3d 215 (2d Cir. 2006) ............................................................................... 15

*Spannaus v. U.S. Dep't of Justice,*
   824 F.2d 52 (D.C. Cir. 1987) ............................................................................. 14

*Spry v. Thompson,*
   Civ. No. 03-121-ST, 2003 WL 23411996 (D. Or. Dec. 8, 2003) .................... 12 , 13

*Sugar Cane Growers Co-op of Florida v. Veneman,*
   289 F.3d 89 (D.C. Cir. 2002) ............................................................................... 8

*Tummino v. Hamburg,*
   260 F.R.D. 27 (E.D.N.Y. 2009) ......................................................................... 6, 7

*United States v. Neustadt,*
   366 U.S. 696 (1961) ......................................................................................... 6, 21

*United States v. Walsh,*
   156 F. Supp. 3d 374 (E.D.N.Y. 2016) ................................................................ 20

*Village of Bald Head Is. v. U.S. Army Corps of Eng'rs,*
   714 F.3d 186 (4th Cir. 2013) ......................................................................... 23, 25

*Williams Natural Gas Co. v. FERC,*
   872 F.2d 438 (D.C. Cir. 1989) ........................................................................... 19

*Wind River Mining Corp. v. United States*,
   946 F.2d 710 (9th Cir. 1991) ..................................................................................... 9

**STATUTES**

5 U.S.C. § 551 ................................................................................................ 21, 22, 23

5 U.S.C. § 553 .................................................................................................. 1, 19, 20

5 U.S.C. § 704 ............................................................................................................. 22

12 U.S.C. § 1701 ................................................................................................. *passim*

12 U.S.C. § 1708 ....................................................................................................... 13

12 U.S.C. § 1710 ................................................................................................. *passim*

12 U.S.C. § 1711 ....................................................................................................... 13

12 U.S.C. § 1715 ..................................................................................... 2, 10, 18, 20

28 U.S.C. § 2401 ......................................................................................................... 8

42 U.S.C. § 3535 ................................................................................................ *passim*

42 U.S.C. § 3542 ................................................................................................ *passim*

Pub. L. No. 105-276, 112 Stat 2461 (1998) ................................................... 3, 14, 15

**Administrative and Executive Materials**

24 C.F.R. part 10 ....................................................................................................... 20

24 C.F.R. part 291 ..................................................................................................... 21

24 C.F.R. § 291.90(e) ................................................................................................ 22

**Other Authorities**

64 Fed. Reg. 6470 (Feb. 9, 1999) ............................................................................. 21

67 Fed. Reg. 5418 (Feb. 5, 2002) ............................................................... 3, 10, 16, 17

67 Fed. Reg. 66038 (Oct. 29, 2002) ............................................................... 4, 17, 19

71 Fed. Reg. 32392 (June 5, 2006) ................................................................................ 4, 11, 18

72 Fed. Reg. 22694 (Apr. 30, 2007) ........................................................................ 4, 12, 16, 18

## INTRODUCTION

Nearly a year after the commencement of this litigation and months after the parties completed briefing on Defendants' respective motions to dismiss, Plaintiffs seek leave to amend their complaint to assert a ninth cause of action—a procedural claim under the Administrative Procedure Act ("APA"), 5 U.S.C. § 553—against the Federal Defendants. This Court should not grant Plaintiffs' request because it would be futile to allow Plaintiffs to amend their First Amended Complaint ("FAC"). Indeed, the Court lacks jurisdiction over Plaintiffs' APA claim because Plaintiffs cannot show a legally protected interest sufficient to confer standing to assert such a claim, and even if Plaintiffs could overcome this particular jurisdictional defect, their proposed claim is at least nine years too late. Plaintiffs' APA claim fares no better on the merits because the Secretary of Housing and Urban Development ("the Secretary" or "HUD") is not required to comply with the procedural requirements of the APA in the context of this statutorily-authorized demonstration program.

For these reasons, the Court should deny Plaintiffs' motion, or in the alternative dismiss their procedural APA claim.

## BACKGROUND[1]

Since 2002, HUD has been conducting note sales as a demonstration, and multiple statutory provisions support HUD's authority to engage in such demonstrations. When Congress enacted §

---

[1] The Federal Defendants respectfully refer the Court to their briefs in support of the Federal Defendants' motion to dismiss (ECF Nos. 56-5, 58) for the statutory and regulatory framework of the National Housing Act, 12 U.S.C. § 1701 *et seq.*, and background information on HUD's sales of defaulted mortgage loans under 12 U.S.C. § 1710. And pursuant to this Court's request during the November 30, 2017 status conference, the Federal Defendants incorporate by reference the arguments made in their motion to dismiss briefing, *see id.*, as well as those arguments set forth in the Federal Defendants' Letter in Opposition to Plaintiffs' Motion for Leave to Amend the First Amended Complaint (Sept. 27, 2017), ECF No. 63.

501 of the Housing and Urban Development Act of 1970, it granted HUD authority to conduct demonstration programs. Section 501 provides that HUD "is authorized and directed to undertake such programs of research, studies, testing, and demonstration relating to the mission and programs of the Department as he determines to be necessary and appropriate." 12 U.S.C. § 1701z-1. In addition to the authority to conduct demonstrations, the Secretary has broad authority to "make such rules and regulations as may be necessary to carry out his functions, powers and duties." 42 U.S.C. § 3535(d); 12 U.S.C. § 1715b.

Section 470 of the 1983 Housing and Urban-Rural Recovery Act sets forth the procedures with which the Secretary must comply when conducting a demonstration that is not expressly authorized by statute. Section 470 states that "[n]o demonstration program not expressly authorized in law may be commenced by the Secretary of [HUD] until (1) a description of such demonstration program is published in the Federal Register, which description may be included in a notice of funding availability; and (2) there expires a period of sixty calendar days following the date of such publication during which period the Secretary shall fully consider any public comments submitted with respect to such demonstration program." 42 U.S.C. § 3542. Unlike under notice-and-comment rulemaking, once the Secretary has published an initial notice of demonstration, § 3542 does not require him to publish any subsequent notices to respond to public comment or announce changes to the demonstration. *See id.* In 2002, pursuant to these procedures and his authority under §§ 1701z-1 and 1715b of the National Housing Act as well as 42 U.S.C. § 3535(d), the Secretary established the demonstration originally referred to as the Accelerated Claim Disposition ("ACD") Demonstration program.[2] *See* 67 Fed. Reg. 5418 (Feb. 5, 2002).

---

[2] Since 2002, HUD has adopted various names to refer to its demonstration implementing section 204 of the National Housing Act, 12 U.S.C. § 1710, as amended by section 601 of the Fiscal Year 1999 Departments of Veterans Affairs and Housing and Urban Development and

As the Notice of FHA Accelerated Claim Disposition Demonstration explains, the purpose of the demonstration is to "address any programmatic concerns" and "assess its success and determine whether to implement the ACD process on a permanent basis, throughout the country." *Id.* The Notice references the Secretary's broad authority under § 1710 of the National Housing Act to "sell real and personal property acquired by the Secretary pursuant to the provisions of this Act *on such terms and conditions as the Secretary may prescribe*." 12 U.S.C. § 1710(g) (emphasis added). To that end, the Notice states that the demonstration will "have a limited initial duration" and "initially include [defaulted] mortgage loans secured by properties within the jurisdiction of HUD's Philadelphia, Pennsylvania and Atlanta, Georgia Homeownership Centers ("HOCs")." *Id.* The Philadelphia HOC includes defaulted mortgage loans secured by properties in, among other states, New York. *See id.* The Notice further explains that "[m]ortgagee participation in the ACD [demonstration] is voluntary." The Notice invites "[i]nterested persons . . . to submit comments" by April 8, 2002, and provides an address at which to submit the comments. *Id.* Approximately eight months after publishing the February 5, 2002 Notice, HUD published an additional notice responding to public comments and conducted its first sale of defaulted mortgages through the ACD Demonstration. 67 Fed. 66038 (Oct. 29, 2002).

On June 5, 2006, the Secretary issued an Advance Notice of Proposed Rulemaking ("ANPR") that solicited public comment "on HUD's Accelerated Claim and Asset Disposition

---

Independent Agencies Appropriations Act (Pub. L. No. 105-276, approved October 21, 1998) ("FY 1999 Appropriations Act"). Section 601 of the FY 1999 Appropriations Act amended section 204 to make more effective the methods for paying insurance claims and disposing of HUD-acquired single family mortgages and properties. *See* 12 U.S.C. § 1710(a) & (g). Thus, since 2002, HUD has referred to the demonstration as the ACD Demonstration, the Single Family Loan Sales ("SFLS") program, and Distressed Asset Stabilization Program ("DASP"), the latter of which was not adopted until 2012. For convenience and to be consistent with the Federal Defendants' briefs in support of their motion to dismiss (ECF Nos. 56-5, 58), this brief will refer to the demonstration generally as either the note sale program or DASP.

(ACD) program before HUD proceeds to issue a proposed rule that will commence the rulemaking process that will result in the codification of the requirements for the ACD program."  71 Fed. Reg. 32392 (June 5, 2006).  The ANPR expressly referenced the Secretary's desire to solicit public comments in an effort to make "possible improvements to the program," including the most efficient way to "maximize the return to the FHA insurance fund" by "minimiz[ing] the time an asset is held."  *Id.*  Finally, the ANPR stated that the Secretary sought public comment on the ACD demonstration before it "become[s] a permanent part of HUD's single family mortgage insurance program." *Id.*  However, on April 30, 2007, the Secretary published a regulatory agenda providing public notice that HUD had withdrawn the ANPR effective March 1, 2007.  *See* 72 Fed. Reg. 22694 (Apr. 30, 2007).  Thereafter, the Secretary continued the demonstration, making additional modifications, including changing the disposition method from joint venture to whole note sales like the ones in which Plaintiffs Washington, Mason, and Blackett's defaulted mortgage loans were sold.

## ARGUMENT[3]

I.      **The Court Should Deny Plaintiffs' Motion to Amend Their Complaint As Futile.**

      **A.  Plaintiffs lack standing to bring their proposed procedural APA claim.**

Plaintiffs do not dispute: (1) that they failed to make payments on their home mortgage loans for months (and, in some cases, years); (2) that as a result of this default, their original

---

[3] The parties do not dispute the legal standard applicable to Plaintiffs' motion for leave to amend their FAC.  *See* Fed. Defs.' Opp. Ltr. at 1, ECF No. 63 (Sept. 27, 2017).  At the Court's request, the Federal Defendants' opposition brief focuses primarily on their contention that it would be futile to allow Plaintiffs to amend their FAC to assert a procedural claim under the APA.  The Federal Defendants' arguments with respect to Plaintiffs' undue delay and the undue prejudice imposed on the Federal Defendants by Plaintiffs' request are incorporated by reference from the Federal Defendant's opposition letter motion.  *See id.* at 2-4.

mortgage servicers initiated foreclosure proceedings against them that are currently pending; and (3) that—as a condition of submitting Plaintiffs' defaulted mortgage loans for sale through DASP—their original mortgage servicers certified that they had exhausted all Federal Housing Administration ("FHA") loss mitigation options.  *See* First Am. Compl. ("Am. Compl." or "FAC") ¶¶ 117, 118, ECF No. 11; *see also* Fed. Defs.' Mot. to Dismiss ("Fed. Defs.' Br.") at 12-22, ECF No. 56-5.  These admissions are fatal not only to Plaintiffs' ability to demonstrate standing to bring Counts I through IV of their FAC, *see id.*, but also to their ability to demonstrate standing to assert their proposed procedural claim under the APA.

To bring a procedural claim based on the APA, Plaintiffs must first demonstrate that they have standing to assert the claim.  This requires Plaintiffs to show, among other things, that "the particularized injury that [Plaintiffs] [are] suffering or [are] likely to suffer is fairly traceable to the agency action"—in this case, the establishment of DASP—that purportedly required the procedures about which Plaintiffs now complain.  *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 669 (D.C. Cir. 1996).  Put another way, "unless there is a substantial probability that the substantive agency action that disregarded a procedural requirement created a demonstrable risk, or caused a demonstrable increase in an existing risk of injury to the particularized interests of the plaintiff, the plaintiff lacks standing."  *Id.*; *see also Tummino v. Hamburg*, 260 F.R.D. 27, 33 (E.D.N.Y. 2009) ("the mere violation of a procedural right . . . does not permit any and all persons to sue to enforce the right").  Indeed, "the Supreme Court has 'never freed a plaintiff alleging a procedural violation from showing a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to [Plaintiffs'] particularized interest.'"  *Ass'n of Am. Physicians & Surgeons, Inc. v. Food & Drug Admin.*, 539 F. Supp. 2d 4, 20 (D.D.C. 2008) (quoting *Florida Audubon*, 94 F.3d at 664).

Plaintiffs fail to meet this threshold. Plaintiffs complain that they were deprived of the ability to comment on the note sale program but do not "identif[y] a legally protected interest that has been infringed by these alleged procedural shortcomings." *Id.* at 21. As the Federal Defendants explained in their motion to dismiss briefing, *see* Fed. Defs.' Br. at 22-25 (explaining why Plaintiffs' Fifth Amendment due process claim fails as a matter of law), the Supreme Court's decision in *United States v. Neustadt* and the statutory structure and legislative history of the National Housing Act make clear that "'[t]he [FHA] mortgage insurance program was not designed to insure anything other than the repayment of loans made by lender-mortgagee.'" *Id.* (quoting *Neustadt*, 366 U.S. 696, 709 (1961)). "The mortgage insurance relationship [under the National Housing Act and its implementing regulations] [] exists exclusively between the lender and [FHA]." *Bresier v. Golden Nat'l Mortg. Banking Corp.*, 225 F.3d 645, 1 (2d Cir. 2000). Because Plaintiffs lack a legally protected interest in the mortgage insurance relationship between HUD and the FHA-approved mortgage lenders, Plaintiffs lack standing to assert a procedural APA challenge to the note sale program in which HUD pays the accelerated insurance claims of the mortgage lenders. *See Tummino*, 260 F.R.D. at 32-33 ("deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing").

Even if Plaintiffs could show that they have a legally protected interest (which they cannot), their procedural APA claim still would fail because they cannot show "a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to [their] particularized interest." *Ass'n of Am. Physicians & Surgeons*, 539 F. Supp. 2d at 21. Plaintiffs do not dispute that they were headed to foreclosure (depriving them of FHA "benefits") irrespective of whether their defaulted loans were sold through

6

DASP.  As Plaintiffs themselves allege, their original mortgage servicers had already determined and certified to HUD that they had "exhausted all of the FHA's loss mitigation options and determined that there is no home-saving solution." Am. Compl. ¶¶ 117, 118, ECF No. 11.  In other words, the sale of Plaintiffs' defaulted mortgages through DASP could not have deprived Plaintiffs of any alleged FHA "benefits" because Plaintiffs had *already received* what they call the "benefits" of the FHA insurance program: their mortgage servicers had attempted to resolve Plaintiffs' delinquency within the parameters of the FHA program, but those efforts were unsuccessful.  Thus, Plaintiffs cannot show that there is any probability, let alone a substantial probability, that their deprivation of the ability to comment on the note sale program "created a demonstrable risk, or caused a demonstrable increase in an existing risk of injury" to their particularized interests. *Florida Audubon Soc'y*, 94 F.3d at 669.[4]

### B.  Plaintiffs' Ninth Cause of Action is Time-Barred.

This Court lacks jurisdiction over Plaintiffs' procedural APA claim for the additional reason that the claim is time-barred.  Section 2401 "bars actions against the United States that are not brought within six years of the date the cause of action accrued," and applies to challenges to agency action made pursuant to the APA.  *Air India v. Brien*, 261 F. Supp. 2d 134, 137 (E.D.N.Y.

---

[4] Plaintiffs also lack standing because their procedural challenge will not redress their alleged injuries insofar as the terms of their respective mortgage contracts provide the mortgagees the right to foreclose in the event of default.  And it bears mentioning that even if the Court were to find that HUD should have followed the APA's notice-and-comment rulemaking procedures, the appropriate remedy for such a procedural deficiency would be to remand the matter to the agency.  *See Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014).  The appropriate remedy would not be, as Plaintiffs suggest, to unwind years' worth of defaulted mortgage loan sales to third parties, most of whom are not before this Court.  Indeed, to do so would "invit[e] [] chaos," *see Sugar Cane Growers Co-op of Florida v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002), a result that this Court should avoid.  *See also id.* at 97("[t]he egg has been scrambled and there is no way to restore the status quo ante"); *see also Milk Train v. Veneman*, 310 F.3d 747, 756 (D.C. Cir. 2002) (monies distributed three years earlier to dairy producers were not recoverable).

2003); *see also* 28 U.S.C. § 2401(a) ("Every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."). Compliance with § 2401's limitations period "is a jurisdictional predicate for the court's ability to entertain the claim." *Id.* Thus, before this Court decides to allow Plaintiffs to amend their FAC to add a procedural APA claim, it must first determine whether the proposed claim is timely by examining "when that cause of action accrued." *Id.*

Procedural challenges made pursuant to the APA accrue when the agency has published the challenged decision in the Federal Register. *See Air India*, 261 F. Supp. 2d at 138 (explaining that it is "unanimous" that, under § 2401, the cause of action accrues when the final regulation is published in the Federal Register); *see also Sai Kwan Wong v. Doar*, 571 F.3d 247, 263 (2d Cir. 2009) ("In the case of claimed procedural error in the promulgation of a regulation, final agency action occurs upon issuance of the regulation"); *Cedars-Sinai Med. Ctr. v. Shalala*, 177 F.3d 1126, 1129 (9th Cir. 1999) (same). Congress has made the determination that publication in the Federal Register "'is sufficient to give notice of the contents of the document to a person subject to or affected by it,'" *see Air India*, 261 F. Supp. 2d at 138 (citing 44 U.S.C. § 1507). Accordingly, "if a person wishes to challenge a mere procedural violation in the adoption of a regulation or other agency action, the challenge must be brought within six years of [publication in the Federal Register]." *Wind River Mining Corp. v. United States*, 946 F.2d 710, 715 (9th Cir. 1991). Applied here, Plaintiffs' claim accrued in 2002, when HUD published a notice in the Federal Register advising the public of HUD's decision to establish a demonstration program prior to engaging in possible notice-and-comment rulemaking.

Plaintiffs attempt to avoid this jurisdictional obstacle by arguing that their claim is timely because "HUD never published anything in the Federal Register" about DASP affecting them.

Pls.' Br. at 16.  Plaintiffs contend that the demonstration that HUD established in 2002 and noticed in the Federal Register is "distinct" from the "Note Sale Program" about which they now complain. *Id.*  Plaintiffs argue that, as a result, their notice-and-comment claim did not accrue "until Federal Defendants actually injured them by selling their mortgage notes in 2014."  Pls.' Br. at 12.  This argument fails for several reasons.

### 1. Plaintiffs' APA claim is untimely because HUD published notice of the challenged note sale program in the Federal Register in 2002.

First, contrary to Plaintiffs' claim, the demonstration program for which HUD published a notice in 2002 is not "distinct" from the note sale program that Plaintiffs claim began in 2010.[5] Rather, since 2002, HUD has utilized its demonstration authority under 12 U.S.C. § 1701z-1, 12 U.S.C. § 1715b, and 42 U.S.C. § 3535(d) to employ alternative disposition methods under 12 U.S.C. § 1710(g) to determine the most efficient and effective means to pay accelerated mortgage insurance claims and dispose of the defaulted mortgage loans on terms and conditions that the agency may prescribe.  To that end, on February 5, 2002, HUD published a "Notice of FHA Accelerated Claim Disposition Demonstration" describing the agency's proposed demonstration program and inviting public comment by April 8, 2002.  *See* 67 Fed. Reg. 5418 (Feb. 5, 2002). The notice explained the purpose and scope of the demonstration program.  For example, the 2002 notice announced that the demonstration would include mortgages secured by properties in New York.  *See id.*  The 2002 notice also explicitly stated the experimental nature of the demonstration, *see id.* ("HUD may well decide at a future date to expand the scope of the ACD demonstration to

---

[5] Plaintiffs' argument is premised on its legal conclusion that "the demonstration program and Note Sale Program are distinct." Pls.' Br. at 13.  It is well-settled law, however, that this Court need not assume as true legal conclusions set forth in either Plaintiffs' FAC or in their motion for leave to amend their FAC.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 717 (2d Cir. 2013).

include one or more additional HOCs."), and delineated what the agency hoped to assess by conducting the demonstration:

> At the conclusion of the ACD Demonstration, HUD will assess its success and determine whether to implement the ACD process on a permanent basis throughout the country. In conducting this evaluation, HUD will assess such factors as whether the use of the ACD process will: (1) Reduce loss rates; (2) reduce the cost and time associated with claim dispositions; (3) enhance the ability of HUD to assess risk and manage the FHA mortgage insurance fund.

*Id.* at 5419-20. The 2002 notice also explained that "[t]he ACD demonstration will be designed to permit ongoing review of these and other factors that HUD considers necessary for an accurate evaluation of the demonstration's success." *Id.* at 5420. Consistent with its stated objective to determine whether and how to implement the demonstration program permanently, HUD conducted approximately 17 sales of defaulted single family mortgage loans between 2002 and 2016.[6]

### 2. HUD's 2006 publication of the Advance Notice of Proposed Rulemaking is not evidence of the agency's intent to create a new note sale program.

Plaintiffs zero in on HUD's publication of a June 2006 ANPR in the Federal Register, *see* 71 Fed. Reg. 32392 (June 5, 2006), arguing that HUD ended its demonstration program in 2005 and began a new note sale program in 2010. According to Plaintiffs, "[b]y publishing this advanced notice of proposed rulemaking in 2006, HUD confirmed that the demonstration program was finished and that it was contemplating a new, nationwide program," the latter of which began in 2010. Pls.' Br. at 14. But this argument is belied by the June 2006 Federal Register notice itself and misunderstands the preliminary (and non-binding) nature of the ANPR.

As an initial matter, the ANPR does not state that HUD intends either to terminate the demonstration that it began in 2002 or to initiate a new demonstration at some future date. The

---

[6] *See* https://www.hud.gov/program_offices/housingcomp/asset/sfam/sfls.

ANPR simply requested public comment on certain issues including whether alternative disposition methods, such as whole loan sales "involving the disposal of a portfolio of assets to the highest bidder," would be more effective.  *See* 71 Fed. Reg. at 32392-32393.  The ANPR sought comment on this and other issues related to the disposition of defaulted mortgage loans as a preliminary step towards a possible future rulemaking process.  *See id.* ("solicit[ing] comments on HUD's Accelerated Claim and Disposition (ACD) program *before* HUD proceeds to issue a *proposed rule that will commence the rulemaking process* that will result in codification of the requirements for the ACD program, thus making the ACD program a permanent part of HUD's single family mortgage insurance programs" (emphasis added)).

HUD ultimately withdrew the ANPR less than a year later, *see* 72 Fed. Reg. 22694 (Apr. 30, 2007).  HUD's decision to do so only evidences the agency's decision to continue the demonstration by pursuing additional modifications, rather than moving forward with a proposed rule.  Indeed, as Plaintiffs themselves acknowledge, the 2006 ANPR is not "not final agency action," *see* Pls.' Br. at 16, and thus not binding on anyone including the agency.  *See Consumer Fed'n of Am. v. Consumer Prod. Safety Comm'n*, 990 F.2d 1298, 1305 (D.C. Cir. 1993).[7]

### 3.  HUD was not required under 42 U.S.C. § 3542 to provide notice of changes it made to the demonstration.

Plaintiffs' argument seems to rest on the mistaken assumption that any changes or modifications that HUD made to the note sale program in 2010 created a new program for which HUD failed to provide notice.  *See* Pls.' Br. at 13-15.  As explained in detail below, however, once

---

[7] Even assuming *arguendo* that the ANPR had some legal effect, the very latest the procedural claim might have accrued is April 2007, when HUD published notice of its decision to withdraw the ANPR, thus maintaining the evolving demonstration instead of proceeding to notice-and-comment rulemaking under a "new" program.  *See* 72 Fed. Reg. 22694 (April 30, 2007).  But even under this theory, Plaintiffs' claim would have expired in 2013 at the latest, three years before Plaintiffs filed their FAC and four years before Plaintiffs filed the pending motion to amend the FAC.

HUD published the 2002 notice and provided a 60-day public comment period, HUD had satisfied its procedural obligations under 42 U.S.C. § 3542, thereby allowing the agency to continue the demonstration "on the terms and conditions [the agency] prescribes."  12 U.S.C. § 1710(g).  This is consistent with the experimental nature of demonstrations, which provide agencies with the necessary flexibility to evaluate and modify programs before codifying them.  *See Spry v. Thompson*, Civ. No. 03-121-ST, 2003 WL 23411996, at * 3 (D. Or. Dec. 8, 2003) (explaining that the Social Security Act permits the Secretary of Health and Human Services to waive certain Medicaid requirements in the context of state Medicaid demonstration projects "to provide the flexibility needed to enable states to try new or different approaches and cost-effective delivery of health care services").

Section 1701z-1's demonstration authority and § 3542's procedures reflect Congress's intent to provide HUD flexibility in determining the most effective and efficient manner to dispose of defaulted mortgage loans and pay the accelerated insurance claims of participating FHA-approved mortgage lenders under 12 U.S.C. § 1710.  The agency must account for dynamic economic conditions and collect sufficient data to make informed assessments and improvements to its processes.  *See, e.g.*, *C.K. v. New Jersey Dep't of Health & Human Servs.*, 92 F.3d 171, 177 (3d Cir. 1993) (observing that Secretary's ability to waive certain Medicaid requirements "enable[s] individual states to test reforms to their [Aid to Families with Dependent Children] AFDC program through 'demonstration projects'").  It is for this reason that HUD has found it necessary and appropriate to continue the demonstration to determine the most effective means of maximizing returns to the insurance fund, in fulfillment of the agency's statutory obligation to protect the fund.  *See* 12 U.S.C. § 1708(a)(3); *see also id.* § 1711(f).  This is precisely what HUD has done with the note sales that it has conducted since it established the demonstration in 2002.

12

And as the procedural requirements of § 3542 make clear, the agency is free to tweak and make other adjustments to the demonstration program, including cosmetic changes to the program's name (*see supra* at 3 n.2), without publishing additional notices in the Federal Register.

> **4. The July 2017 Inspector General Report supports HUD's position that the 2010 note sale is simply a continuation of the demonstration that the agency has conducted since 2002.**

The July 2017 Inspector General ("IG") Report does not compel a different conclusion. Plaintiffs' argument that "HUD's Inspector General agrees that the note sale program and the earlier demonstration program are distinct" is belied by the IG's report. The report expressly observes that "[a]fter a nearly 5-year *pause*, HUD *continued* the note sales program, referring to it as the Single Family Loan Sales (SFLS) program."[8] *See* Second Am. Compl., Ex. A at 3 (emphasis added). Thus, contrary to Plaintiffs' arguments otherwise, the 2002 ACD demonstration and the 2010 note sale program (and, later, DASP) are not "distinct" programs. Rather, sales of defaulted mortgage loans since 2010 are simply a continuation of the 2002 demonstration for which HUD provided Federal Register notice as required by 42 U.S.C. § 3542, with modifications as a result of "ongoing review." All of these defaulted mortgage loan sales have been conducted pursuant to the same authority at 12 U.S.C. § 1710, as amended by the FY 1999 Appropriations Act, Pub. L. No. 105-276.

In an effort to avoid this conclusion, Plaintiffs advance two arguments, neither of which has any merit. First, Plaintiffs argue that the Court should find that their cause of action accrued "when HUD took final agency action that *injured them*." Pls.' Br. at 17 (emphasis in original). But as explained above, it is well-settled that procedural challenges made under the APA accrue

---

[8] Contrary to Plaintiffs' contention, *see* Pls.' Br. at 19, there is nothing "ambiguous," about this statement in the IG's report. If the IG shared Plaintiffs' view that the demonstration program ended in 2005, the report would not have referred to a "pause" in the program that then "continued" under a new name. *See* Second Am. Compl., Ex. A at 3.

when the agency publishes the challenged action in the Federal Register, *see Sai Kwan Wong*, 571 F.3d at 262-63, and this is a "jurisdictional condition attached to the government's waiver of sovereign immunity, and as such must be strictly construed," *see Spannaus v. U.S. Dep't of Justice*, 824 F.2d 52, 55 (D.C. Cir. 1987).

Plaintiffs next assert that their claim is timely because "[t]he first time HUD took final agency action under the Note Sale Program was September 22, 2010—the date of the first Note Sale Program," and thus under Rule 15(c)'s "relation back" doctrine, their procedural challenge under the APA "relates back" to their original complaint, which was filed in 2016. Pls.' Br. at 17-18. There are two flaws in this argument. As an initial matter (and as explained above, *see supra* 8-13), the relation-back doctrine does not make their APA claim timely because the claim accrued in 2002. As stated above, the 2010 sale is a mere continuation of HUD's demonstration established in 2002; this conclusion is unavoidable given that both the joint venture and whole note sales have been conducted pursuant to the same statutory authority, *see* 12 U.S.C. § 1710, as amended by section 601 of the Fiscal Year 1999 Department of Veterans Affairs and Housing and Urban Development and Independent Agencies Appropriations Act, Pub. L. No. 105-276. In other words, any procedural challenge to the note sale program accrued in 2002, not 2010.

And even if the 2010 note sale program could be construed to be "distinct" from the 2002 ACD demonstration (and the note sales conducted by HUD during the years in between), such that Plaintiffs' claim accrued in 2010 as they argue, the relation-back doctrine does not apply because the APA claim relies upon an "entirely distinct set" of facts from those at issue in the FAC. "Claims that are based on an 'entirely distinct set' of factual allegations will not relate back." *Slayton v. Am. Express Co.*, 460 F.3d 215, 228 (2d Cir. 2006) (internal citation omitted). Plaintiffs' argument that their FAC put the Federal Defendants on "notice" of their procedural challenge to

the note sale program, and that their proposed claim merely "add[s] a 'new legal theory applied to the same facts set out in the earlier pleading,'" *see* Pls.' Br. at 18 (internal citation omitted), is belied by Plaintiffs' own admission that their "notice-and-comment challenge has little to do with housing discrimination, or any other subject to which the Fair Housing Act is addressed," *see id.* at 9, which is the focus of the allegations in their FAC. *See, e.g.*, Am. Compl. ¶¶ 1, 10-11, 84-85, 94-97, 183-93, 316-413.

Accordingly, Plaintiffs' procedural challenge is time-barred.  Because HUD published notice of the demonstration in 2002, including its application to defaulted mortgage loans in New York (the state in which Plaintiffs currently reside) and sought comment on the same as required under § 3542, *see* 67 Fed. Reg. at 5418, Plaintiffs' procedural challenge under the APA expired in 2008.  For these reasons, the Court should find that it would be futile to permit Plaintiffs to amend their FAC.  Alternatively, the claim should be dismissed for lack of jurisdiction.

### C.  Plaintiffs' Ninth Cause of Action Fails As A Matter of Law.

Underlying Plaintiffs' proposed ninth cause of action is their erroneous assumption that the establishment of note sale program (or DASP) is subject to the procedural requirements of the APA.  Plaintiffs' claim is flawed for at least two reasons.  First, Congress authorized HUD to conduct demonstrations, *see* 12 U.S.C. § 1701z-1, and delineated the procedures with which HUD must comply to conduct a demonstration, *see* 42 U.S.C. § 3542.  Since 2002, HUD has conducted a demonstration to determine whether and how to permanently implement its discretionary authority under 12 U.S.C. § 1710 to pay accelerated mortgage insurance claims upon assignment of defaulted mortgage loans, and to dispose of the same on such terms and conditions as HUD may prescribe.

Second, even if Congress had not expressly delineated the procedures with which HUD must comply to conduct a demonstration program such as the one challenged here, DASP still would not be subject to the APA's procedural requirements because it is not "agency action" within the meaning of the APA.  Either of these reasons is a sufficient basis to find that it would be futile to allow Plaintiffs to amend their FAC to add the proposed ninth cause of action, or, in the alternative, a reason to dismiss the ninth cause of action for failure to state a claim.

### 1. Congress has specified the procedures with which HUD must comply when establishing a demonstration program such as DASP.

HUD was not required to follow the APA's notice-and-comment procedures in order to establish DASP because Congress expressly delineated the type of procedures with which HUD must comply where, as here, it exercises its authority to conduct a demonstration program not expressly authorized by another statute.  *See generally* 42 U.S.C. § 3542(a).  And there is no dispute, *see* Pls.' Br. at 2, that HUD fulfilled its procedural obligations under 42 U.S.C. § 3542 when, in 2002, HUD established a demonstration to determine whether and how to permanently implement its discretionary authority under 12 U.S.C. § 1710 to pay accelerated mortgage insurance claims upon assignment of defaulted notes, and to dispose of those defaulted notes on such terms and conditions as HUD may prescribe.  *See* 67 Fed. Reg. at 5418; *see also* 67 Fed. Reg. 66038 (Oct. 29, 2002).  And although 42 U.S.C. § 3542 does not require such publication, HUD published a second notice in the Federal Register later that year responding to public comments. *Id.*

Plaintiffs do not dispute that HUD initiated a demonstration program in 2002.  They argue instead that the demonstration ended in 2005, and that HUD began a new, permanent program in 2010 when it adopted a new disposition method.  In support of this argument, Plaintiffs rely on the publication of the ANPR in 2006, as well as the geographic expansion of the program and the

switch from joint venture to whole note sales beginning in 2010.  However, none of these actions expresses an intent by HUD to end the demonstration and codify a permanent program.  Indeed, HUD has never stated that it has terminated the demonstration.  Publishing an ANPR is "a generalized and tentative undertaking" that precedes the initiation of potential notice-and-comment rulemaking.  *Consumer Fed'n of Am.*, 990 F.2d at 1304.  The 2006 ANPR did not state that HUD was terminating the demonstration and initiating rulemaking.  Quite the opposite, the ANPR explains that "HUD believes that improvements can be made to the program to make it more effective. Consequently, *before* proceeding with the regulatory codification of the ACD program, HUD is soliciting comments from all interested parties."  71 Fed. Reg. 32392 (emphasis added).  The ANPR was thus a preliminary step to gather additional information "before HUD proceeds to issue a proposed rule that will commence the rulemaking process that will result in codification for the ACD program, thus making the ACD program a permanent part of HUD's single family mortgage insurance programs."  *Id.*  The ANPR even solicits comments on whether alternative disposition methods, such as whole note sales "involving the disposal of a portfolio of assets to the highest bidder," would be more effective.  *Id.* at 32392-32393.  To that point, after withdrawing the ANPR effective March 1, 2007, *see* 72 Fed. Reg. 22694 (Apr. 30, 2007), in subsequent years HUD modified the demonstration to conduct whole note sales.

Neither the publication nor the withdrawal of the ANPR affected HUD's statutory authority under 12 U.S.C. § 1701z-1, 42 U.S.C. § 3535(d), and 12 U.S.C. § 1715b to continue to operate the demonstration to implement its authority to sell personal property on the terms and conditions it prescribes.[9]  12 U.S.C. § 1710(g); *Consumer Fed'n of Am.*, 990 F.2d at 1305 (review of agency's

---

[9] It is worth noting that Congress has not required rulemaking as a precondition for HUD to exercise its accelerated claim payment disposition authority.  By statute enacted in 1998, Congress authorized HUD to "pay insurance benefits" upon assignment of mortgages in

decision not to issue new regulation entitled to greater deference than decision to promulgate, rescind, or amend existing regulation because non-promulgation does not "alter the regulatory status quo") (quoting *Williams Natural Gas Co. v. FERC*, 872 F.2d 438, 442-43 (D.D.C. 1989). Consistent with the continuation of the demonstration, HUD decided to pursue the alternative disposition method of whole note sales beginning in 2010. But the adoption of an alternative disposition method only confirms that HUD was continuing to experiment with the demonstration to determine the most effective process before adopting permanent regulations. Indeed, the demonstration had always contemplated alternative methods other than joint venture sales. *See, e.g.,* 67 Fed. Reg. at 66038. Likewise, although HUD expanded the geographic scope of the demonstration, the agency had always contemplated such an expansion. Neither of these changes triggered a legal requirement to permanently codify the program. *See id.* Accordingly, HUD has continuously operated this demonstration since 2002, making numerous enhancements based upon experience and changes in economic conditions.

Plaintiffs' assertion that HUD was required to follow the APA's notice-and-comment requirements (5 U.S.C. § 553)[10] before implementing DASP ignores the fact that Congress has

---

monetary default for not less than three months, and to "sell . . . [such] personal property acquired by the Secretary pursuant to the provisions of this Act on such terms and conditions as the Secretary may prescribe." 12 U.S.C. § 1710(a)(1)(A) & (g). In contrast to other sections of the statute such as the section requiring the Secretary to prescribe loss mitigation requirements in regulations, *see* 12 U.S.C. § 1715u(a), § 1710(g) does not make the Secretary's authority contingent upon the prior promulgation of regulations prescribing the terms and conditions of sale. *See* 12 U.S.C. § 1715u(a) ("[M]ortgagees shall engage in loss mitigation actions . . . as provided in regulations by the Secretary."); *see also Rodriguez v. United States*, 480 U.S. 522, 525 (1987) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotations omitted); *Gully v. NCUA Bd.*, 341 F.3d 155, 164 (2d Cir. 2003). Thus, at all times HUD has had discretionary authority to conduct the note sales, and there is no basis to vacate the sales.

[10] By its own terms, § 553 does not apply "to the extent that there is involved . . . (2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or

already specified, in separate statutory provisions, the requirements for HUD's implementation of a demonstration program, such as DASP.  Notice-and-comment procedures apply only to agency rulemakings, *see* 24 C.F.R. § 10.1; *see also* 5 U.S.C. § 553(b)-(c).  These requirements do not bear on the type of procedures necessary to provide notice of a demonstration, particularly where, as here, Congress has delineated the manner and form of notice HUD must provide to conduct a demonstration like DASP.  *See Asiana*, 134 F.3d 393, 398-99 (D.C. Cir. 2010) (holding that "to the extent that § 43501 [of the Federal Aviation Reauthorization Act] specified [different notice procedures], the FAA was not required to conform to APA § 553 procedures").  To hold otherwise would render the procedures governing notice of demonstration set forth in § 3542 entirely superfluous.  *See United States v. Walsh*, 156 F. Supp. 3d 374, 385 (E.D.N.Y. 2016) (it is "one of the most basic interpretative canons that a statute should be construed so that effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or insignificant") (internal quotation marks and citation omitted).  This Court should avoid such a result by upholding HUD's exercise of demonstration authority under § 3542, without imposing additional requirements not prescribed by Congress.[11]

---

contracts."  5 U.S.C. § 553(a).  Nonetheless, HUD has promulgated a rule providing that "[i]t is the policy of the Department of Housing and Urban Development to provide for public participation in rulemaking with respect to all HUD programs and functions, including matters that relate to public property, loans, grants, benefits, or contracts even though such matters would not otherwise be subject to rulemaking by law or Executive policy."  24 C.F.R. § 10.1.  Thus, even if HUD decided to codify the demonstration through permanent, notice-and-comment rulemaking, such rulemaking would be subject to HUD's regulations at 24 C.F.R. part 10.

[11] Similarly, Congress has authorized HUD to conduct a demonstration to inform the possible future codification of a permanent program through eventual notice-and-comment rulemaking. 12 U.S.C. § 1701z-1.  And Congress has authorized HUD to "make such rules and regulations *as may be necessary to carry out his functions, powers, and duties*."  42 U.S.C. § 3535(d) (emphasis added); *see also* 12 U.S.C. § 1715b.  Because HUD is authorized to conduct a demonstration, no rules or regulations are "necessary to carry out [this] function[]" while HUD experiments with the process.  *Id.*

Nor is the demonstration a "substantive rule." As a threshold matter, the demonstration consists of a series of actions, and therefore is not a "rule" within the meaning of the APA, which defines the term as "a *statement* of general or particular application and future effect." *See* 5 U.S.C. § 551(4); *see also infra* at 22-24.   Plaintiffs claim that the note sale program either "effects a substantial change in existing law or creates new law, rights, or duties." *See* Pl. Br. at 9.  Plaintiffs are wrong.  It was *Congress* that gave HUD the authority to pay insurance claims upon assignment and to dispose of such assigned loans on terms and conditions as HUD may prescribe.  12 U.S.C. § 1710; *see also* 42 U.S.C. § 3535(i)(3).  Nor does the demonstration create any new legal rights or duties for participating mortgage lenders because it is simply a voluntary program that offers FHA-approved mortgage lenders an alternative insurance claim payment method, and a disposition method that allows eligible mortgagees who elect to participate in the demonstration the opportunity to bid on pools of defaulted mortgage loans.  This is further underscored by the fact that it the FHA mortgage insurance program creates "'no legal relationship between the FHA and the individual mortgagor.'"  Fed. Defs.' Br. at 25 (quoting *Neustadt*, 366 U.S. at 709).  In other words, Plaintiffs have no "rights or duties" that flow from the FHA mortgage insurance program. *See id.*  Indeed, Plaintiffs do not dispute that they have defaulted on their mortgage loans and that as a result, their original mortgage lenders have determined that there are no viable loss mitigation options that would result in home retention.  *See id.* at 14.

Finally, the regulations at 24 C.F.R. part 291 and the notice of demonstration published in October 2002 both provide that HUD may pursue other methods of disposition, which HUD may decide to codify at part 291 if HUD determined that such a method or methods should be used permanently to maximize returns to the insurance fund.  *See, e.g.,* 24 C.F.R. § 291.90(e) ("HUD may select any other methods of sale, as determined by the Secretary."); "Disposition of HUD-

Acquired Single Family Property; Final Rule," 64 Fed. Reg. 6470, 6471 (Feb. 9, 1999) ("HUD

will amend section 291.90 in the event that HUD determines to use a different sales method "more

frequently than originally anticipated," and in the interim will use "appropriate methods, which

may include bid materials, the internet, and other methods," to notify the public of "sales methods"

for "any given disposition of single family properties.").  Thus, from 2002 through the present,

HUD has been exercising its demonstration authority to determine the most effective method of

disposition that will maximize returns to the insurance fund.  As a result, Plaintiffs' proposed ninth

cause of action should be denied as futile or dismissed for failure to state a claim for which relief

can be granted.

### 2.   DASP is not "agency action" within the meaning of the APA.

Section 704 of the APA limits judicial review to "final agency action" and defines "agency

action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the

equivalent or denial thereof, or failure to act."  5 U.S.C. § 704.  "This definition is divided into

three parts 'beginning with a list of five categories of decisions made or outcomes implemented

by an agency—agency rule, order, license, sanction, or relief.'"  *Am. Civil Liberties Union v. Nat'l

Sec. Agency*, 493 F.3d 644, 678 (6th Cir. 2007) (quoting *Norton v. S. Utah Wilderness Alliance*,

542 U.S. 55, 62 (2004) ("*SUWA*")). "All of these categories involve *circumscribed, discrete

agency actions*, as their [statutory] definitions make clear. . . ."  *SUWA*, 542 U.S. at 62 (emphasis

in original).  Thus, as relevant here, the APA defines "rule" as "'an agency statement of . . . future

effect designed to implement, interpret, or prescribe law or policy.'"  *Id.* (quoting 5 U.S.C. §

551(4)).  "The second part of the 'agency action' definition—'the equivalent or denial thereof'—

must be a discrete action or the denial of a discrete action, otherwise it would not be equivalent to

the five listed categories."  *Am. Civil Liberties Union*, 493 F.3d at 678 (quoting *SUWA*, 542 U.S.

at 62). Finally, the third "part of the definition—a 'failure to act'—is 'properly understood as a failure to take an agency action.'" *Id.* Put another way, "the APA's definition of agency action focuses on an agency's *determination* of rights and obligations, whether by rule, order, license, sanction, relief, or similar [discrete] action." *Village of Bald Head Is. v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013).

DASP does not fit within the scope of any of these five discrete agency actions. Rather, DASP is a mechanism for FHA-approved mortgage lenders holding eligible defaulted mortgage loans to assign the defaulted mortgage loans to HUD in exchange for an insurance payment. Plaintiffs argue that DASP is a "substantive rule" subject to the APA's procedural requirements because it is an "agency *action* of general applicability that effects a substantial change in existing law or policy or creates new law, rights, or duties." *Id.* at 9 (emphasis added). The flaw in Plaintiffs' argument is that it relies on a statutory definition of "rule" that is their own (not Congress's) creation. The APA defines a "rule as a '*statement* of general or particular applicability or future effect designed to implement, interpret, or prescribe law or policy.'" Pls.' Mot. at 4 (quoting 5 U.S.C. §§ 551(4), (5)) (emphasis added). Tellingly, Plaintiffs' motion fails to cite to any *statement* of general or particular applicability or future effect related to DASP that could be construed as a "substantive rule" within the meaning of the APA, *see id.* at 4-6, 9-10. That is because DASP is not a rule, nor is it any of the other four discrete "agency actions" subject to judicial review under the APA.

The Sixth Circuit's decision in *American Civil Liberties Union v. National Security Agency* ("*ACLU v. NSA*") analyzes the distinction between discrete agency actions subject to judicial review under the APA and broad programmatic conduct that is not. 493 F.3d 644 (6th Cir. 2007). In that case, plaintiffs challenged NSA's practice of obtaining certain data by intercepting

telephone and email communications with certain foreign individuals without a warrant.  Among other claims, plaintiffs argued that this practice constituted a program that was contrary to law under the APA.  The Sixth Circuit reversed the district court's grant of summary judgment for plaintiffs.

As relevant here, plaintiffs' claim was unreviewable because it did not challenge an "agency action" within the meaning of the APA.  The APA's definition of "agency action" lists five categories—rule, order, license, sanction, and relief— that "'involve *circumscribed, discrete agency actions*.'"  *Id.* at 678 (quoting *SUWA*, 542 U.S. at 62) (emphasis in original).  "Plaintiffs are not complaining of 'agency action' as defined by the APA" but are instead challenging "the NSA's warrantless interception of overseas communications, the NSA's failure to comply with [the Foreign Intelligence Surveillance Act ("FISA")]'s warrant requirements, and the NSA's presumed failure to comply with FISA's minimization procedures."  *Id.*  "This is conduct, not 'agency action'" and "there is no authority to support the invocation of the APA to challenge generalized conduct."  *Id.*  And as relevant here, "plaintiffs do not complain of any NSA rule or order, but merely the generalized practice, which . . . was not formally enacted pursuant to the strictures of the APA."  *Id.* at 679.  Accordingly, the Sixth Circuit dismissed plaintiffs' APA challenge, reasoning that plaintiffs are not "challenging any sort of 'circumscribed, discrete' action" but instead "are seeking to invalidate or alter the NSA's generalized practice of wiretapping certain overseas communications without warrant."  *Id.*

The Sixth Circuit's reasoning in *ACLU v. NSA* applies equally to Plaintiffs' proposed notice-and-comment challenge to HUD's payment of accelerated claims upon assignment of defaulted mortgage loans and disposition of the same.  Plaintiffs' proposed claim does not, as they

argue, challenge a "discrete" rule issued by HUD.[12]  To the contrary, Plaintiffs seek to invalidate the general agency practice of paying insurance claims upon assignment of certain defaulted mortgage loans from FHA-approved mortgage lenders and disposing of those defaulted loans through note sales.  *See Village of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013) (emphasis added) (explaining that "the term 'action' as used in the APA is a term of art that does not include all conduct such as, for example, constructing a building, *operating a program*, or performing a contract" (emphasis added)).

Because plaintiffs are not challenging any agency statement of general or particular application and future effect, but rather a *process* by which the agency pays insurance claims upon assignment of defaulted mortgage loans and subsequently disposes of the same, Plaintiffs do not challenge an agency action within the meaning of the APA.  Accordingly, their ninth cause of action for failure to follow APA notice-and-comment rulemaking procedures must be denied as futile or dismissed for failure to state a claim upon which relief may be granted.

---

[12] Plaintiffs' procedural claim fails for the additional reason that DASP does not constitute "*final agency action*" within the meaning of the APA.  "'As a general matter, two conditions must be satisfied for an agency action to be final.  First, the action must mark the consummation of the agency's decisionmaking process.  And second, 'the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'"  *ACLU*, 493 F.3d at 679 n.37 (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).  As the Sixth Circuit explained in concluding that NSA's operation of the Terrorist Surveillance Program is not *final* agency action within the meaning of the APA, "the NSA's wiretapping does not consummate any sort of agency decisionmaking process nor does it purport to determine the rights or obligations of others."  *Id.*  So too it is with DASP.  DASP is not the "consummation" of HUD's decision-making process.  And as far as Plaintiffs are concerned, as discussed above, the FHA mortgage insurance program does not confer them any legal rights.  Through DASP, HUD is simply taking assignment and disposing of defaulted mortgage loans, the vast majority of which were already headed toward foreclosure.

**CONCLUSION**

For the foregoing reasons and those set forth in the Federal Defendants' opposition letter, the Court should deny Plaintiffs' motion for leave to amend their FAC as futile.  In the alternative, the Court should dismiss Plaintiffs' ninth cause of action.


Dated: January 19, 2018                          Respectfully submitted,

                                                 CHAD A. READLER
                                                 Acting Assistant Attorney General

RICHARD P. DONOGHUE                              LESLEY R. FARBY
United States Attorney                           Assistant Branch Director
Eastern District of New York


ELLIOT M. SCHACHNER                              By: *Tamra T. Moore*
Assistant United States Attorney                 TAMRA T. MOORE
Eastern District of New York                     Trial Attorney
                                                 United States Department of Justice
                                                 Civil Division – Federal Programs Branch
                                                 20 Massachusetts Avenue, N.W.
                                                 Washington, DC  20530
                                                 (202) 305-8628

                                                 *Attorneys for the Federal Defendants*

25